**EXHIBIT A**

DANIEL M. HAWKE
ELAINE C. GREENBERG
AMY J. GREER
DAVID S. HOROWITZ
BRENDAN P. MCGLYNN
JACK C. EASTON
TAMI S. STARK (TS-8321)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Telefax: (215) 597-2740


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                                             :
SECURITIES AND EXCHANGE COMMISSION,        :
                                                             :
                                Plaintiff,                   :
                                                             :
                        v.                                   :       Civil Action No.
                                                             :       07 CV 6072
SIMPSON CAPITAL MANAGEMENT, INC.,           :
ROBERT A. SIMPSON and                          :
JOHN C. DOWLING,                               :
                                                             :
                                Defendants.             :
_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as

follows:

## SUMMARY

1.      Between May 2000 and September 2003, defendant Robert A. Simpson, the

President and founder of defendant Simpson Capital Management, Inc. ("Simpson

Capital"), a hedge fund manager, and defendant John C. Dowling, Simpson Capital's head

trader, conducted a fraudulent scheme involving unlawful "late trading" in shares of mutual funds. Late trading refers to placing orders to buy, redeem, or exchange mutual fund shares after the 4:00 p.m. Eastern Time ("ET") market close while still receiving the current day's mutual fund price, or net asset value ("NAV"). The late trader obtains an advantage – at the expense of the other shareholders of the mutual fund – when he learns of market moving information and is able to purchase (or redeem) mutual fund shares at prices set *before* the market moving information was released.

2.      Defendant Simpson Capital is the investment adviser to a hedge fund complex consisting of a master fund, Simpson Master Investments, Ltd., which makes investments on behalf of two hedge funds, Simpson Partners, L.P. and Simpson Offshore, Ltd. (collectively, the "Simpson Funds"). Between May 2000 and September 2003, Simpson Capital, through Simpson and Dowling, used five separate introducing broker-dealers to place more than 10,700 trades in over 375 mutual funds after 4:00 p.m. ET, and improperly received the current day's NAV.

3.      Defendants' late trades were part of a profitable investment strategy that depended for its success on the implementation of mutual fund trading based on post-4:00 p.m. market information. By engaging in late trading, defendants profited from market events that occurred after 4:00 p.m. but were not reflected in the price they paid for the shares.

4.      Defendants, by fraudulently late trading in the manner described in this Complaint, realized approximately $57 million in ill-gotten gains for the Simpson Funds, and caused corresponding harm to innocent shareholders in the affected mutual funds, by diluting the value of their shares. That is, by receiving prices they were not entitled to,

defendants' late trading resulted in a transfer of $57 million from the mutual funds and their shareholders to the Simpson Funds.

5.     Defendant Simpson was an investor in the Simpson Funds, and Simpson Capital, which he owns, received management and performance fees.  As a result of the fraudulent trading, Simpson personally earned at least $19 million in fees and profits. Defendant Dowling received more than $996,000 in salary and bonuses during the time the defendants conducted the late trading scheme.

6.     By knowingly or recklessly engaging in the conduct described in this Complaint, defendants Simpson Capital, Simpson and Dowling violated, and unless restrained and enjoined by this Court will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

7.     The Commission brings this action seeking to permanently enjoin the defendants from engaging in the wrongful conduct alleged herein.  The Commission also seeks a final judgment ordering the defendants to disgorge any ill-gotten gains and to pay prejudgment interest thereon, and ordering the defendants to pay civil money penalties.

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)], to enjoin such acts, practices, and courses of business; obtain disgorgement, prejudgment interest and civil penalties; and for other appropriate relief.

9.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.    Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means and instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

11.    Simpson Capital Management, Inc., located in New York, New York, was founded by Robert A. Simpson in 1998, and is the investment adviser to two hedge funds: Simpson Partners, L.P. ("Simpson Partners") and Simpson Offshore, Ltd. ("Simpson Offshore"). Simpson is the sole owner of Simpson Capital. Between May 2000 and September 2003, Simpson Capital received compensation, in the form of advisory and performance fees, from the Simpson Funds in exchange for advising them on which securities to buy and sell. Simpson Capital has never been registered with the Commission in any capacity.

