**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X

STATE OF NEW YORK,                              :

               Plaintiff,        :        **COMPLAINT**

      -against-                     :        Index No.

                           :

CANARY CAPITAL PARTNERS, LLC,
CANARY INVESTMENT MANAGEMENT,        :
LLC, CANARY CAPITAL PARTNERS, LTD and
EDWARD J. STERN,                              :

             Defendants.        :

----------------------------------------------------------------X

        Plaintiff, the State of New York, by Eliot Spitzer, Attorney General of the State of

New York ("Attorney General"), complaining of the above-named defendants, alleges upon

information and belief, that:

**PARTIES**

        1.     This action is brought in the name of the State of New York pursuant to

Civil Practice Law and Rules § 1301.

        2.     Defendant Edward J. Stern ("Stern"), a resident of New York County,

New York is, and was at all relevant times, the Managing Principal of defendants Canary Capital

Partners, LLC and Canary Investment Management, LLC (collectively, "Canary").

        3.     Defendant Canary Capital Partners, LLC is a limited liability company

organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza

Drive, Secaucus, New Jersey.

1

4.      Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

5.      Defendant Canary Capital Partners, Ltd. is a Bermuda limited liability company.  Stern is also the Managing Principal of Canary Capital Partners, Ltd.

## JURISDICTION

6.      This action is brought in the name of and on behalf of the people of the State of New York by the Attorney General pursuant to his authority under General Business Law section 353 to seek monetary and equitable relief where it is demonstrated that any person or entity has engaged in, is engaged or is about to engage in, any fraudulent practices in the offer for sale, sale, offer to purchase, or purchase of securities within or from the State of New York.

7.      This action also is brought by the Attorney General pursuant to his authority under Executive Law section 63(12) to seek an order granting (i) injunctive relief to prevent repeated or persistent fraudulent or illegal activities and (ii) monetary relief.

## PRELIMINARY STATEMENT[1]

8.      From 1999 to 2003, Canary engaged in two fraudulent schemes and benefitted to the extent of tens of millions of dollars at the expense of mutual fund investors. Both schemes involved the complicity of mutual fund management companies that violated their fiduciary duties to their customers in return for substantial fees and other income for themselves

---

[1]  Documents referenced in this complaint are set forth in a separate volume entitled "Exhibits to Complaint" which is being filed herewith.  The documents generally are arranged by bates stamp numbers, which identify the company that produced the document.  For example, a parenthetical reference to "(BofA-000485)" designates a document produced by the Bank of America.

2

and their affiliates.

9.     The first scheme was Canary's "late trading" of mutual fund shares.  As described in greater detail below, the daily price of mutual fund shares is generally calculated as of 4:00 p.m. EST.  Orders to buy, sell or exchange mutual fund shares placed at or before 4:00 p.m. EST on a given day receive that day's price.  Conversely, orders placed after 4:00 p.m. EST are supposed to be priced using the following day's price.  Canary agreed with certain financial institutions (including the Bank of America) that orders Canary placed after 4 p.m. on a given day would illegally receive that day's price (as opposed to the next day's price, which the order would have received had it been processed lawfully).  This allowed Canary to capitalize on post-4:00 p.m. information while those who bought their mutual fund shares lawfully could not.

10.     Late trading can be analogized to betting today on yesterday's horse races.

11.     The second scheme involved "timing" of mutual funds.  "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares.  The technique is designed to exploit inefficiencies in the way mutual fund companies price their shares.  This practice is by no means limited to Canary.  Indeed:  (1) it is widely acknowledged that timing inures to the detriment of long-term shareholders; (2) because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it; and (3) nonetheless, in return for investments that will increase fund managers' fees, fund managers enter into undisclosed agreements to allow timing.

12.     In fact, certain mutual fund companies have employees (generally referred to as the "timing police") who are supposed to ferret out "timers" and put a stop to their

3

short-term trading activity.  Nonetheless, the mutual fund managers arranged to give Canary and other market timers a "pass" with the timing police, who would look the other way rather than attempt to shut down their short-term trading.

13.    The mutual fund prospectuses created the misleading impression that mutual funds were vigilantly protecting investors against the negative effects of timing.  In fact, the opposite was true:  managers sold the right to time their funds to Canary and other hedge fund investors.  The prospectuses were silent about these arrangements.

14.    As a result of "late trading" and "timing" of mutual funds, Canary, the mutual fund companies and their intermediaries profited handsomely.  The losers were unsuspecting long-term mutual fund investors.  Canary's excess profits came dollar-for-dollar out of their pockets.

## A.        Late Trading

15.    Canary's practice of late trading exploited the unique way in which mutual funds set their prices.  Mutual funds are valued once a day, usually at 4:00 p.m. EST, when the New York market closes.  The price, known as the Net Asset Value or "NAV," generally reflects the closing prices of the securities that comprise a given fund's portfolio, plus the value of any cash that the fund manager maintains for the fund.  A mutual fund stands ready to buy or sell (the mutual fund industry refers to sales as "redemptions") its shares at the NAV with the public all day, any day -- but unlike a stock, the price of a mutual fund does not change during the course of the day.  Accordingly, orders placed at any time during the trading day up to the 4:00 p.m. cutoff get that day's NAV, but an order placed at 4:01 p.m. or thereafter receives the next day's NAV.  This is the rule of "forward pricing", which became law in 1968.

### 1.    The Purpose of "Forward Pricing"

16.    This system assures a level playing field for investors.  Mutual fund investors do not know the exact price at which their mutual fund orders will be executed at the time they place the orders (unlike stock investors), because NAVs are calculated after the market closes.  Orders placed on or before 4 p.m. on a given day are filled at the NAV determined that day while orders placed after 4 p.m. are filled at the NAV calculated the next day.  Thus, all investors have the same opportunity to assemble "pre-4:00 p.m. information" before they buy or sell.  And no investor has (or at least is supposed to have) the benefit of "post-4:00 information" prior to making an investment decision.  The importance of this protection becomes clear when, for example, there is an event after 4:00 p.m. (like an unexpectedly positive corporate earnings announcement) that makes it highly probable that the market for the stocks in a given fund will open sharply higher the next day.  Forward pricing ensures fairness:  those who bought the fund during the day, before the information came out, will enjoy a gain.  Those who buy shares in the fund _after_ the announcement are not supposed to share in this profit.  Their purchase order should receive the NAV set at the end of the next day, when the market will have digested the news and reflected its impact in (1) higher prices for the stock held by the fund and therefore (2) a higher NAV for the fund.

17.    An investor who has the ability to avoid forward pricing and buy at the _prior_ NAV enjoys a significant trading edge.  He or she can wait until after the market closes for significant news such as the above-earnings announcement to come out, and then buy the fund at the old, low NAV that does not reflect the impact of the new information.  When the market goes up the next day, the lucky investor would be able to sell and realize an arbitrage profit based

solely on the privilege of trading on the "stale" NAV.

18.     Where does the late trader's arbitrage profit come from?  Dollar for dollar, it comes out of the mutual fund that the late trader buys.  In essence, the late trader is being allowed into the fund after it is closed for the day to participate in a profit that would otherwise have gone completely to the fund's buy-and-hold investors.  When the late trader redeems his shares and claims his profit, the mutual fund manager has either to sell stock or use cash on hand -- stock and cash that used to belong to the long-term investors -- to give the late trader his gain. This makes late trading basically a zero-sum game.  Putting to one side the investment results of the mutual fund for the brief time that the late trader actually holds it, the late trader's gain is the long-term investors' loss.  The forward pricing rule was enacted to prevent this kind of abuse. See 17 C.F.R. § 270.22c-1(a).

