# EXHIBIT D

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
September 7, 2007

ADMINISTRATIVE PROCEEDING
File No. 3-12753

| | |
|---|---|
| In the Matter of<br><br>PRITCHARD CAPITAL PARTNERS, LLC, THOMAS WARD PRITCHARD, JOSEPH JOHN VANCOOK, AND ELIZABETH ANN MCMAHON,<br><br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940 |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Thomas Ward Pritchard ("Thomas Pritchard") and that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Exchange Act and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Pritchard Capital Partners, LLC ("Pritchard Capital"), Joseph John VanCook ("VanCook") and Elizabeth Ann McMahon ("McMahon").

**II.**

After an investigation, the Division of Enforcement alleges that:

**A.      Respondents**

1.      Pritchard Capital is a Louisiana limited liability company that has been registered with the Commission as a broker-dealer pursuant to Section 15(b) of the Exchange Act since March 2000.  Pritchard Capital is headquartered in Mandeville, Louisiana and has branch offices in New York, New York and Atlanta, Georgia.

2.      Thomas Pritchard, a resident of Covington, Louisiana, is the managing director of Pritchard Capital.  At all times relevant hereto, Thomas Pritchard was also the chief compliance officer of Pritchard Capital.  Thomas Pritchard currently owns 80% of Pritchard Capital and holds Series 3, 5, 7, 15, 24, 27 and 63 securities licenses.

3.      VanCook is a resident of Rye, New York.  From approximately March 2001 through February 2004, VanCook was associated with Pritchard Capital in its New York office. In 2002, VanCook became a partner of Pritchard Capital and by 2003 owned 20% of the firm. VanCook holds Series 7 and 63 securities licenses.

4.      McMahon is a resident of Long Beach, New York.  From approximately March 2001 through January 2004, McMahon was associated with Pritchard Capital in its New York office.  During all relevant times, McMahon held Series 7, 24, 63 and 65 securities licenses. McMahon asserted her Fifth Amendment privilege against self incrimination during the staff's investigation.

**B.      Background**

5.      Pritchard Capital opened its New York office and hired VanCook in March 2001. During his tenure at Pritchard Capital, VanCook was instrumental in building the firm's business among clients who traded mutual fund shares.

6.      Pritchard Capital hired McMahon in its New York office in approximately March 2001.  Pritchard Capital's New York office was classified as an Office of Supervisory Jurisdiction with McMahon listed as the branch manager.

7.      "Late trading" refers to the practice of placing orders to buy or sell mutual fund shares after 4:00 p.m. Eastern Time, the time as of which mutual funds typically calculate their net asset value ("NAV"), but receiving the price based on the NAV already determined as of 4:00 p.m. Late trading enables the trader to profit from market events that occur after 4:00 p.m. but are not reflected in that day's price.

8.      From as early as approximately November 2001 through July 2003, Pritchard Capital allowed some of its mutual fund customers to late trade mutual fund shares.  Virtually all of the late trading occurred through Pritchard Capital's New York office and involved VanCook and McMahon.

**C.      Late Trading**

9.      At all times relevant hereto, Pritchard Capital entered its customers' mutual fund trades through an electronic Mutual Fund Order Entry System ("MFRS") operated by the broker-dealer through which Pritchard Capital cleared its trades (the "clearing broker-dealer").  Pritchard Capital had direct access to the MFRS system, through which mutual fund orders could be entered until 5:30 p.m. Eastern Time on any trading day in any of the funds available through the clearing broker-dealer.  Mutual fund trades entered up until 5:30 p.m. would receive the NAV calculated as

2

of 4:00 p.m. that day.  Although both VanCook and McMahon entered mutual fund orders into the MFRS system, McMahon entered the majority of the mutual fund orders.

10.    The clearing broker-dealer was a dealer within the meaning of Rule 22c-1(a) under the Investment Company Act because it had selling agreements with the mutual funds that were traded through the MFRS system.

11.    The clearing broker-dealer supplied Pritchard Capital with written documentation explaining the MFRS system and listing the mutual funds with which the clearing broker-dealer had selling agreements.  Among other things, that documentation states that "All orders should be received and time stamped by the close of the NYSE, 4 PM EST."

12.    The prospectuses of the  mutual funds that were subject to the late trading facilitated by Pritchard Capital contained disclosures stating that the mutual funds calculated their NAV either "at" or "as of" 4:00 p.m. Eastern Time and that an investor would receive the price next calculated after receipt of the order.  Many of them stated that orders received after the close of trading on the NYSE (generally 4:00 p.m.) would receive the public offering price next determined on the following business day.  Some of the prospectuses even specified that the time that the broker or financial intermediary received the order "shall be" the time used for determining whether the investor received that day's NAV.

13.    Pritchard Capital's customers were permitted to place mutual fund orders by e-mailing or faxing spreadsheets to VanCook or McMahon listing proposed or tentative trades.  Some of the spreadsheets containing the tentative trades were specifically designated as "tentative" or "contingent" trades.  Also, some of the trade sheets or e-mails transmitting the trade sheets expressly instructed Pritchard Capital to wait for the customer's confirming call before entering the trades.  The customer's proposed trade order generally was date and time stamped when received, usually before 4:00 p.m. Eastern Time.