12.    Robert A. Simpson, age 46, resides in New York, New York. He is the founder, President, and Chief Investment Officer of Simpson Capital. Simpson manages and directs the operations of the firm and, at all relevant times, was primarily responsible for all investment and trading decisions. In addition to owning Simpson Capital, Simpson is also an investor in the Simpson Funds.

13.    John C. Dowling, age 41, resides in New York, New York. From November 2000 to the present, Dowling has been employed with Simpson Capital as its head trader. At all relevant times, Dowling was responsible for research and daily trading execution at Simpson Capital.

## RELATED ENTITIES

14.     Simpson Master Investments, Ltd. ("Simpson Master"), a Cayman Islands company, was established in 1998 to invest in securities as a master-feeder fund for Simpson Partners and Simpson Offshore.  Under this structure, Simpson Partners and Simpson Offshore invested substantially all of their assets in Simpson Master.  During the time of the conduct alleged in this Complaint, Simpson, together with several relatives, owned approximately 18 percent of the assets in the hedge funds.  From January 2000 to December 2003, the assets under management in the Simpson Funds ranged from $128.7 to $242.6 million.

15.     Simpson Partners, L.P. was incorporated in New York in 1994.  As of August 2003, in addition to Simpson and his family, Simpson Partners had 29 investors.  As of December 31, 2003, Simpson Partners had a 79.2 percent interest in Simpson Master.

16.     Simpson Offshore, Ltd. was incorporated in the Cayman Islands in 1998 as a tax-exempt entity.  As of August 2003, Simpson Offshore had 27 investors.  As of December 31, 2003, Simpson Offshore had a 20.8 percent interest in Simpson Master.

## FACTS

### Background – Late Trading

17.     The price of a mutual fund's shares is based on the value of the securities (and other assets) held by the mutual fund, and each fund is required by the Commission's regulations to calculate the value of the fund's holdings, or NAV, each trading day. Generally, the funds in which the Simpson Funds traded calculated the prices of their shares as of the close of the major United States securities exchanges and markets (4:00 p.m. ET).

18.     Rule 22c-1(a), [17 C.F.R. § 270.22c-1], adopted pursuant to Section 22(c) of the Investment Company Act of 1940, [15 U.S.C. § 88a-22(c)], requires any registered investment company issuing redeemable securities, its principal underwriter, any dealers in its shares, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem. The mutual funds in which the Simpson Funds traded were registered investment companies subject to Rule 22c-1(a).

19.     Mutual funds generally determine the NAV of mutual fund shares as of 4:00 p.m. ET. Accordingly, orders received by the entities identified in Rule 22c-1 before 4:00 p.m. must be executed at the price determined as of 4:00 p.m. that day. Orders received by these entities after 4:00 p.m. must be executed at the price determined as of 4:00 p.m. the next trading day.

20.     "Late trading" refers to the practice of placing orders to buy or redeem mutual fund shares after the time as of which a mutual fund has calculated its NAV (usually as of the close of trading at 4:00 p.m. ET), but receiving the price based on the prior NAV already determined as of 4:00 p.m. Late trading violates Rule 22c-1(a) under the Investment Company Act, enabling the trader to profit from market events that occur after 4:00 p.m. and are not reflected in that day's price. In particular, the late trader obtains an advantage -- at the expense of the other shareholders of the mutual fund -- when he learns of market moving information and is able to purchase (or redeem) mutual fund shares at prices set *before* the market moving information was released. Late trading harms innocent shareholders in mutual funds by diluting the value of their shares.

## Simpson's Early Attempts to Late Trade

21.    At all times relevant to the conduct described in this Complaint, defendant Simpson Capital acted by and through defendants Simpson and Dowling.

22.    In 1994, Simpson founded Simpson Capital, the investment adviser to the Simpson Funds, and implemented an investment strategy involving market timing mutual funds.  Subsequently, he successfully enhanced that strategy by engaging in the illegal late trading described in this Complaint.