## 2.     Summary of Canary's Late Trading

19.      Canary engaged in late trading on a daily basis from in or about March 2000 until this office began its investigation in July of 2003.  It targeted dozens of mutual funds and extracted tens of millions of dollars from them.  During the declining market of 2001 and 2002, it used late trading to, in effect, sell mutual fund shares short.  This caused the mutual funds to overpay for their shares as the market went down, serving to magnify long-term investors' losses.

20.     Canary obtained some of its late trading "capacity" (the opportunity to engage in late trading) directly from one mutual fund manager, the Bank of America.  Bank of America installed special computer equipment in Canary's office that allowed it to buy and sell Bank of America's own mutual funds -- the Nations Funds -- and hundreds of other mutual funds

at the 4:00 p.m. price until 6:30 p.m. New York time.   In return, Canary agreed to leave millions of dollars in Bank of America bond funds on a long-term basis.  These parked funds are known in the trade as "sticky assets."

21.     Canary obtained additional late trading capacity from intermediaries, including Security Trust Company ("STC"), an Arizona company providing trust administrative services (including access to mutual funds) to retirement plans.  STC gave Canary the ability to trade hundreds of additional mutual funds as late as 9:00 p.m. New York time.  So profitable was this opportunity that STC ultimately demanded, and received, a percentage of Canary's winnings.

**B.    Timing**

22.     Mutual funds are meant to be long-term investments.  They are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts.  Nevertheless, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way they set their NAVs.

23.     This strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio.  These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.  A typical example is a U.S. mutual fund that holds Japanese shares.  Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time.  If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old.  If there have been positive market moves during the New York trading day that will

cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect

them, and the fund's NAV will be artificially low.   Put another way, the NAV does not reflect

the true current market value of the stocks the fund holds.  On such a day, a trader who buys the

Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day

by selling.  This and similar strategies are known as "time zone arbitrage."   Taking advantage of

this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.[2]

24.     A similar type of timing is possible in mutual funds that contain illiquid

securities such as high-yield bonds or small capitalization stocks.  Here, the fact that some of the

---

[2]A particularly striking historical example of time zone arbitrage is described in a June 10, 2000 article in TheStreet.Com entitled "Your International Fund May Have the 'Arbs Welcome' Sign Out" :

> On Oct. 28, 1997, on the heels of a 10% decline in the U.S. stock market, Asian markets dropped precipitously.  By 4 p.m. ET, however, the U.S. markets had recovered.  To anyone following the Asian markets, it was clear that those markets would follow suit when they opened for trading.

> Unfortunately, this was not so clear to some mutual funds that invest in securities traded in Asian markets.  These funds calculated their NAVs at the lower, 13 hours' stale closing prices on the exchange.  Many arbitragers, knowing the funds' next-day NAV would rise, stood ready to exploit this pricing discrepancy.

> . . . They poured money into Asia/Pacific funds and sold them the next day, pocketing a one-day profit of around 10%.  This profit came directly out of the pockets of the remaining shareholders.

> How much did shareholders in Asia-Pacific funds lose because the funds used stale prices to value their portfolios?  Not surprisingly, the funds aren't talking. But based on methodology suggested by the SEC, shareholders in many of these funds would have seen their accounts drop by up to 2.5% overnight.

See also "International Funds Still Sitting Ducks for Arbs," TheStreet.com (July 1, 2000).

fund's securities may not have traded for hours before the New York closing time can render the fund's NAV stale, and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

### 1.    The Effect on Long Term Shareholders

25.    Like late trading, effective timing captures an arbitrage profit. And like late trading, the arbitrage profit from timing comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days -- as Canary did -- the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

26.    Timing is not entirely risk free, however. For example, the timer has to keep his or her money in the target fund for at least a day, so he or she may enjoy additional gains or incur losses, depending on the market. But such gains and losses are distinct from the timer's arbitrage profit, which is essentially crystallized at the moment of purchase.

27.    Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. This "strategy" does not eliminate the transfer of wealth out of the mutual fund

9

caused by timing; it only reduces the administrative cost of those transfers.  However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the funds' assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market.  Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

### 2.    Tools to Combat Market Timing

28.    Mutual fund managers are aware of the damaging effect that timers have on their funds.  And while the effects on individual shareholders may be small once they are spread out over all the investors in a fund, their aggregate impact is not:  for example, one recent study estimates that U.S. mutual funds lose $4 billion each year to timers.  Eric Zitzewitz, Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds (October 2002) 35, at http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.  While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds -- like those made by Canary -- are easy for managers to spot.  And mutual fund managers have tools to fight back against timers.

29.    Fund managers typically have the power simply to reject timers' purchases.  Many funds have also instituted short-term trading fees ("early redemption fees") that effectively wipe out the arbitrage that timers exploit.  Generally, these fees go directly into the affected fund to reimburse it for the costs of short term trading.  In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market

10

moves that might render the NAV stale.  This is called giving the fund a "fair value."  It eliminates the timer's arbitrage.   As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

### 3.    Incentives for Allowing Market Timing

30.    Given the harm that timing causes, and the tools available to put a stop to it, why would a mutual fund manager allow his fund to be timed?  The answer lies in the way that mutual funds are organized.  Typically a single management company sets up a number of mutual funds to form a family.  For example, Banc of America Capital Management, LLC is the manager for the Nations Funds family, including Nations International Equity fund, Nations Small Cap fund and so on.  While each mutual fund is in fact its own company, as a practical matter the management company runs it.  The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves.   Still, the management company owes fiduciary duties to each fund and each investor.

31.    The management company makes its profit from fees it charges the funds for financial advice and other services.  These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes.  The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time.  Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

11

32.    Canary found many mutual fund managers willing to take that deal.[3]  In the period from 2000 to 2003, Canary entered into agreements with dozens of mutual fund families allowing it to time many different mutual funds. Typically, Canary would agree with the fund manager on target funds to be timed – often international and equity funds offering time zone or liquidity arbitrage -- and then move the timing money quickly between those funds and a resting place in a money market or similar fund in the same fund family.  By keeping the money -- often many million dollars -- in the family, Canary assured the manager that he or she would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between.  In addition, sometimes the manager would waive any applicable early redemption fees.  By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

33.    As an additional inducement for allowing the timing, fund managers often received "sticky assets."  These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial vehicles (e.g., a bond fund or a hedge fund run by the manager) that assured a steady flow of fees to the manager.

**4.    Failure to Disclose Timing Arrangements**

34.    These arrangements were never disclosed to mutual fund investors.  On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual

---

[3]  Indeed, many fund managers contacted by Canary had active, preexisting timing businesses entirely separate from their relationship with Canary.

fund timing.  For example, the "Excessive Trading Policy" in the February 25, 2002 prospectus

for the Janus Income Funds states:

> Frequent trades in your account or accounts controlled by you can
> disrupt portfolio investment strategies and increase Fund expenses
> for all Fund shareholders.  The Funds are not intended for market
> timing or excessive trading.  To deter these activities, the Funds or
> their agents may temporarily or permanently suspend or terminate
> exchange privileges of any investor who makes more than four
> exchanges out of a Fund in a calendar year and bar future
> purchases into the Fund by such investor.  In addition, the Funds or
> their agents also may reject any purchase orders (including
> exchange purchases) by any investor or group of investors
> indefinitely for any reason, including, in particular, purchase
> orders that they believe are attributable to market timers or are
> otherwise excessive or potentially disruptive to the Fund.
>
> Orders placed by investors in violation of the exchange limits or
> the excessive trading policies or by investors that the Fund
> believes are market timers may be revoked or cancelled by a Fund.
> . . .

(CC 002438-439)  Nevertheless, as described further below, Canary was allowed to time a Janus

fund subject to such a prospectus.