14.    If a customer submitted tentative mutual fund trades, VanCook and/or McMahon would not actually execute the order through the MFRS system unless and until they received confirmation from the customer.  The form of confirmation varied; some customers confirmed their trades by e-mail or facsimile and others confirmed by telephone.  The individual at Pritchard Capital who received the trade confirmations would generally make notations on the tentative spreadsheet indicating which trades were to be executed and which were not.  On many occasions, customers would wait until after 4:00 p.m. Eastern Time to either confirm trades with Pritchard Capital or to notify Pritchard Capital that they did not wish to do any of the trades previously submitted on the tentative trade sheet.

15.    Pritchard Capital generally did not document the time of its customers' final confirmations of tentative mutual fund trades.

16.    VanCook and McMahon permitted some of Pritchard Capital's mutual fund customers to buy or sell mutual funds after 4:00 p.m. Eastern Time, the time as of which funds

typically calculate their NAV, but receive the price based on the NAV already determined as of 4:00 p.m. Eastern Time.

17.    One mutual fund trader (the "first trader"), who managed fourteen active market timing accounts at Pritchard Capital confirmed over 90% of his mutual fund orders after 4:00 p.m. and received the NAV calculated as of 4:00 p.m. on the day of the trades. The first trader engaged in over 2,600 mutual fund trades through Pritchard Capital during the relevant period. Both VanCook and McMahon told the first trader that he had to submit his final mutual fund orders by 5:00 p.m.

18.    Another mutual fund trader (the "second trader") managed seven market timing accounts at Pritchard Capital during the relevant period. From mid-November 2002 through mid-January 2003, the second trader experimented with a late trading strategy with VanCook. In approximately October or November 2002, the second trader was contemplating terminating his market timing business at Pritchard Capital. VanCook, in an effort to retain the business, proposed to the second trader a trading strategy whereby the second trader could submit mutual fund orders to Pritchard Capital before 4:00 p.m. and subsequently choose to cancel or allow those trades to go through any time up until 5:00 or 5:05 p.m. and still receive that day's NAV. The second trader would decide to trade based on activity in the futures market between 4:45 and 5:00 or 5:05 p.m. VanCook told the second trader that there were other customers at Pritchard Capital that engaged in late trading.

19.    VanCook and McMahon would also receive communications from additional customers after 4:00 p.m. placing, modifying or confirming mutual fund trades and would subsequently enter those trades into the MFRS system, knowing that those trades would receive the current day's NAV.

### D.    Compensation

20.    Pritchard Capital's market timing customers contracted with the firm to provide mutual fund trading services in exchange for a negotiated wrap fee (generally 1.0% to 1.25%) and, in many cases, a $25 per trade transaction fee.

21.    At all times relevant hereto, VanCook received compensation of 50% of the wrap fees related to the business that he generated, with Pritchard Capital retaining the other half.

### E.    Supervisory Failures

22.    At all times relevant hereto, Thomas Pritchard was responsible for developing supervisory policies and procedures at Pritchard Capital.

23.    Pritchard Capital and Thomas Pritchard supervised VanCook during all times relevant hereto.

24.     Pritchard Capital and Thomas Pritchard failed reasonably to supervise the activities of VanCook with a view to preventing his violations of the federal securities laws in that, among other things:

a.     Thomas Pritchard failed reasonably to respond to red flags of potential late trading by VanCook.  During his periodic visits to the firm's New York office, Thomas Pritchard's review of files focused on the trade blotters.  He gave only a "cursory look" to mutual fund correspondence and trade ticket files.  Because of Thomas Pritchard's cursory review, he failed to recognize, and/or failed to respond appropriately to, red flags or indications of wrongdoing by VanCook.  For example, many of the "trade ticket files" were designated as "tentative or "contingent" trades."  Some of the trade sheets or e-mails transmitting the trade sheets expressly instructed Pritchard Capital to wait for the customer's confirming call before entering the trades. The contingent nature of the tentative trades, coupled with the ability to enter mutual fund trades as late as 5:30 p.m. Eastern Time through the clearing broker-dealer's MFRS system, merited further inquiry into the potential for late trading; and

b.     Pritchard Capital's written supervisory procedures did not contain policies or procedures reasonably designed to prevent or detect illegal late trading by VanCook.

**F.     Books and Records**

25.     At all times relevant hereto, Pritchard Capital, acting through VanCook and McMahon, generally did not prepare conventional order tickets for its mutual fund transactions. Rather, the firm generally created order tickets for its mutual fund orders and trades by retaining the communication (if written or e-mailed) containing the actual or proposed mutual fund order with the time of receipt noted.  Pritchard Capital also printed out a screen from the MFRS system that showed the order as entered on the MFRS system.