23.    "Market timing" includes: (i) frequent buying and selling of shares of the same mutual fund or (ii) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing.  Market timing, while not illegal per se, can harm other mutual fund shareholders because, among other things, it can dilute the value of their shares.  In general, Simpson conducted short term trading within a fund family between equity-based mutual funds and money market funds, typically maintaining a position within a fund family for one to five days and trading based upon various market signals.

24.    Simpson was primarily responsible for all investment decisions at Simpson Capital and was assisted by Dowling, the head trader, who had knowledge of and implemented all decisions.  Dowling executed trading instructions and, together with Simpson, established the late trading scheme with at least five introducing broker-dealers described in this Complaint.

25.    Simpson and Dowling executed their market timing trades, and subsequently late traded, through at least five broker-dealers, including Kaplan & Co. Securities, Inc. ("Kaplan"), Wall Street Access, and three other broker-dealers ("Brokers A, B and C") (collectively, the "Introducing Brokers").  The Introducing Brokers cleared their trades

through a number of different broker-dealers, including Bear Stearns Securities Corp. ("Bear Stearns"), Banc of America Securities LLC, JB Oxford & Co. and another broker-dealer (collectively, the "Clearing Brokers").

26.     The Clearing Brokers used the mutual fund trading platform known as the Mutual Fund Routing System ("MFRS"). In general, MFRS routes mutual fund orders from the user to the Fund/SERV platform, an automated system for processing purchase and redemption orders of mutual fund shares. Fund/SERV acts as a communication hub between the clearing broker or other financial intermediary of the investor and the primary transfer agent of the mutual fund company.

27.     Simpson first developed his trading strategies with his brother-in-law, Edward Stern of Canary Capital Partners, LLC ("Canary"). By the late-1990s, Simpson and Stern ended their working relationship, but Simpson continued to market time mutual funds through Simpson Capital. On September 3, 2003, the New York Attorney General filed a civil complaint against Stern and Canary for, among other things, illegal late trading.

28.     Simpson enhanced his market timing strategy by late trading. The ability to late trade allowed the Simpson Funds to profit from market events, futures markets information, and other fluctuations that occurred after the market closed, and, therefore, were not reflected in that day's NAV. Simpson and Dowling monitored the futures markets and used news and other information disseminated after the market closed to make their trading decisions.

29.     Ultimately, the trading strategy, which depended for its success on illegal late trading, was very profitable. As described in greater detail in this Complaint, from 2000

through 2003, the performance of the Simpson Funds far exceeded that of the overall stock market.

30.    Simpson sought to late trade mutual funds as early as 1998.  At that time, Simpson was market timing the Pilgrim Baxter family of funds through a broker-dealer.

31.    In July 1998 and again in early 1999, Simpson asked the broker-dealer's president if he could submit his Pilgrim Baxter market timing trades after 4:00 p.m. ET and receive that day's NAV.  On both occasions, the president rejected Simpson's requests, telling him that the practice was illegal and that neither his broker-dealer nor its clearing firm would allow it.

32.    Several months later, Simpson again proposed a plan to the broker-dealer's president for allowing Simpson Capital to submit trades after 4:00 p.m.  As proposed by Simpson, the broker-dealer would time-stamp blank order tickets before 4:00 p.m.  Simpson would then call after 4:00 p.m. to actually specify the trade information and place the order. Simpson stated that, because broker-dealers often receive a large number of trades just prior to 4:00 p.m., and that it necessarily requires time after 4:00 p.m. to enter those trades into the clearing broker's computer system, it would not appear abnormal for a post-4:00 p.m. entry time to be recorded in the computer system.  He further proposed that broker-dealer personnel could then fill in the trade information on the blank order tickets with the pre-4:00 p.m. order time stamp, thus providing evidence, if needed, that the trade had been received before 4:00 p.m.  The president again rejected Simpson's request, and again told him that his proposal would violate the securities laws, and the policies and procedures of both his broker-dealer and the clearing firm.