35.    Canary realized tens of millions of dollars in profits as a result of these

timing arrangements.   In many cases these profits also reflect late trading, as Canary would

frequently negotiate a timing agreement with a mutual fund management company, and then

proceed to late trade the target funds through Bank of America, STC or another intermediary.

**FACTUAL ALLEGATIONS**

**A.    Stern and Canary Capital**

36.    Beginning in or around 2000, Stern became a full-time investor and

money manager.  He had two main businesses:  (1) investing in various hedge funds run by

others and (2) the rapid-fire trading of mutual funds.  The latter was done through Canary

Capital Partners, LLC, a hedge fund devoted to late trading and timing mutual funds.  (Canary Capital Partners, Ltd. is a sister hedge fund engaged in mutual fund timing.)

37.     Canary's main office is in Secaucus, New Jersey and it also conducts business at 667 Madison Avenue, New York, New York.  Canary employed a number of professionals and traders, and used sophisticated computer models and equipment in order to identify and then exploit late trading and timing opportunities.  Because so much of its business occurred after the close of U.S. markets, Canary employees regularly worked into the evening.

38.     Stern is the Managing Member of Canary Investment Management, LLC, which receives a fee for managing Canary assets calculated as 1.5% of assets under management and 25% of profits above a certain threshold.  As of July 2003, Canary Asset Management had received approximately $40 million in Canary management and incentive fees.  The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

B.     **Profits and the Growth of Canary**

39.      Stern began timing trading in July of 1998.  Initially he used only  money he raised from private sources.  In 1998, Stern made a profit of 18%; in 1999, his profit was 110%. (CC007295)

40.     In September of 2000, Canary began to accept capital from non-family investors.  In the year 2000, Canary earned its investors a return of 49.5% (net of fees), while the S&P 500 declined by 9% and the NASDAQ declined by 39%.  (CC 007295)   By early 2001, Canary and Canary Capital Partners Ltd. had $184 million in assets. (CC007294)

41.     By the end of 2001, the assets of Canary and Canary Capital Partners Ltd.

14

had grown to approximately $400 million. (CC007309)  In 2001, Canary earned a return of 28.5% (net of fees), while the S&P 500 and the NASDAQ declined by 13% and 21%, respectively. (CC007309)

42.    In 2002, the assets of Canary and Canary Capital Partners, Ltd. increased to $730 million.  (CC007326) Canary earned 15% (net of fees) in 2002, while the S&P 500 and the NASDAQ declined by 23% and 31%, respectively.  (CC007326)

43.    Canary experienced disappointing returns of 1.5% in the first five months of 2003, as U.S. equity markets were rising.  (CC07331)  As a result, in or about May, 2003, it decided to return all funds contributed by outside investors.  In his letter to these investors announcing the decision Stern wrote:  "We hope that you considered the ride to be a good one...." (CC07331)

C.    Canary's Trading Strategies

44.    Stern evolved and improved his trading strategies over time to achieve these above-market results.  Prior to 2000, Stern followed a simple timing strategy that consisted largely of buying a small cap technology fund (subject to "liquidity arbitrage") in a certain fund family on days when the market was up, and selling it when the market began to decline. Stern was able to do this over and over again – systematically transferring wealth out of the fund – because of an understanding he had with a senior executive of the fund family, who allowed Stern unlimited timing privileges and received a "sticky asset" private equity fund investment in return.

45.    Canary's interest in similar negotiated timing capacity deals never flagged, and it continued to devote considerable energy to finding such opportunities in 2000,

2001, 2002 and 2003.  Indeed, starting in late 2000 Canary engaged a consultant who was devoted exclusively to looking for timing capacity.  By July of 2003, Canary had negotiated (sometimes directly, and sometimes through intermediaries) timing capacity agreements with approximately thirty mutual fund families, many of which involved "sticky assets" of one kind or another.

46.    In 2000, Canary also began to expand its timing capacity through an approach called "timing under the radar."  This refers to placing trades in mutual fund shares in such a way that the timing activity is difficult for the mutual fund family whose funds are targets to detect.  Timers pursuing this strategy trade through brokers or other intermediaries (for instance, STC and Bank of America provided this service in addition to late trading) who process large numbers of mutual fund trades every day through omnibus accounts where trades are submitted to mutual fund companies en masse.  The timer hopes that his activity will not be noticed among the "noise" of the omnibus account.

47.    While Canary targeted a number of funds for timing "under the radar", these arrangements were never lasting or dependable.  They were subject to being shut down at any time if the mutual fund company noticed the unusual activity.  It was much better business for Canary to negotiate for timing capacity directly with the fund managers, even if it had to tie up some of its capital in "sticky assets" to do so.

48.    In early 2000, Canary began to engage in late trading.  Its first opportunity came in the form of an agreement with Kaplan & Co. Securities Inc., a broker dealer located in Boca Raton, Florida, which Canary approached after hearing that it provided late trading. (CC000002-008)  This contract provides that "[f]inal instructions for trades to be executed for

16

Client shall be provided telephonically or by e-mail and shall be received no later than 4:30 p.m. EST at the offices of Kaplan & Co.," and holds out the possibility of Kaplan & Co. executing trades received later than that.  (CC000002)   In May of 2000, Canary entered into its agreement with STC, and gained the capability of submitting its orders until 8:30 p.m. New York time. (STC 00001-00007) Canary continued to expand its channels for late trading in following years, ultimately setting up a number of separate arrangements (including, most notably, Bank of America, which arrangement is described in more detail below) that allowed it to trade after the New York close.  As one example, in August of 2002 Canary entered into a contract with the broker-dealer JB Oxford & Company that provided:

> Each day that Customer intends to engage in mutual fund transactions, Customer shall send via Excel spreadsheet or other mutually acceptable means to JB Oxford a list of proposed transactions before 4:15 p.m. New York time. . . . Customer intends to confirm and activate such trade communications via telephone by 4:45 p.m., New York time . . .

(CC 000009)  JB Oxford received 1% of assets traded as compensation for these services.

49.     In 2001, faced with dropping markets, Canary developed a complex strategy that allowed it to in effect sell mutual funds short and profit on declining NAVs.  To achieve this, Canary first needed to determine the exact portfolio makeup of a target mutual fund.  Mutual fund managers were happy to provide this information to Canary.  Canary would then (1) sell these securities short to create a negative mirror image of the fund and (2) buy the fund in an offsetting amount.  As a result, Canary would own the shares of the fund, but be overall "market neutral."  It would then wait, fully hedged, until there was a market event that would drive down the fund's price and create an opportunity for arbitrage.  Canary would sell the shares back to the fund that day at an artificially high price (because the NAV would not yet

17

fully reflect the market movement downward) and then close out the short position with cheaper, market price shares.  The cash left over was Canary's profit.  To reduce the transaction costs of the strategy, Canary worked with derivatives dealers (including Bank of America) to create "equity baskets" of short positions in fund holdings that mimicked the effect of shorting every stock in the fund, with one customized "basket" per fund.  This strategy served Canary well through the market drops in 2001 and 2002.

**D.    The Bank of America**

50.    Canary's most extensive late trading and timing relationship was with the Bank of America.  Starting in 2001, the Bank of America (1) set Canary up with a state-of-the-art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (2) gave Canary permission to time its own mutual fund family, the "Nations Funds," (3) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (4) sold Canary the derivative short positions it needed to time the funds as the market dropped.  None of these facts were disclosed in the Nations Funds prospectuses.  In the process, Canary became one of Bank of America's largest customers.  The relationship was mutually beneficial: Canary made tens of millions through late trading and timing, while the various parts of the Bank of America that serviced Canary made millions themselves.  All of this activity was coordinated through the Bank of America broker who brought Canary in as a client, Theodore C. Sihpol, III.