26.     At all times relevant hereto, Pritchard Capital, acting through VanCook and McMahon, failed to make and keep accurate and complete records regarding the terms and conditions of each mutual fund order and the modifications and cancellations of such orders in that, among other things:

a.     In the case of tentative or proposed trades, the records evidencing orders frequently were not accurate reflections of the final order and did not clearly document the terms and conditions of the orders and any modifications or cancellations thereof.

b.     From approximately May 2003 through July 2003, Pritchard Capital, acting through VanCook and McMahon, failed to make order tickets for mutual fund orders reflecting the time of receipt of such orders; and

c.     In those instances, on or after May 2, 2003, where Pritchard time-stamped a tentative mutual fund order prior to 4:00 p.m. Eastern time and subsequently allowed the customer to confirm, cancel or modify that order after 4:00 p.m. Eastern time, without documenting the time of such confirmation, cancellation or modification, Pritchard Capital failed to document a required record.

### G.    Violations

27.    As a result of the conduct described above, the clearing broker willfully violated Rule 22c-1(a), as adopted under Section 22(c) of the Investment Company Act, which requires certain mutual funds, persons designated in such issuers' prospectuses as authorized to consummate transactions in any such security, their principal underwriters, or dealers in the funds' securities, to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem.

28.    As a result of the conduct described above, VanCook willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder which makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, to employ any device, scheme or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

29.    As a result of the conduct described above, McMahon caused, and Pritchard Capital and VanCook willfully aided and abetted and caused, the clearing broker's violations of Rule 22c-1, promulgated under Section 22(c) of the Investment Company Act, which provides that no registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

30.    As a result of the conduct described above, Pritchard Capital willfully violated, and VanCook and McMahon willfully aided and abetted and caused Pritchard Capital's violations of, Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(6) thereunder, which require that broker-dealers registered with the Commission make and keep current, for prescribed periods, certain books and records.  Rule 17a-3(a)(6) requires that registered broker-dealers make and keep "[a] memorandum of each brokerage order, and of any other instruction, given or received for the purchase or sale of securities, whether executed or unexecuted.  The memorandum shall show the terms and conditions of the order or instructions and of any modification or cancellation thereof; the account for which entered; the time the order was received; the time of entry; the price at which executed; the identity of each associated person, if any, responsible for the account; the identity of any other person who entered or accepted the order on behalf of the customer or, if a customer entered the order on an electronic system, a notation of that entry; and, to the extent feasible, the time of execution or cancellation."  Rule 17a-3(a)(6) was amended, effective May 2, 2003, to add the requirement to note the time an order was received from a customer.

31.     As a result of the conduct described above, Pritchard Capital and Thomas Pritchard failed reasonably to supervise, within the meaning of Sections 15(b)(4) and 15(b)(6) of the Exchange Act, in that they failed reasonably to supervise VanCook,  a person subject to their supervision, with a view to preventing VanCook's violations of the federal securities laws.

### III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A.     Whether the allegations set forth in Section II are true and, in connection therewith, to afford Pritchard Capital, Thomas Pritchard, VanCook and McMahon the opportunity to establish any defenses to such allegations;

B.     What, if any, remedial action is appropriate in the public interest against Pritchard Capital and VanCook pursuant to Section 15(b) of the Exchange Act including, but not limited to, disgorgement, including reasonable interest, and civil penalties pursuant to Section 21B of the Exchange Act;

C.     What, if any, remedial action is appropriate in the public interest against Thomas Pritchard and McMahon pursuant to Section 15(b) of the Exchange Act including, but not limited to, civil penalties pursuant to Section 21B of the Exchange Act;

D.     What, if any, remedial action is appropriate in the public interest against Pritchard Capital, VanCook and McMahon pursuant to Section 9(b) of the Investment Company Act including, but not limited to, civil penalties pursuant to Section 9(d) of the Investment Company Act; and

E.     Whether, pursuant to Section 21C of the Exchange Act and Section 9(f) of the Investment Company Act, Pritchard Capital should be ordered to cease and desist from causing violations of and any future violations of Rule 22c-1 of the Investment Company Act and committing or causing violations of and any future violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(6) thereunder.

F.     Whether, pursuant to Section 21C of the Exchange Act and Section 9(f) of the Investment Company Act, VanCook and McMahon should be ordered to cease and desist from causing violations of and any future violations of Rule 22c-1 of the Investment Company Act and Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(6) thereunder, and VanCook should be ordered to cease and desist from committing or causing violations of and any future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## IV.

IT IS HEREBY ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than thirty (30) days and not later than sixty (60) days from service of this Order, at a time and place to be fixed, and before an Administrative Law judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. §201.110.

IT IS FURTHER ORDERED that the respondents shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice. 17 C.F.R. §201.220.

If a respondent fails to file the directed Answer or fails to appear at a hearing after being duly notified, the respondent may be deemed in default, and the proceedings may be determined against him or her upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice. 17 C.F.R. §201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon the respondents personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice. 17 C.F.R. §201.360(a)(2).

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceedings will be permitted to participate or advise in the decision of this matter, except as a witness or counsel in proceedings held pursuant to notice. Because this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.


Nancy M. Morris
Secretary

8