33.    In early 2000, Simpson also requested that one of his administrative employees seek out relationships that would enable Simpson Capital to place trades after 4:00 p.m. and still receive that day's NAV.  Ultimately, this employee, who had years of experience handling mutual fund trades, advised Simpson against doing this, because she had heard from other industry sources that placing trades after 4:00 p.m. and still receiving that day's NAV was illegal.

34.    Defendants Simpson and Dowling ignored these clear warnings that late trading was illegal, and eventually arranged at least five late trading relationships with the Introducing Brokers.  When subsequently told by at least one broker-dealer that late trading would no longer be permitted, the defendants closed the Simpson Fund accounts held at that broker-dealer and took them to other brokers that improperly allowed it.

### Simpson's and Dowling's Late Trading Scheme

35.    From May 2000 to September 2003, Simpson and Dowling, through Simpson Capital, knowingly or recklessly placed, or caused others at Simpson Capital to place, more than 10,700 late trades in approximately 375 mutual funds.  The Simpson Funds reaped approximately $57 million in ill-gotten gains from late trading.  The Introducing Brokers through which Simpson and Dowling traded all facilitated the late trading by receiving and placing Simpson Capital's trades after 4:00 p.m., and ensuring that Simpson Capital received the same day's NAV on those trades.

36.    For more than three years, Simpson and Dowling engaged in a scheme to place thousands of trades after 4:00 p.m. and receive that day's NAV, either with the intent to defraud the mutual funds and the fund shareholders, or in reckless disregard that innocent mutual fund investors were being defrauded.  Both knew, or were reckless in not knowing,

that late trading was illegal. They sought out broker-dealers that would allow them to place trades after 4:00 p.m., and devised a method that would falsely represent to mutual funds that trades had been received prior to 4:00 p.m. in order to receive that day's NAV.

37.     The five Introducing Brokers used by the defendants entered into dealer agreements with the distributors, or principal underwriters, of various mutual fund families. These agreements authorized the Introducing Brokers to serve as dealers for a particular mutual fund family's funds, and thereby sell the family's mutual funds to their customers.

38.     In addition, the Introducing Brokers entered into clearing agreements with the Clearing Brokers which, among other things, stated the terms under which each Introducing Broker was allowed to place trades through the Clearing Broker. The Clearing Brokers also had dealer agreements with numerous mutual fund families. Accordingly, the Introducing Brokers had implicit authorization to sell mutual funds pursuant to the dealer agreements with their respective Clearing Broker.

39.     The dealer agreements that the Introducing Brokers and the Clearing Brokers entered into typically required them to sell the fund families' mutual funds in accordance with the federal securities laws and the terms of the mutual funds' prospectuses.

40.     The mutual fund prospectuses for the funds through which the defendants late traded generally stated that the publicly available price for the shares was calculated as of 4:00 p.m. ET or as of the close of the New York Stock Exchange (which is typically also 4:00 p.m. ET). Thus, the Introducing Brokers were required to receive orders to purchase, redeem, or exchange shares of a fund no later than 4:00 p.m. ET to be executed at that day's NAV.

**Broker A**

41.    From May 2000 to May 2003, Simpson and Dowling, through Simpson

Capital, placed at least 1,869 late trades through Broker A -- late trading comprised

approximately 95 percent of the trades that Simpson Capital placed through Broker A --

causing approximately $10.4 million in dilution to the affected mutual funds, representing

harm to mutual funds and their shareholders and ill-gotten gains to the Simpson Funds.

42.    Broker A facilitated Simpson Capital's late trading by e-mailing to Simpson

at 11:00 a.m. each day a daily "position sheet" containing Simpson Capital's available cash

balance and mutual fund holdings, and a "scenario sheet" containing a blank area for

Simpson Capital to indicate any orders it wanted executed that day.  By 3:00 p.m. each day,

Dowling or an administrative assistant would e-mail or fax a completed scenario sheet to

Broker A's trading desk with the proposed trades for the day.