### 1.    Setting Up the Stern Relationship

51.    Sihpol, who works in the Banc of America Securities' ("BAS") high-net worth group located in midtown Manhattan, visited Stern at his office in Secaucus, New Jersey

in April 2001.

52.     During that meeting, Stern outlined Canary's approach to timing mutual funds and results it had achieved doing so, but did not mention late trading.  He asked if Canary would be allowed to time the Nations Funds family, and proposed that the Bank of America could both lend Canary the money to do so and provide clearing services for the timing trades. Sihpol agreed to check with the Bank of America and get back to Canary. He returned to the office and set about obtaining approval for Canary's proposal from his superiors.

53.     After making some inquiries within the Bank of America and speaking with Stern on the telephone, Sihpol asked Stern to come to the bank's New York headquarters and explain his proposal in person to a larger group that included representatives from the BAS clearing business.  At this meeting, which took place in late April, 2001, Stern and two of Canary's traders explained their strategy to the Bank of America group again, discussed their credit needs, and presented a list of the Nations Funds they would most like to time.

54.     When the conversation turned to clearing, the representatives of the BAS clearing business offered to set up Canary with direct access to the bank's clearing function through their electronic ADP system.  Using technology that was proprietary to BAS, Canary would be able to enter its trades directly into Canary's computers in New Jersey after the market closed until 6:30 p.m. New York time, without having to speak to a Bank of America representative.  The representatives of the bank's clearing business mentioned this late trading capability as an additional selling point for ADP.

55.     The meeting was a success.  The parties agreed to go forward, subject to final approval of the list of Nations Funds to be timed.   Sihpol prepared a memorandum

19

summarizing the Canary/Stern relationship and their efforts thus far to implement Canary's

mutual fund trading strategy. This memo, dated April 16, 2001, was sent to Charles D.

Bryceland, his superior in the high-net worth brokerage business at BAS, and to a BAS

compliance officer. Among other things, the memo notes that:

> • Canary uses a proprietary strategy involving market timing
> through daily mutual fund trading;
>
> • (a) the "immediate objective" was to implement Canary's
> "proprietary market-timing trading strategy, through the use of
> [BAS'] mutual fund clearing operations," (b) initially it was
> contemplated that Bank of America would permit Canary to time
> $20 million to $30 million in Nations Funds, and (c) Canary would
> make a "sticky" asset investment of the same amount of money in
> Nations bond funds;
>
> • (a) initially Canary would execute its mutual find timing trades
> by calling the trades into Sihpol, (b) later, however, Canary would
> be provided a direct link to BAS' proprietary mutual fund clearing
> system, and (c) the BAS clearing department had approved
> installation of the "direct link;" and
>
> • other potential business Bank of America could pursue with
> Canary and the Stern family included a potential $100 to $200
> million line of credit to facilitate Canary's trade operations and a
> $25 million to $30 million opportunity for the BAS' derivatives
> desk to assist Canary in shorting the stocks owned by the mutual
> funds Canary was timing.

Sihpol acknowledged that Canary's requests were "a bit unorthodox," but stated that Canary

"made it clear they are not only willing to play by the guidelines we agree on, but also pay [Bank

of America] for the value we can add." (BofA 003449-50)

56.    Bryceland, Sihpol's branch manager, favored the market timing

relationship with Canary and would later commend the diligence of Sihpol and his team to some

of the most senior Bank of America executives. The BAS compliance representative initially

questioned the propriety of giving a client "direct access" to BAS' mutual fund clearing

capabilities.  Apparently the compliance officer's concerns were satisfied when Sihpol informed

him that other Bank of America employees "felt the business was worthwhile and an appropriate

use of [Bank of America's] resources."  (BofA 003430)

       57.    On May 1, 2001, Canary sent Sihpol a letter confirming the Nations Funds

he hoped to time and providing the dollar amounts of timing for each fund.  Initially, Canary

intended to time four funds – Nations Convertible, Nations International Equity, Nations

Emerging Markets and Nations Small Cap – in an aggregate amount of $16.8 million.  The short

term trading was to average one "round turn" per week (i.e., one purchase and one sale of the

mutual fund shares each week).  After selling a fund, the proceeds of the sale were to be

deposited into a Nations money market fund or short-term bond fund until such time that Canary

decided to "redeploy" it for the next timing trade in the "approved" Nations funds.

       58.    The letter further confirmed the understanding reached with respect to

manual, electronic and late trading, and BAS' intention to provide financing for it.  Canary

wrote:

> We plan on transacting our trades manually at first (via Fax), at a
> time of day that is a little bit earlier than [the BAS clearing
> representative] specified in our first meeting.  As soon as we can
> work out our lending arrangement with the bank and begin
> transacting electronically via ADP, we will draw down leverage
> against the capital we have deployed in the Nations funds,
> effectively increasing our trading capital with your firm to $32
> million.  If all goes well, this capital should grow larger as we get a
> sense of what trades can and cannot be done via the Banc of
> America Securities Platform.  We really would like to get going
> with ADP and begin trading electronically as soon as possible.

(BofA-001534) Canary also confirmed one of Bank of America's rewards for allowing such

timing activity – "sticky assets."  The letter notes:

> It is also our intention to commit "permanent" capital to Nations funds in an amount equal to the dollars that...[a special purpose mutual fund timing vehicle affiliated with Canary] trades.  For the time being, we have chosen to invest in Nations Short to Intermediate Government and Nations Short Term Income Fund....

(BofA-001534)

59.    Though Sihpol had obtained the go-ahead from clearing operations, his branch manager and the compliance department, he still needed the consent of Banc of America Capital Management, LLC ("BACAP"), the investment manager of the Nations Funds.  Sihpol had kept Robert H. Gordon, then the co-President of BACAP, abreast of the negotiations with Stern from the beginning, and had obtained from him the list of Nations Funds from which Canary had made its selection of target funds.  On May 3, 2001, Sihpol sent Gordon an e-mail, apparently attaching a copy of Canary's May 1, 2001 letter, in which he advised Gordon of the names of the trading vehicles Canary would be using for its timing trades and that a Canary affiliate would be "making the dollar for dollar investment in the two short-term government funds."  (BofA-001532)

60.    Sihpol also sought to enlist Gordon's assistance with Canary's proposed derivatives transactions involving the securities held in certain of the Nations mutual funds.  In the same e-mail, Sihpol wrote:

> Additionally, if you could...let us know what the most efficient, proper way of getting the portfolio's positions and weightings to Cockatiel that would put us on track for a conversation with our derivatives desk.
>
> Thanks again for all your help....
>
> Ted

(BofA-001532)  That same day, Gordon forwarded Sihpol's e-mail and its attachment to various

senior managers within BACAP as well as certain individual portfolio managers.  Gordon wrote:

> I've spoken to a number of you about this day trading exception.
> The account is the Stern Family, a significant and growing
> GCIB/Bank relationship.  Also, nice incentive of matching funds
> in the Short-Intmdt. Gov't Fund....
> thanks, and let me know if there are any issues.

(BofA-001532)  Apparently, no one raised any issues.  Indeed, after being notified in a

subsequent e-mail from Sihpol that the $20 million in "sticky" assets promised by Canary had

arrived, Gordon forwarded the e-mail to various BACAP personnel confirming that Canary was

"an approved timer."  (BofA-001540-001541)

    61.    In addition, Gordon's e-mail granting a special market timing dispensation

to Canary was forwarded to the BACAP "timing police" responsible for protecting the Nations

Funds from market timers.  (BofA-001540)

### 2.    Late Trading at the Bank of America

    62.    At first, Canary conducted its late trading with the Bank of America

"manually."  Prior to 4:00 p.m. New York time, Canary sent Sihpol or a member of his team a

series of "proposed" mutual fund trades by e-mail or fax.  Upon receipt, Sihpol or a member of

his team filled out an order ticket, time stamped it, and set it to one side until that evening.