43.    These proposed trades were only tentative trading instructions, however, and

the broker was not authorized to execute them until Simpson Capital subsequently

confirmed the trades after 4:00 p.m.  The e-mails that Simpson Capital sent to Broker A,

with the attached scenario sheets, specifically stated that the proposed trades were "[s]ubject

to phone confirmation by Robert Simpson, [an administrative assistant], Jack Dowling or

[an assistant trader] by 4:30 p.m. today."

44.    Simpson Capital would make confirming calls for nearly all of its trades

after 4:00 p.m., and as late as 5:30 p.m., with instructions to execute some or all of the

proposed trades, change certain trades, or cancel certain trades, with the understanding that

all of the non-cancelled trades would be executed at that day's NAV.  Dowling made almost

all of the confirming calls.  Each morning Simpson reviewed the daily position sheets

received from Broker A to confirm that the prior day's trades had received the previous day's NAV.

45.     Broker A cleared its trades through Bear Stearns and had direct access to Bear Stearns' MFRS platform.  After receiving the post-4:00 p.m. confirming call from Simpson Capital, Broker A traders then placed the trades on the Bear Stearns system.  The traders placed Simpson Capital's trades through the Bear Stearns trading platform until 5:30 p.m., and each of those trades received the current day's NAV.

46.     For example, handwritten notes of a Broker A trader contained on a scenario sheet dated August 6, 2002 show that either Simpson or Dowling confirmed via telephone an exchange in the Alliance Fund at 5:20 p.m.  Bear Stearns' trading records reflect that Broker A placed the trade at 5:25 p.m.  Simpson Capital's Bear Stearns account statement reflects that Simpson Capital received the NAV for August 6 rather than for August 7. Similarly, on August 9, 2002, Simpson Capital again confirmed via telephone an exchange in the Alliance Fund at 5:00 p.m., and Broker A placed the trade through Bear Stearns at 5:10 p.m.  Simpson Capital's Bear Stearns statement reflects that Simpson Capital received the August 9th NAV.

**Wall Street Access**

47.     From April 2001 to October 2001, Simpson and Dowling, through Simpson Capital, placed more than 1,060 late trades at Wall Street Access, a registered broker-dealer, causing dilution of approximately $3.8 million to the affected mutual funds.  Wall Street Access facilitated Simpson Capital's late trading, and Simpson Capital was the only customer of Wall Street Access that it permitted to late trade.

48.    In April 2001, Simpson Capital began late trading at Wall Street Access. Gene T. Mancinelli, a registered representative, handled the account and facilitated Simpson Capital's late trades.

49.    Simpson and Dowling placed trades at Wall Street Access in the same manner they had at Broker A, with the use of preliminary trade spreadsheets sent before 4:00 p.m., and final trade instructions provided in post-4:00 p.m. telephone calls.

50.    Simpson Capital would typically fax a sheet of proposed trades prior to 4:00 p.m. which was labeled "tentative trades." Typically, one of several Wall Street Access employees would then handle the faxed sheet, which read, "Please wait for a call from Simpson Capital for execution." Simpson Capital would then generally contact the employee after 4:00 p.m. to instruct Wall Street Access how to proceed -- to execute some or all of the proposed trades, change certain trades, or cancel certain trades, with the understanding that all of the non-cancelled trades would be executed at that day's NAV. Each call involved as many as 33 trades at once.

51.    Recorded telephone conversations among Simpson, Dowling, and employees at Wall Street Access demonstrate the importance Simpson placed on being able to late trade. On April 5, 2001, at the beginning of the relationship, Simpson contacted Mancinelli to explore the possibility of setting up a mutual fund trading account. Mere moments into the conversation, Simpson began asking about the ability to trade after 4:00 p.m.:

> Simpson:  What cut-off time do they give you on mutual fund orders?
>
> Mancinelli:  Uh, again, as long as we have the order by 4:00 we can input our orders in until 5:30 and uh, we have

Fund Serve and we have selling group agreements with pretty much all of the major funds.

Simpson: I mean, if you had to sell like a ticket order by four o'clock….

Mancinelli: Yeah there's a standard routine, as long as we have your spreadsheet with your orders in by four we can put orders in up until 5:30 so in fact uh, we know the game.