Sometime after 4 p.m. New York time, Canary telephoned Sihpol or a member of his team to

either confirm or cancel the "proposed" order.  If confirmed, the order (with its pre-close time

stamp) was sent by fax to Bank of America's mutual funds clearing department for processing,

and received that day's NAV.  If the order was cancelled, Sihpol or a member of his team would

destroy the ticket.

63.     This procedure violated not only the SEC's "forward pricing rule" and the bank's compliance manual, but was contrary to the Nations Funds prospectus.  For example, the Nations Funds Primary A Shares prospectus dated August 1, 2001 states that orders received

> before the end of a business day (usually 4:00 p.m. Eastern time, unless the NYSE closes early) will receive that day's net asset value per share.  Orders received after the end of a business day will receive the next business day's net asset value per share.

(BofA-004955-005158 at BofA-005123)

64.     The manual trading system was cumbersome, and Canary soon began using ADP, the "direct link."  After Bank of America technicians installed it in Canary's offices in June of 2001, the link became the preferred route for Canary's late trading (although the manual procedure was still followed occasionally for certain orders and when Canary experienced technical problems).  The link enabled Canary to trade late not just in the Nations Funds where it had negotiated capacity, but in the many other mutual fund families with which the bank had clearing agreements. When there was a significant market event after 4:00 p.m. EST but before the ADP trading window closed at 6:30 p.m., the NAVs of many of these funds would be stale and potentially ripe for arbitrage trading by Canary.

65.     Sihpol and his team collected a so called "wrap fee" of one percent of the Canary assets in Nations Funds and one half of one percent of the assets in other funds traded through the platform.[4] Throughout 2001, 2002 and up until July 2003, Canary placed late orders for hundreds of mutual fund trades through ADP.   Each evening, summaries of Canary's late

---

[4]The term "wrap fee" as used at Bank of America generally refers to the fee it charges for investment advice on accounts it manages.  The bank provided no investment advice to Canary; the "wrap fee" was compensation for timing capacity and late trading.

24

trades were faxed to Sihpol's team, which used them to reconcile trading reports and then discarded them.

### 3.    Financing Canary's Late Trading and Timing

66.    Sihpol went to the Bank of America's private banking area to obtain additional financing for Canary's trading strategies.  The executives who approved this financing knew that the money would be used to time the bank's own funds.  Bank of America initially agreed to a $75 million line of credit, and later increased it to $100 and then $200 million.  The collateral for these loans was Canary's mutual fund positions, so the bank's credit area tracked Canary's trading closely to make sure the bank was fully secured.  Canary paid the bank a generous interest rate of LIBOR plus 1.25% for this loan.

### 4.    Derivatives

67.    Sihpol also sought and obtained approval for the BAS equity derivatives area to engage in the complex "equity basket" transactions that enabled Canary to sell mutual funds short and profit from falling markets.   Sihpol facilitated establishing these "synthetic" short positions by obtaining from Gordon's group the precise makeup of the Nations Funds that Canary was interested in shorting.  This information was then transferred to the bank's derivatives desk, which would then sell the stocks that the Nations Funds managers were buying in order to create a hedge.  Sihpol helped Canary update these positions on a regular basis so that the positions tracked the changing portfolios of the Nations Funds.  Canary paid the bank derivatives group commissions for the stock sales plus a generous financing spread.

### 5.    The Canary Relationship Expands

68.    Canary's timing activity in Nations Funds proceeded during 2001.  In

25

early 2002, however, Gordon raised an issue with Sihpol about an agreement the two had

reached in December, 2001 to provide Canary with more timing capacity.  This agreement was

reflected in an e-mail sent to Bryceland, Sihpol's branch manager, in which Siphol wrote:

> Canary is currently OK to trade 1% (or approx. $5MM) of the
> Nation's International fund.  When Rob [Gordon] and I spoke in
> December we agreed an increase to 2% would be acceptable
> provided it was accompanied by an amount of "sticky" assets to be
> determined later.

(BofA-015009)  When the time had come for Gordon to make good on this agreement, Sihpol

sent an e-mail dated January 2, 2002:

> Rob-
>
> Happy New Year.  We wanted to let you know Canary's line of
> credit with the bank has been increased to $100MM (from $75)
> and they are anticipating putting it to work with us over the next
> couple of weeks.  Do you have any feel on when we could expand
> their space in [the International Fund] as we discussed last month?
> This is a top priority for them and have [sic] offered "sticky" assets
> in return for additional trading space.
>
> Thanks again for the help.
>
> Ted

(BofA-015010-11)

69.    Gordon disagreed.  The agreement, according to Gordon, was only that

he would consider approving an increase in Canary's timing capacity which was, in any event,

contingent upon the fund sub-advisor's consent to the timing activity.  (BofA-015008)  Gordon

then enlisted the assistance of a senior executive at Bank of America's private bank, with whom

he had already discussed the issue.  In an e-mail forwarding Sihpol's January 2nd e-mail, Gordon

wrote:

> . . . you and I talked briefly about this on the bus in Phoenix — is
> this something that you want me to continue to make exceptions
> for (we don't as a general rule except market timers)?  The
> corresponding balances they give us in the funds are nice but I
> wouldn't do it for that.
>
> Rob

(BofA-015010)

70.    This message was forwarded to another Bank of America executive with the note that the Canary relationship "is controversial within bacap" and requesting that she speak with Gordon and advise on a game plan.  (BofA-015010)  According to an e-mail from Bryceland, Sihpol's supervisor, the private bank's concern "was making sure we do additional business if we are giving them 100mm of our balance sheet?"  (BofA-015008-009) Bryceland then scheduled a lunch meeting for the following day to discuss the Canary relationship and related issues with Gordon.   (BofA-015008-009)

71.    The next day, January 4, 2002, Sihpol sent an e-mail, at Bryceland's request, quantifying the past and future Canary relationship.  In relevant part, Sihpol wrote:

> The commission generated as of 12/31/01 has totaled over
> $655,000 (not including any revenue generated from the LIBOR +
> 125 [basis points] $100MM line of credit from the bank- of which
> $70 MM is currently drawn).  This means the revenues for AMG
> would total over $2,250,000 on an annualized basis.  This number
> assumes zero growth over the next year and does not include the
> one time fees (initial mutual funds charges, loan closings, etc.) the
> account experienced this year.  We are meeting with Eddie Stern
> on Monday to discuss dramatically expanding their derivative
> business and the addition of new capital to their trading accounts.

(BofA-015014-15) Bryceland then forwarded Sihpol's "quantification" of the Canary relationship to still further senior members in the Bank of America hierarchy.  Recipients

27

included Richard DeMartini, the head of all of Bank of America's asset management businesses.

Included with Sihpol's e-mail was Bryceland's praise for the individuals involved:

> Accolades go to:
> *   Rob Gordon & BACAP for giving access to BACAP funds for market timing activities (initial business we booked and not normally accepted by BACAP)
> *   [Private Bank executives] - Line of credit for 75 mm, now 100mm to provide leverage for derivative and market timing transactions in an expedited and extremely professional way
> *   Ted Sihpol .... - for...appropriately drawing on the firms [sic] resources to establish [the Canary relationship].
>
> It is always nice to enter a new year with a success like this. Thanks to all team members who have contributed to this profitable relationship and for thinking across divisional lines to make money for the firm.

(BofA-015014)

72.    After these e-mail briefings of the upper ranks of Bank of America

management, Sihpol met with Canary as he indicated he would in the "quantification" e-mail.