Simpson: Okay, that's good. Uh, sure I'll be interested in talking about it.

Simpson returned to the subject of late trading in that same call:

Simpson: Well, at one place, frankly what's going on is [the clearing broker] was very strict with the 4 o'clock cut-off.

Mancinelli: Right.

Simpson: I mean, you know, uh, meaning that you couldn't get orders, you know, cancelled or put in after if you wanted to get something in after 5, 5:30 or something like that.

Mancinelli: Again we can tip-toe in and by all means, I'll play the game as much as I can play.

52.    In other conversations in April 2001, Dowling asked Mancinelli about the procedures for late trading, including whether the tentative trade sheets should be time stamped before 4:00 p.m. in anticipation of a confirmation call later in the day. Mancinelli told Dowling that Wall Street Access would time stamp the sheets before 4:00 p.m. and that the firm would do whatever Dowling wanted with respect to confirmation.

53.    On or about May 9, 2001, Dowling asked Mancinelli the absolute latest time that trades could be confirmed, indicating that from time to time the defendants might "get some news that pops out that's gonna change our decision." Dowling and Mancinelli

agreed that final confirmation of trades would occur by 5:20 p.m. to give Wall Street Access time to enter trades before its clearing broker's trading platform shut down at 5:30 p.m.

54.     Simpson Capital's late trading continued unabated until mid-October 2001. In the summer of 2001, the compliance departments at Wall Street Access and at its clearing broker determined that all trades had to be received before 4:00 p.m., and that customers would not be permitted to modify or cancel trades after that time.  Wall Street Access told its customers, including Simpson, that only corrections would be allowed after 4:00 p.m. However, Simpson continued to late trade after agreeing with Mancinelli to interpret this to mean that canceling or changing a preliminary trade sent before 4:00 p.m. constituted a "correction."

55.     On or about October 4, 2001, Wall Street Access informed Dowling that only genuine mistakes such as input errors would be correctable after 4:00 p.m.  Dowling indicated that this was a major problem and Simpson subsequently told a Wall Street Access employee that "we're not going to be able to continue doing business if you're saying we gotta decide by 4:00."  Simpson stated that they would decide on orders between 5:15 and 5:30 p.m.

56.     Despite being told that Wall Street Access would no longer accept late trades, Simpson and Dowling continued to try to place trades after 4:00 p.m.  On or about October 11, 2001, Dowling asked Mancinelli if it would still be possible to occasionally place late trades.  Mancinelli told him that he could do so, but that he should make the confirming calls directly to Mancinelli.  On or about October 18, 2001, a Wall Street Access senior vice president told Simpson that a trade received that day at 4:23 p.m. would not be processed and that any future late trading would not be accepted.

57.    Finally, on or about October 19, 2001, the senior vice president told Mancinelli that Simpson Capital's accounts had to be closed.  That same day, Dowling called to place trades, and Mancinelli told him that Simpson Capital's positions would have to be liquidated.  Simpson Capital was given two weeks to close its accounts.

58.    The ability to late trade was so integral to Simpson's and Dowling's profitable trading strategy that when Wall Street Access no longer allowed them to late trade, the defendants took their accounts to brokers who would.  Within weeks after closing Simpson Capital's accounts at Wall Street Access in October 2001, Simpson and Dowling opened accounts at Broker B and at Kaplan Securities, where they continued to late trade, in November and December 2001, respectively.  In addition, defendants' trading at yet another Introducing Broker, Broker C, beginning in October 2002, was conditioned on the ability to late trade.

**Kaplan & Co. Securities, Inc.**

59.    From December 2001 to August 2003, Simpson and Dowling, through Simpson Capital, placed at least 1,008 late trades through Kaplan, causing dilution of at least $17.4 million to the affected mutual funds.

60.    Kaplan traders entered late trades through three different clearing firms – Bear Stearns, JB Oxford & Co., and another Clearing Broker.