Apparently the controversy within BACAP continued, however, as Gordon had not yet approved

Canary's request for additional timing capacity.  Sihpol e-mailed the results of his Canary

meeting to Gordon as follows:

> 1.    They are adding an additional $50MM to their trading accounts to be run at 50 [basis points].  This is part of $90MM worth of negotiated space they have been promised by another firm and wish to trade the space here.  This will be followed by the additional 40MM as they use the $100MM line of credit.
> 2.    They agreed to try and increase their communication with us/the funds when increasing or decreasing the size of their trade in our (Nations) funds.
> 3.    They would like to see a term sheet on the principal protected note managed by Marsico as soon as one becomes available - and understand the value of participating in proprietary offerings.
> 4.    They [sic] fund would like to increase their business w/

28

> [the derivatives area] - esp. the ability to trade the same contracts
> more frequently (weekly).  The execution of our [derivatives] desk
> is the best they have on the street.
>
>      5.    Lastly, they would like to ask if we could grant them space
> (1-2%) in 3 additional Nations Funds. . . .
>
> While I know we continue to ask for space, the client continues to
> bring us new, outside, assets and continues to pay us generously on
> in-house, outside and derivative accounts.  Thanks again for the
> help and anything you could do would be great....

(BofA-015006-007)  Gordon forwarded Sihpol's status e-mail to DeMartini with the following

message:

> Rich — Once we've gotten the Marsico Principal Protected Fund
> off the ground, we intend to ask Mr. Stern for a commitment of
> $20 million in return for the market timing commitments.
>
> Rob

(BofA-015006)  BACAP, however, was unable to launch the Marsico Principal Protected Fund

into which the sticky money was to be deposited.   Gordon nonetheless approved additional

timing capacity (BofA-003500), and Canary continued timing various Nations Funds throughout

2002 and into 2003.

### 6.    Disclosures in the Nations Funds Prospectuses

73.     At no time did the Nations Funds disclose to shareholders (1) the

agreements with Canary, (2) Canary's extensive market timing activities pursuant to these

agreements, (3) the "sticky asset" deals, (4) the fact that Canary had access to a BAS trading

platform that enabled Canary to trade late, or (5) the other financial services the Bank of

America had provided Canary (and the revenues the Bank of America derived therefrom) in

connection with Canary receiving timing capacity in the Nations Funds.

74.     The 2001 Nations Funds prospectus contains no meaningful disclosures

29

relating to market timing.  In 2002, however, when Canary's timing activity was in full swing,

Nations Funds <u>added</u>  language to the prospectus disclosing the harmful effect of market timing

and reassuring shareholders that Nations Funds would protect them.  For example, the August 1,

2002 Nations Funds prospectus for Primary A shares discloses the following:

> The interests of a Fund's long-term shareholders and its ability to
> manage investments may be adversely affected when its shares are
> repeatedly bought and sold in response to short-term market
> fluctuations — also known as "market timing."  The exchange
> privilege is not intended as a vehicle for market timing.  Excessive
> exchange activity may interfere with portfolio management and
> have an adverse effect on all shareholders.  When BA Advisors
> believes frequent trading would have a disruptive effect on a
> Fund's ability to manage its investments, a Fund may reject
> purchase orders and exchanges into a Fund by any person, group
> or account that is believed to be a market timer.

(CC 003574-003797 at CC 003764)

75.    As one of Bank of America's "timing police" stated in an internal email

discussing another timers' approach to Nations Funds in search of timing capacity:

> Our stated policy for the Funds, and our representation to the
> Board, is that we do not allow market timing activity.

(BofA 001389)  A copy of this email was sent to Gordon on March 18, 2003.  Five days later,

Gordon approved further Canary timing in two additional Nations funds.  (See BofA-003500)

**7.     The End of the Canary Relationship**

76.    Ultimately, even BACAP's own employees questioned whether Canary's

timing trading was detrimental to long-term shareholders.  In a May 12, 2003 e-mail, a BACAP

employee complained vociferously to the "timing police" about the damage a timer -- apparently

Canary -- was doing to one of the Nations Funds:

> the PB has a client who trades $9 million in and out of the midcap

> index fund all the time.  It wasn't so bad when he held his
> positions for a while, but now he's trading extremely short swings,
> sometimes with holding periods of only a day.  The impact of this
> has been lessened since we have been getting notification in time
> to hedge at the close, but there is still a cost that's being borne by
> other fund shareholders.  We would be happy to set up a futures
> trading account for this guy and handle his futures trades for him,
> but a mutual fund is not the right vehicle for this kind of trading.

(BofA 000485)   Notwithstanding these concerns, Canary continued to time the Nations Funds

until early July, 2003, when Canary received a subpoena from the Attorney General's Office.  At

that point, Canary's timing of Nations Funds ceased.  On July 3, 2003, a member of the BACAP

"timing police" force sent the following e-mail to his colleague:

> This [attachment] is the [Canary] account in Small Company that
> came in on June 11 through Bear Stearns that Ted Sihpol indicated
> would be "sticky" money.  They placed a full liquidation
> yesterday.

(BofA-001496-99)  The BACAP "timing police" noticed right away that Canary's "sticky"

assets" had left the bank.

## E.        Security Trust Company

77.    STC, headquartered in Phoenix, Arizona, provides corporate trust services

to retirement plans, third-party administrators and various institutional clients.  It became

Canary's partner in a wide-ranging late trading and timing venture.

78.    STC provides an electronic trading platform to the administrators of

retirement plans and other clients that allows them to trade in mutual funds.  This platform gives

access to hundreds of mutual funds and processes thousands of mutual fund trades each day.

Many of these are submitted by individual participants in retirement plans -- in essence, when an

individual shifts retirement money among the mutual funds available in his or her retirement

31

plan, that plan in turn executes the resulting trades through STC. After aggregating the orders it receives during the course of the trading day, STC submits them in the evening to the National Securities Clearing Corporation for processing. STC charges retirement plans a fee of approximately ten basis points (one-tenth of one percent) of custodied assets for such trades. (STC 00028)

79. Canary's relationship with STC began in May of 2000, when Canary met with STC to see if it could use the STC electronic platform for its late trading and timing business. This platform provided Canary with one-stop shopping: (1) it could trade until 9:00 p.m. New York time and (2) STC offered an unusually broad range of mutual funds for "under the radar" timing. STC agreed to give Canary access to the STC trading platform at its standard rate of ten basis points.

80. Canary and STC memorialized their understanding in part in a written protocol entitled "Best Practices". Among other things, this provided that:

- Canary would vary the sizes of trades through STC to make them more difficult for fund companies to detect;

- "Upon receipt of concerned feedback from a fund complex (a "Fund") with respect to trade activity that cannot be alleviated by either conversations between the Fund and [STC] or a change in trading activity, [STC] shall request to [Canary] that the Fund no longer be used in the Account";

- "[STC] should arrange to Commingle 'sticky' or static assets into the multiple Omnibus Accounts in order to increase stability in the Fund and decrease perceived activity"; and

- STC would not provide "the same or similar services" to other mutual fund timers with the exception of another hedge fund named Samaritan and another Stern vehicle

32

named the Da Vinci fund.