61.    From early 2000 until September 2003, Kaplan used various methods to facilitate thousands of late trades on behalf of at least 20 customers, including Simpson Capital.  Kaplan received and entered almost all of the customers' mutual fund trades after 4:30 p.m.

62.     Kaplan's system for taking late trades was similar to Broker A's.  Kaplan sent its customers a daily position sheet in the morning, and customers then e-mailed their proposed trades to Kaplan by 2:30 p.m.  According to a Kaplan trader, Simpson Capital "religiously called to confirm their trades at 5:30 p.m. for the accounts that cleared through Bear Stearns and 5:15 p.m. for [another clearing broker's] accounts."

63.     Kaplan traders knew that the ability to trade after the market closed at 4:00 p.m. was essential to Simpson Capital.  In fact, Dowling told a Kaplan trader how Simpson Capital based its trading decisions on information received after the close of the market.  He told the trader that, among other things, Dowling and Simpson would be monitoring the post-4:00 p.m. behavior of the futures markets to determine whether they would trade on a particular day.

### Broker B

64.     From November 2001 to December 2002, Simpson and Dowling, through Simpson Capital, placed approximately 5,326 late trades at Broker B -- late trading comprised approximately 96 percent of the trades that Simpson Capital placed through Broker B -- causing approximately $17.6 million in dilution to the affected mutual funds.

65.     Broker B facilitated Simpson Capital's late trading.  Broker B cleared its trades during the relevant period through Banc of America Securities, LLC ("BAS").  Broker B had access to BAS's MFRS system and was able to directly enter mutual fund trades into that system on any given day until 5:30 p.m. ET.

66.     Virtually all of Simpson Capital's late trading occurred through Broker B's New York office and involved two registered representatives in that office.  One of the representatives e-mailed daily mutual fund position sheets to customers.  Each afternoon, this representative received customer tentative order sheets before 4:00 p.m. which she, in

turn, time-stamped before 4:00 p.m.  However, like each of the other Introducing Brokers used by Simpson Capital, Broker B did not actually execute the trades until the customer called to confirm the order after 4:00 p.m.  Simpson and Dowling routinely called between 4:45 p.m. and 5:20 p.m. to confirm which of Simpson Capital's pre-4:00 p.m. tentative orders to execute.  Broker B then immediately executed Simpson Capital's trades after receiving the call.  All of these trades received the current day's NAV.

67.    Broker B's representatives did not enter mutual fund orders into the MFRS system until receipt of confirmation from Simpson or Dowling, which almost always occurred after 4:00 p.m.  The individual who received the trade confirmations would generally make notations on the tentative spreadsheet indicating which trades were to be executed and which were not.

**Broker C**

68.    From October 2002 to September 2003, Simpson and Dowling, through Simpson Capital, placed approximately 1,479 late trades at Broker C -- late trading comprised approximately 94 percent of the trades that Simpson Capital placed through Broker C -- causing approximately $7.9 million in dilution to the affected mutual funds. Broker C facilitated Simpson Capital's late trading.

69.    One registered representative handled the Simpson Capital account for Simpson and Dowling.  Simpson previously had an account with the representative at another firm, and he knew both Dowling and Simpson.  When the previous firm stopped using the Bear Stearns MFRS trading platform, Simpson requested the representative to move to a broker-dealer that had access to the trading platform and, in September 2002, the

representative began working at Broker C.  Broker C cleared its trades through Bear Stearns and had direct access to Bear Stearns' MFRS trading platform.

70.    Simpson moved the Simpson Funds' accounts to Broker C, and this registered representative was the only employee at the firm who took and placed Simpson Capital's trades.

71.    On several occasions, Dowling described Simpson Capital's trading strategy, in which Simpson and Dowling monitored the futures markets and used news and other information disseminated after the market closed to make their trading decisions.  Dowling and Simpson told the representative how they traded with another broker who cleared through Bear Stearns.  They described how they would send in tentative order sheets before 4:00 p.m. that were time stamped when received, and then had until 5:45 p.m. to confirm which trades, if any, they wanted to place, using the MFRS platform.