(STC 00009-0011)  At or about the time the "Best Practices" document was prepared, STC

demanded a new arrangement with Canary that reflected its status as Canary's partner.  Canary

would now pay STC  "market value fees" of one percent on custodied assets (ten times what

legitimate customers paid) and "profit sharing fees" of four percent of Canary's gains.  (STC

00012 and 00027)   In October of 2000, STC also asked for and received a belated written

assurance that the trades Canary sent to STC as late as 9:00 p.m. were in fact "received" by

Canary before 4:00 p.m. New York time.  (STC 00007)

        81.    STC thereafter assisted Canary in locating new timing capacity.  With

regard to "under the radar" trading, STC helped Canary camouflage its trades by revealing to

Canary the mutual fund positions and trades of the retirement plans that were STC's legitimate

customers.  This allowed Canary to piggyback onto the retirement funds' trade flows in such a

way that the targeted mutual fund families would not notice Canary's timing. While potentially

damaging to STC's pension fund clients (because now their own mutual fund investments were

targets for Canary's timing), this was a significant help for Canary.   STC also introduced Canary

to the mutual fund managers at the bank where STC does its commercial banking business, Bank

One.

**F.**        **Bank One**

        82.    Bank One Corporation owns Banc One Investment Advisors ("BOIA"),

the management company for the "One Group" mutual funds.  STC introduced Stern to the

President of BOIA, Mark Beeson, in the spring of 2002.  Stern explained Canary's strategy, and

eventually Canary and Beeson agreed to the following:  (1) Canary would create a "special

purpose vehicle" (i.e., create a Canary affiliate) to conduct timing trading and fund it with $15

million; (2) Bank One would lend the special purpose vehicle $15 million at a high interest rate

in order to finance the timing; (3) Canary would be given timing capacity in the One Group

funds; and (4) Canary would consider making a "sticky asset" investment in a Bank One hedge

fund.   Beeson confirmed the deal in an e-mail to Stern dated March 21, 2002:

> Our managers are willing to work with you on the equity funds.
> They would like to start with ½ % of the fund's net assets as the
> maximum position and then evaluate moving to 1% later. . . . We
> will be ready to start trading once the other banking arrangements
> are complete.  Also, the head of our hedge group will be in New
> York on April 2.  Is it possible to meet with you or your hedge
> fund manager to discuss this opportunity more?

(See Miscellaneous Documents, Exhibit 6)  Stern responded on March 26:

> Here is the list of mutual funds we would like to trade, along with
> some other relevant information about the trading we want to do. .
> . . How does the following week look for your hedge fund guy?[5]

83.     Thereafter, Bank One permitted Canary to time the One Group funds it

had chosen:  the two international funds, the Small Cap Growth Fund, and two mid cap funds.

Since these trades were executed through STC, Canary was also able to engage in late trading.

84.     The prospectus for the One Group funds reassured investors that Bank

One protected them from timers like Canary.  For instance, it states:

> The exchange privilege [i.e., selling shares] is not intended as a
> way for you to speculate on short term movements in the market.
> Therefore:
>
> •     To prevent disruptions in the management of the Funds,
>       One Group limits excessive exchange activity.  **Exchange
>       activity is excessive if it exceeds two substantive**

---

[5]Canary never made the hedge fund investment with Bank One.

**exchange redemptions within 30 days of each other.**

- Excessive exchange activity will result in revocation of your exchange privilege.

(CC 004017-004018) (emphasis in original). Canary engaged in "excessive exchange activity" under this definition, but was not shut down.

85.     One Group had also established special penalties for timers of their international funds. These are also described in the prospectus:

> If you sell your shares of the International Equity Index Fund or the Diversified International Fund within 90 days of purchase, you will pay a redemption fee of 2.00% on the value of the shares sold. . . . The redemption fees are paid to the Funds and are designed to offset the brokerage commissions, capital gains impact, and other costs associated with fluctuations in Fund assets levels caused by short-term shareholder trading.

(CC 004019) The redemption fees were waived for Canary.

86.     In early 2003, Beeson asked Canary to stop timing the international funds, as he was uncomfortable continuing to waive the redemption fees required by the prospectus. He also relayed that the One Group fund managers were complaining to him about the effects of Canary's timing activity, and asked if Canary could reduce the frequency of its trading. In return, he offered Canary four new funds to time.

87.     Bank One subsequently offered to double its loan to the Canary special purpose vehicle, and asked for the "sticky asset" hedge fund investment that had been discussed in 2002. Canary was only willing to do so if Bank One would finance the investment. When Bank One was unable to do so, the relationship with Canary soured. Canary stopped its timing activity at Bank One in April of 2003.

35

G.          **Janus**

88.      Janus Capital Corporation ("Janus") is the investment advisor for the Janus family of funds.  (CC 002447)  In or about April, 2002, Janus granted permission for Canary to time the Janus Mercury fund.  In exchange, Canary deposited "sticky" money into a Janus money market fund.  Canary timed the Janus Mercury fund during 2002 and 2003.  Canary also received capacity to time the Janus High Yield fund.  Janus subsequently granted Canary capacity to time its High Yield fund as well.

**1.     Canary's Additional Timing Capacity at Janus**

89.      In early 2003, Canary sought timing capacity in Janus' offshore funds. Through an intermediary, it contacted Janus and offered "sticky" assets in exchange for this additional timing capacity.  (JCG 000277-000278)  In response, a concerned Janus employee sent e-mails to Richard Garland, the CEO of Janus International, expressing alarm over the volume of market timing activity in Janus funds:

> I'm getting more concerned w/ all of these market timers and how they are affecting our PM's [*i.e.*, Portfolio Managers] trading activity. [Portfolio Managers] have voiced their sensitivity on a number of occasions re: this type of activity in JWF.  I spoke to [a Janus employee] and confirmed that this is a big problem domestically and I want to avoid this at all cost before it gets too problematic offshore.  Now that we have our exchange limitation in our prospectus, I would feel more comfortable not accepting this type of business because its too difficult to monitor/enforce & it is very disruptive to the PM's & operation of the funds.  Obviously, your call from the sales side.

(JCG 000277)

90.      The employee also recommended to Garland that Janus refuse the additional business from Canary due to the issues created for portfolio managers: "For now, I

don't think we should take-on additional business of this nature....We need to keep our funds

clean & minimise [sic] issues for PM's/fund performance.  Do you agree?"  (JCG 000276)

>Garland did not agree.  He replied:

>I have no interest in building a business around market timers, but
>at the same time I do not want to turn away $10-$20m!  How big is
>the [Canary] deal . . .?

(JCG 000276)  After learning that Canary's timing could amount to between $10 and $50 million

dollars, Garland gave the "[g]o ahead" for Canary's additional timing capacity on April 3, 2003.

(JCG 000275) The new agreement with Canary was never finalized, however.

### 2.    Janus Attempts To Establish A Timing Policy

91.    Managing the extensive timing activity in its funds became difficult for

Janus.  In early June, 2003, it began to consider adopting a consistent policy on market timing.

Discussion concerning development of such a policy was opened up to certain Janus employees.

Comments included:

>• "Our stated policy is that we do not tolerate timers.  As such, we
>won't actively seek timers, but when pressed and when we believe
>allowing a limited/controlled amount of timing activity will be in
>JCG's best interests (increased profitability to the firm) we will
>make exceptions under these parameters."  (JCG 000605)

>• "My own personal recommendation is not to allow timing,
>period, and follow the prospectus....[T]imers often hide multiple
>accounts and move on the same day which could hurt other
>investors and enrage the Pms....I don't think the static assets that
>we might be able to hold onto are worth the potential headaches,
>nor does this fall into our 'narrow and deep' focus.  I suggest we
>maintain the timing agreements we have, but allow no more."
>(JCG 000569-570)

>• "[I]f we are going to allow timing, we want to be sure that there
>are enough static assets [i.e., "sticky" assets] so that we are making
>a decent profit for all the trouble we are put through."  (JCG

000569)

**3.     The Janus Prospectuses**

92.     The Janus prospectus did not disclose the approved market timing activity

in Janus funds.  On the contrary, the disclosures in the prospectus gave the appearance that

market timers were being policed and shut down.  For example, the February 25, 2002

prospectus for the Janus Income Funds (including the HighYield Fund that Canary was timing)

states under the heading "Excessive Trading Policy":

> Frequent trades in your account or accounts controlled by you can
> disrupt portfolio investment strategies and increase Fund expenses
> for all Fund shareholders.  The Funds are not intended for market
> timing or excessive trading.  To deter these activities, the Funds or
> their agents may temporarily or permanently suspend or terminate
> exchange privileges of any investor who makes more than four
> exchanges out of a Fund in a calendar year and bar future
> purchases into the Fund by such investor.  In addition, the Funds or
> their agents also may reject any purchase orders (including
> exchange purchases) by any investor or group of investors
> indefinitely for any reason, including, in particular, purchase
> orders that they believe are attributable to market timers or are
> otherwise excessive or potentially disruptive to the Fund.
>
> Orders placed by investors in violation of the exchange limits or
> the excessive trading policies or by investors that the Fund
> believes are market timers may be revoked or cancelled by a
> Fund....