72.    In order to late trade at Broker C, Simpson Capital faxed a numerical list of potential trades to the representative during the day, typically between 10:00 a.m. and 2:00 p.m.  He time-stamped the sheet at the time he received it.  Between 5:30 p.m. and 5:45 p.m., Dowling, another employee, or Simpson called and told him which trades listed on the sheet should be executed, and which should not.  The caller referred to the trades by number, saying, for example, "Go ahead on 1, 2, 3, 5, and 6, and leave number 4 alone." Within minutes after receiving the call, the representative entered the trades through the Bear Stearns MFRS system, and each trade received that day's NAV.

73.    The representative understood that the MFRS system shut down at 5:45 p.m., and that this was the cut-off time for entering trades into the system.  Those he dealt

with at Simpson Capital always wanted the latest possible time to make their decisions, so he tried to put in trades as close to 5:45 p.m. as possible.

74.    After the New York Attorney General action against Canary Capital was filed in September 2003, the representative told Dowling and Simpson that final trading instructions had to be received by 4:00 p.m., i.e., that they had to confirm their trades before 4:00 p.m.  Defendants closed the Simpson Capital accounts at Broker C soon after, and the representative left Broker C in January 2004.

### Profits From Late Trading

75.    Simpson's and Dowling's late trading strategy was extremely profitable. During the period from May 2000 through September 2003, the Simpson Funds illegally earned approximately $57 million from late trading, representing approximately 70 percent of the Simpson Funds' total gains on investments of $81.5 million over that time period. Letters from Simpson to his investors touted annual returns far in excess of benchmarks such as the S&P 500.  For example, for the year ended December 31, 2001, Simpson Partners had a positive return of 32.8 percent before performance and management fees, while the S&P 500 lost 13 percent.  Even in Simpson Partners' worst performing year, ending December 31, 2000, its annual return before performance and management fees still exceeded the performance of the S&P 500 by over 20 percent.

76.    During the relevant time period, Simpson Funds' clients paid to Simpson Capital an annual performance fee, paid quarterly, of 20 percent of the increase of the net asset value of common shares during the quarter, and an annual management fee of one percent of the net asset value of the common shares, payable at the beginning of each quarter.

77.    As sole owner of Simpson Capital, Simpson benefited substantially in the form of management and performance fees and growth on his own investment in the funds. In addition to the management and performance fees earned from 2000 through 2003, Simpson reinvested the fees earned from earlier years in the Simpson Funds, and during the relevant period over 15 percent of fund assets, on average, were his.

78.    As a result of defendants' fraudulent scheme, Simpson received at least $19 million in ill-gotten gains, in the form of management and performance fees, and the growth on his own investment in the Simpson Funds.  Dowling received more than $996,000 in salary and bonuses during the time defendants conducted the late trading scheme.

## CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Simpson Capital, Simpson and Dowling

79.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 78, inclusive, as if the same were fully set forth herein.

80.    From at least May 2000 until September 2003, defendants Simpson Capital, Simpson and Dowling, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

(a)    employed devices, schemes or artifices to defraud;

(b)    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

81.      By engaging in the foregoing conduct, defendants Simpson Capital, Simpson and Dowling violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder.

**WHEREFORE**, the Commission respectfully requests that this Court:

## I.

Permanently restrain and enjoin defendants Simpson Capital, Simpson and Dowling, and their agents, officers, servants, employees, attorneys, and those persons in active concert or participation with them, directly or indirectly, singly or in concert, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder.

## II.

Order defendants Simpson Capital, Simpson and Dowling to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint, in accordance with a plan of disgorgement acceptable to the Court and to the Commission.

### III.

Order defendants Simpson Capital, Simpson and Dowling to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u(d)(3)], in an amount to be determined by the Court.

### IV.

Grant such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,


_____ s/ _____
Daniel M. Hawke
Elaine C. Greenberg
Amy J. Greer
David S. Horowitz
Brendan P. McGlynn
Jack C. Easton
Tami S. Stark  (TS-8321)

Attorneys for Plaintiff

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740


Dated:  June 27, 2007