(CC 002438-439)

**G.     Strong**

93.     Strong Capital Management, Inc. ("Strong") is the advisor for the Strong

family of mutual funds.  Canary met with Strong representatives on October 16, 2002, asked for

permission to time their mutual funds, and at the same time offered to invest in a proprietary

Strong hedge fund.  (Strong 00924)   After agreeing which funds Canary would be allowed to

38

time, Strong provided Canary with the September month-end portfolio holdings of the target

funds on November 13.  (Strong 0503)  On November 26, an internal Strong email documented

the understanding with Canary:

> "[Canary] will be opening a brokerage account . . . valued somewhere around $18 million dollars. The purpose of the brokerage account will be to trade mutual funds and trade on margin. [It] will be actively trading the mutual funds that [a Portfolio Manager] manages, but will not trade more than 1% of the total assets of the fund on any one day. . . . The client will also have substantial additional assets in other areas of Strong for Cash Management[6] and Hedge Fund purposes.

The trading arrangement was documented in more detail in a letter to Canary that day:

- • The following funds are available for your strategy;
  - •Strong Growth 20 Fund
  - •Strong Growth Fund
  - •Advisor Mid Cap Growth Fund
  - •Strong Large Cap Growth Fund
  - •Strong Dividend Income Fund
- • If your assets are not invested in one of the above funds then these assets will reside in one of the Strong Money Markets.
- • You will need to be invested in any fund on the last day of the month if you are invested in that same fund on the first day of that same month.
- • All funds will be available for margin according to Reg T.
- • We will need trading instructions from you by 2:45 PM CST/3:45 PM EST on any day you wish to trade.
- • All positions are limited to 1% of the assets within the fund....

(CC 000013)  An e-mail the following day shows Strong alerting its transfer agent and clearing

broker to the arrangement with Canary so that the trades would not be rejected for "flipping."

(Strong 0748)

---

[6]The cash management portion of this agreement was apparently never funded.

94.     Strong's prospectus gave investors no warning that their funds would be used for timing, but rather created the misleading impression that Strong identified and barred timers from its funds.  A Strong prospectus for one of the funds Canary timed reads:

> **Market Timers**
> The Fund will consider the following factors to identify market timers: shareholders who (1) have requested an exchange out of the fund within 30 days of an earlier exchange request; (2) have exchanged shares out of the Fund more than twice in a calendar quarter; (3) have exchanged shares equal to at least $5 million or more than 1% of the Fund's net assets; or (4) otherwise seem to follow a timing pattern. . . .

(CC 005094)  It then goes on to reserve the right to shut market timers down:

> We reserve the right to:
>
> •Refuse, change, discontinue, or temporarily suspend account services, including purchase, exchange, or telephone, facsimile and online account redemption privileges, for any reason.
>
> •Reject any purchase request for any reason, including exchanges from other Strong Advisor Funds or Strong Funds.  Generally, we do this if the purchase or exchange is disruptive to the efficient management of a fund (due to the timing of the investment or an investor's history of excessive trading).

(CC 005196)

After several months of trading, Canary wrote Strong on February 21, 2003:

> We are prepared to make an investment in your hedge fund.  We will also step up our allocation to your mutual funds to our full $18 MM if that is still ok.

(Strong 0495)

At about this time, Canary asked if it could clear its Strong trades through the Bank of America (which Canary knew would allow it to engage in late trading). On February 25,

Strong replied to Canary: "As for the clearing through B of A, it is not going to work out."

(Strong 0896)

95.     Strong regularly provided Canary with detailed breakdowns of the

portfolios of the target funds.  (Strong 0503-564)  These allowed Canary to sell short the stocks

that the portfolios contained.  Canary was satisfied with the relationship.  In May, Canary wrote

Strong:

> Hey, we are going to be doubling up our mutual fund positions in a
> week or two.  Some time shortly thereafter, we will double up on
> our hedge fund position.

(Strong 0751)

## FIRST CAUSE OF ACTION

96.     The acts and practices of the Defendants relating to late trading violated

section 352-c(1)(a) of the General Business Law, in that they involved the use or employment of

a fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase

or sale, engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or

purchase within or from this state of securities or commodities.

## SECOND CAUSE OF ACTION

97.     The acts and practices of the Defendants relating to late trading violated

section 352-c(1)(c) of the General Business Law, in that they involved the use or employment of

a representation or statement which is false, where the person who made such representation or

statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii)

made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the

representation made, and where such acts or practices were engaged in to induce or promote the

41

issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities.

## THIRD CAUSE OF ACTION

98.    The acts and practices of the Defendants relating to late trading violated section 352-c(2) of the General Business Law, in that Defendants engaged in an artifice, agreement, device or scheme to obtain money, profit or profit by a means prohibited by section 352-c of the General Business Law.

## FOURTH CAUSE OF ACTION

99.    The acts and practices of the Defendants relating to timing violated section 352-c(1)(a) of the General Business Law, in that they involved the use or employment of a fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities.

## FIFTH CAUSE OF ACTION

100.    The acts and practices of the Defendants relating to timing violated section 352-c(1)(c) of the General Business Law, in that they involved the use or employment of a representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation made, and where such acts or practices were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities.

42

**SIXTH CAUSE OF ACTION**

101.    The acts and practices of the Defendants relating to timing violated

section 352-c(2) of the General Business Law, in that Defendants engaged in an artifice,

agreement, device or scheme to obtain money, profit or profit by a means prohibited by section

352-c of the General Business Law.

**SEVENTH CAUSE OF ACTION**

102.    The acts and practices of the Defendants relating to late trading and timing

violated section 63(12) of the Executive Law, in that Defendants engaged in repeated fraudulent

or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on,

conducting or transaction of a business.


**WHEREFORE**, plaintiff demands judgment against the defendants as follows:

A.  That defendants be permanently restrained and enjoined from engaging in any

fraudulent practices in violation of Article 23-A of the General Business Law or section 63(12)

of the Executive Law;

B.  That defendants be restrained and enjoined from engaging in the sale, offer to

sell, purchase, offer to purchase, promotion, negotiation and distribution of any mutual funds;

C.  That defendants, pursuant to General Business Law § 353(3) and Executive

Law § 63(12), disgorge profits obtained and pay damages caused by the fraudulent acts

complained of herein; and

D.  That the Court award such other and further relief to plaintiff as the Court may

deem just and proper in the circumstances.

Dated:  New York, New York                    ELIOT SPITZER
        September 3, 2003                     Attorney General of the State of New York
                                              *Attorney for Plaintiff*
                                              Office & P.O. Address
                                              120 Broadway, 23rd Floor
                                              New York, New York 10271
                                              (212) 416-8219


                                              By: _____
                                              David D. Brown, IV
                                              Assistant Attorney General

44