**EXHIBIT F**



Home | Previous Page

## U.S. Securities and Exchange Commission

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 270**

**[Release No. IC-26288; File No. S7-27-03]**

**RIN 3235-AJ01**

**Amendments to Rules Governing Pricing of Mutual Fund Shares**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Proposed rule amendments.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is proposing amendments to the rule under the Investment Company Act that requires forward pricing of redeemable securities issued by registered investment companies ("funds"). The amendments would provide that an order to purchase or redeem fund shares would receive the current day's price only if the fund, its designated transfer agent, or a registered securities clearing agency receives the order by the time that the fund establishes for calculating its net asset value. The amendments are designed to prevent unlawful late trading in fund shares.

**DATES:** Comments must be received on or before February 6, 2004.

**ADDRESSES:** To help us process and review your comments more efficiently, comments should be sent by one method only. Comments in paper format should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-0609. Comments in electronic format should be submitted to the following E-mail address: rule-comments@sec.gov. All comment letters should refer to File No. S7-27-03; if E-mail is used, this file number should be included on the subject line. Comment letters will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW, Washington, DC 20549. Electronically submitted comment letters will be posted on the Commission's Internet web site (http://www.sec.gov).[1]

**FOR FURTHER INFORMATION CONTACT:** Adam B. Glazer, Attorney, or Penelope W. Saltzman, Senior Counsel, Office of Regulatory Policy, (202) 942-0690, Division of Investment Management, Securities and Exchange

Commission, 450 Fifth Street, NW, Washington, DC 20549-0506.

**SUPPLEMENTARY INFORMATION:** The Commission today is proposing for public comment amendments to rule 22c-1 [17 CFR 270.22c-1] under the Investment Company Act of 1940 [15 U.S.C. 80a] (the "Investment Company Act" or the "Act").

**TABLE OF CONTENTS**

I. BACKGROUND

II. DISCUSSION

    A. Proposed Pricing Requirements

    B. Purchase and Sale Orders; Exchanges

    C. Exceptions

III. III. GENERAL REQUEST FOR COMMENT

IV. IV. COST-BENEFIT ANALYSIS

V. V. PAPERWORK REDUCTION ACT

VI. VI. INITIAL REGULATORY FLEXIBILITY ANALYSIS

VII. VII. STATUTORY AUTHORITY

TEXT OF PROPOSED RULE

## I. BACKGROUND

Rule 22c-1 under the Investment Company Act, the "forward pricing" rule, requires funds, their principal underwriters, and dealers to sell and redeem fund shares at a price based on the current net asset value ("NAV") next computed after receipt of an order to buy or redeem.[2] The rule also requires that funds calculate their NAV at least once a day.[3] Today, most funds calculate NAV when the major U.S. stock exchanges close at 4:00 p.m. Eastern Time.[4]

Under rule 22c-1, an investor who submits an order before the 4:00 p.m. pricing time must receive that day's price, and an investor who submits an order after the pricing time must receive the next day's price. "Late trading" refers to the illegal practice of permitting a purchase or redemption order received after the 4:00 p.m. pricing time to receive the share price calculated

as of 4:00 p.m. that day.[5] A late trader can exploit events occurring after 4:00 p.m., such as earnings announcements, by buying on good news (and thus obtaining fund shares too cheaply) or selling on bad news (and thus selling at a higher price than the shares are worth). In either case, the late trader profits at the expense of long-term investors in the fund.

Investors do not submit orders directly to funds, but to any one of several different types of intermediaries. All order information for a particular fund is ultimately submitted to the transfer agent ("primary transfer agent") that acts as the master recordkeeper for the fund, keeping track of shares sold and redeemed and cash flowing into and out of the fund.[6] Those investors who deal directly with the fund by telephone or computer typically submit their order information to the fund's primary transfer agent.[7] Many, however, invest in mutual fund shares through other intermediaries such as broker-dealers, banks, and retirement plans[8] that form a network of intermediaries that process and record the transactions.[9]

Instead of submitting hundreds or even thousands of individual purchase and redemption orders each day, intermediaries typically net orders received from investors against each other and submit a single file containing net or omnibus purchase or redemption order information to the fund's primary transfer agent.[10] Many of the purchase and redemption orders are routed to fund primary transfer agents through the National Securities Clearing Corporation ("NSCC"), currently the only registered clearing agency[11] that operates an automated system for processing those orders for funds[12] ("Fund/SERV").[13] Fund/SERV provides a central processing system that collects order information from clearing brokers and others, sorts all the incoming order information according to fund, and transmits the order information to each fund's primary transfer agent.[14]

Although purchase and redemption orders must be submitted to retail dealers and other intermediaries by 4:00 p.m. in order to receive that day's price, our rules permit those intermediaries to forward the order information to Fund/SERV or fund primary transfer agents at a later time.[15] These intermediaries, which include broker-dealers, banks, and administrators of retirement plans, typically process orders received before 4:00 p.m. in the early evening hours before submitting them to Fund/SERV or fund primary transfer agents. The process is typically completed in the middle of the night.

## II. DISCUSSION

Investigations by Commission staff and state securities authorities have uncovered late trading of fund shares by intermediaries in violation of our rules, in some cases with the assistance of fund managers.[16] Our investigations and examinations are ongoing, but to date suggest that late trading of fund shares is not isolated, nor is it limited to any one type of fund or intermediary.[17]

Fund managers themselves have permitted late trades by favored investors. Late trading not only violates rule 22c-1, but managers who permit late trading also breach their fiduciary duties to the funds and fund shareholders. We have approved a new rule requiring that all funds have policies and procedures in place designed, among other things, to prevent late trading facilitated by fund personnel. We believe these new policies and procedures, administered by a chief compliance officer reporting directly to the fund's board of directors, will make such schemes more difficult. Vigorous civil enforcement, as well as criminal enforcement actions, when appropriate, will further deter such behavior.

Fund intermediaries have blended late trades with legitimate trades in the file containing net order information submitted to Fund/SERV or a fund's primary transfer agent after 4:00 p.m., effectively concealing the late trades from fund managers and from our compliance examiners. When we adopted rule 22c-1, we also amended our broker-dealer recordkeeping rules to require time-stamping of fund orders, which would permit us to detect late trades.[18] The rule has been circumvented by, for example, routinely permitting favored investors to place orders before 4:00 p.m., but cancel them after late news is received. Purchase orders would survive only when good news released after 4:00 p.m. increased the value of the fund's portfolio, while redemption orders would survive only when bad news depressed the value of the portfolio. Similarly, orders have been placed before 4:00 p.m. to be modified or changed after 4:00 p.m. Also clients that had placed an order for one fund's shares before 4:00 p.m. that was rejected by the fund, have been permitted to substitute an order for another fund's shares after 4:00 p.m. In each of these circumstances, the broker's records would appear to support a series of bona fide trades all of which were time-stamped before 4:00 p.m.

We are very concerned that our current rules, which permit intermediaries to process trades after 4:00 p.m., have failed to prevent late trading, and that available tools to control late trading facilitated by fund intermediaries have proven inadequate. Fund managers have informed us that, although they contractually require intermediaries to segregate orders submitted before 4:00 p.m. from those submitted later, they have no practical way to enforce that contractual obligation because they cannot discern late trades. Some broker-dealers engaging in late trading appear to have successfully concealed their activities from our examination staff and the self-regulatory organizations. Other fund intermediaries are not subject to our regular examination, and we cannot take steps we believe are adequate to prevent late trading through those intermediaries.

To eliminate late trading through fund intermediaries, we are proposing to amend rule 22c-1, as discussed in more detail below, to require that all purchase and redemption orders be received by the fund,[19] a single transfer agent designated by the fund and required by written contract to receive order information and maintain a record of the date and time it receives the information ("designated transfer agent"), or a registered clearing agency (*e. g.*, Fund/SERV) no later than the time at which the fund prices its securities

(e.g., 4:00 p.m.), in order to obtain the current day's price.[20] As a consequence, fund intermediaries, such as broker-dealers, banks, and administrators of retirement plans would have to submit orders to the fund before 4:00 p.m. in order for their customers to receive the 4:00 p.m. price.[21] Orders received later would have to receive the following day's price.

We recognize that this proposed rule change, if adopted, would likely require substantial changes in the way fund intermediaries process fund purchase and redemption orders. The capacity of computer systems that process those orders will likely have to be expanded to handle more transactions within a shorter period of time. Intermediaries will likely require investors to submit purchase orders at an earlier time in the day (e.g., 2:00 p.m.) to obtain the 4:00 p.m. price, in order to allow the intermediary time to process the purchase and redemption orders before submitting them to the fund, its designated transfer agent, or the clearing agency. Administrators of defined contribution employee pension plans, (e.g., 401(k) plans) have informed us that they likely will be unable to process any purchase and redemption requests the same day they are made.[22]

We seek comment on these costs, and whether they are justified by the benefits of the proposed amendments. In proposing these amendments, we assume investors and intermediaries will adapt to the new requirements, just as they adapted when we required forward pricing in 1968. Investors for whom it is important to be able to place orders shortly before 4:00 p.m. will seek out fund complexes that permit investors to submit orders directly to the fund's designated transfer agent. Some fund intermediaries also may compete for such investors by developing more efficient order processing systems. Others may eschew such customers because they tend to be short-term traders or market-timers. We believe that the burden on most fund investors will be small because most are not sensitive to the time at which their purchase or redemption orders are priced. They make longer-term investments, often as part of an automatic purchase program, and treat the time and date of the purchase order as a random event controlled by their employer's payroll processing protocols, or the delivery of the mail. In some cases, a purchase order executed at the next day's price will be executed at a lower price than it would the same day; in other cases, it will be executed at a higher price.

We also seek comment on an approach that has been suggested.[23] This approach would require fund intermediaries, in order to be eligible to submit orders to designated transfer agents or Fund/SERV after 4:00 p.m., to have adopted certain protections designed to prevent late trading.[24] Such protections could include:

- Electronic or physical time-stamping of orders in a manner that cannot be altered or discarded once the order is entered into the trading system;

- Annual certification that the intermediary has policies and procedures

in place designed to prevent late trades, and that no late trades were submitted to the fund or its designated transfer agent during the period; and

- Submission of the intermediary to an annual audit of its controls conducted by an independent public accountant who would submit his report to the fund's chief compliance officer.

We have identified these three protections as important components of this approach. Would each of these protections be appropriate to preventing trading in fund shares? Are there other protections that would be necessary or appropriate to prevent unlawful late trading while permitting intermediaries to continue processing purchase and redemption orders after 4:00 p.m.? If so, what are they?

Would such an approach be effective at stopping late trading? Some broker-dealers appear to have easily circumvented current system controls, including the time-stamping required by our rules. Our staff reports that at least one broker-dealer that had obtained an annual audit of its internal controls by an independent auditor has submitted late trades. We are therefore concerned that an independent auditor may fail to detect weaknesses in internal controls that allow late trading to occur. How could we prevent any such protections and controls from being circumvented similarly in the future? How would we police compliance with the controls by the fund intermediaries over which we have no regulatory authority? Finally, we recognize that this approach might require different systems changes than those required under the proposed amendments discussed in this Release. What costs would this approach impose on intermediaries? Would these costs be passed on to fund investors? Are there other conditions that would be more effective, or equally effective but less costly?

## A. Proposed Pricing Requirements

Rule 22c-1 currently deems a purchase or redemption order to be received, for purposes of determining the appropriate day's price, when the retail dealer receives the order, even if it is actually submitted to the fund's transfer agent at a later time. The proposed amendments would deem an order received only when it is received[25] by (i) the fund itself, (ii) the fund's designated transfer agent, or (iii) a clearing agency registered with the Commission (*e.g.*, NSCC's Fund/SERV system).[26]

Under the proposed rule, fund designated transfer agents would be required to record the date and time they receive order information.[27] These transfer agents and NSCC will operate, in effect, as time-stamping organizations, ensuring that orders are assigned the correct day's price.[28] We believe these organizations, which are regulated by the Commission[29] and operate large automated processing systems, will serve to ensure the integrity of fund pricing.[30]

Are there other intermediaries that could also serve this role? Are there intermediaries that may become involved in processing order information in the foreseeable future that would be capable of serving this role? We recognize that this proposal will require fund transfer agents, NSCC, and other intermediaries to modify, and in some cases to expand, their data processing systems to reflect the rule proposals. If we adopt these proposals in similar form, we would expect to provide a one-year transition period to accommodate system changes. Would such a transition period be adequate? We also note that transfer agents currently are not required under Commission rules to time-stamp information they record.[31] Nevertheless, only a transfer agent that has the ability to time-stamp order information it receives and maintain a record of that information could be a "designated transfer agent" under the proposed amendments. Should our transfer agent rules include time-stamping and record retention requirements for designated transfer agents? If so, should any information in addition to the order information and date and time of receipt be included in the record? In what form and for how long should the record be maintained?

## B. Purchase and Sale Orders; Exchanges

We propose to define the term "order" in the rule to clarify when an order is complete (and therefore has been received) for purposes of obtaining the appropriate day's price. Under the proposed amendments an "order" would mean the direction to purchase or sell either (i) a specific number of shares of a fund (*e.g.*, all the shares held in the account), or (ii) an indeterminate number of shares of a specific value (*e.g.*, $10,000 of shares of the fund).[32] The definition also would state that each order would be deemed irrevocable as of the next pricing time after receipt by the fund, its designated transfer agent, or registered clearing agency.[33] This provision is designed to prevent the cancellation or modification of orders after the pricing time applicable to the order.

Our proposed amendment also contains a special provision for exchange orders. An investor who exchanges between two funds actually engages in two transactions - a redemption of the securities he owns in one fund and a purchase (using the redemption proceeds) of securities in another fund. Typically, exchanges between funds in the same fund complex, and sometimes in different complexes, are processed as a single transaction so that they receive the same day's prices. In the case of an exchange involving a fixed number of shares (*e.g.*, in which the investor redeems all of his shares of the first fund), neither the amount nor the number of shares of the second fund will be known until the NAV of the first fund is determined, which will be sometime after 4:00 p.m. To preserve the ability of funds to offer "seamless" exchange transactions, we propose to define "order" to include a direction to purchase redeemable securities of the fund using proceeds of a contemporaneous order to redeem a specific number of shares of another.

## C. Exceptions

Rule 22c-1 contains several exceptions from the forward pricing requirements, all of which we would preserve.[34] We would add to those exceptions another exception that would permit investor orders to receive same-day treatment if, as a result of an emergency, a dealer (or its agent) was unable to transmit the orders, or NSCC or the fund's designated transfer agent was unable to receive the orders.[35] The exception would prevent investors from losing the current day's price for orders received by dealers before 4:00 p.m., if those orders could not be transmitted to or received by NSCC or the fund's designated transfer agent by 4:00 p.m. because of, for example, a power failure, hurricane or other emergency.[36]

The emergency exception would be available to dealers only if the chief executive officer certifies to the fund (i) the nature, existence, and duration of the emergency, and (ii) that the intermediary received the orders before the applicable pricing time.[37] A fund also would be required to keep a record of each certification it received for six years.[38] If an emergency prevented the designated transfer agent or the clearing agency from receiving order information, the chief executive officer of the designated transfer agent or clearing agency would have to provide notice of the emergency to the fund.[39]

The second exception addresses "conduit" funds, which invest all their assets in another fund and therefore must calculate their NAV on the basis of the other fund's NAV.[40] These funds are registered investment companies, and are subject to regulation and oversight by the Commission. The exception would permit a conduit fund, such as a "master-feeder" fund or an insurance company separate account, to submit its orders based on the NAV established by the other fund on the same day.[41]

We request comment on the exceptions included in the amended rule. Are there other exceptions that we should consider?

### III. GENERAL REQUEST FOR COMMENT

The Commission requests comment on the proposed amendments to rule 22c-1, suggestions for additions to the proposed amendments, and comment on other matters that might have an effect on the proposals contained in this Release. We note that the comments that are of greatest assistance are those that are accompanied by supporting data and analysis of the issues addressed in those comments.

### IV. COST-BENEFIT ANALYSIS

The Commission is sensitive to the costs and benefits imposed by its rules. As discussed above, the proposed amendments to rule 22c-1 would require that an order to purchase or redeem fund shares be received by the fund, its designated transfer agent, or a registered securities clearing agency, by the time that the fund's board of directors establishes for calculating the fund's NAV in order to receive the current day's price.

## A. Benefits

We anticipate that funds and shareholders would benefit from the proposed amendments. The amendments to rule 22c-1 are designed to prevent late trading in fund shares. Preventing late trading would ensure that the value of a fund's outstanding redeemable securities would not be diluted through the sale of a fund's securities at a price below its NAV, or the redemption or repurchase of a fund's securities at a price above its NAV.[42] This dilution harms the fund's long-term shareholders who lose at least as much as late traders gain in profits. By preventing this dilution, long-term investors would have more confidence in the financial markets as a whole, and funds in particular.

Funds would benefit by the increase in investor confidence, as investors would be less likely to seek alternative financial products in which to invest. Long-term investors also would benefit. Without these protections, many long-term investors, who would prefer to invest in mutual funds, may choose other investment instruments to avoid losses to late traders. Finally, these reforms will reduce the transaction costs that funds incur. When a late trader rapidly moves a large amount of money into and out of a fund, the fund incurs significant costs in buying securities and then selling them. These transaction costs include commissions and the spread between the bid and ask prices.

## B. Costs

Currently, orders for a fund's shares received by broker-dealers, 401(k) plan administrators, and other third-party intermediaries from their customers prior to the fund's pricing time are eligible to receive that day's price. The proposed amendments to rule 22c-1 would limit same-day pricing to orders received by the fund, its designated transfer agent, or a registered clearing agency prior to the fund's pricing time. As a result, third-party intermediaries (including broker-dealers and retirement plan administrators) and NSCC would incur certain costs, and funds and investors might incur costs.[43] In addition, fund designated transfer agents would incur costs as a result of a recordkeeping requirement contained in the proposed amendments.

Third-party intermediaries would have to combine their fund share orders for processing prior to the pricing time, and therefore their customers may have to place their orders earlier in the day than investors who conduct business directly with the fund's designated transfer agent in order to receive that day's price.[44] This would put intermediaries at a competitive disadvantage with designated transfer agents, and may result in a number of an intermediary's customers or potential customers bypassing the intermediary and purchasing or redeeming shares directly with the designated transfer agent. Alternatively, intermediaries, in order to compete with designated transfer agents, may upgrade their computer systems in order to process orders more quickly, thus allowing customers to place their orders as close to

the pricing time as possible while qualifying for that day's price.[45] We would expect that the systems would become increasingly efficient over time and thus reduce the delay between the intermediary's receipt of the order and transmission to Fund/SERV or the designated transfer agent. The Commission, however, has no reasonable basis for determining the number of customers or potential customers that intermediaries might lose or the costs associated with the potential lost customer orders. The computer system upgrade would impose one-time costs. The Commission, however, has no reasonable basis for determining the costs of the technological upgrades intermediaries might incur as a result of the proposed amendments, because each intermediary could upgrade in a way that it deems best for its particular computer system.

NSCC, which operates Fund/SERV, would incur costs as a result of the proposed rule amendments. Under the proposed amendments, orders transmitted to Fund/SERV by broker-dealers and other intermediaries prior to a fund's pricing time would receive that day's price. Orders transmitted to Fund/SERV after a fund's pricing time, including orders received by the intermediary prior to a fund's pricing time, would receive the fund's next-day price. Intermediaries, therefore, would likely transmit a number of orders to Fund/SERV close to the pricing time, resulting in a substantial increase in the volume of transmissions received by Fund/SERV just prior to the pricing time. In response to this increase, NSCC would likely have to increase Fund/SERV's capacity to handle the expected concentration of orders just prior to the pricing time. We do not know what the cost estimate for the increased capacity might be.

Funds might incur costs as a result of the proposed rule amendments. First, if third-party intermediaries, such as retirement plan administrators, find it too expensive to upgrade their computer systems, potential investors may end up investing in alternative financial products. For example, if a retirement plan sponsor determines that the system upgrades necessary to complete fund orders in a timely fashion are too expensive, the plan may discontinue offering investments in some or all funds and offer investments in alternative financial products, causing funds to lose potential investors. The Commission, however, cannot predict the potential loss in investments to funds. Second, some funds, particularly smaller funds, that do not have the financial resources to increase their advertising expenditures might lose potential investors as a result of investors bypassing third-party intermediaries and purchasing shares from fund designated transfer agents. Financial intermediaries are likely to be aware of and offer many or most funds regardless of whether the funds advertise. Individual investors, however, are less likely to be aware of funds that do not advertise extensively. Therefore, as a result of investors bypassing financial intermediaries, smaller funds may lose some potential investors.

Finally, if a fund chooses to select a designated transfer agent to receive order information, the fund would incur costs. A fund would have to identify its designated transfer agent in its registration statement and include a provision in its contract with the designated transfer agent requiring the designated transfer agent to receive order information and to maintain a

record of the date and time it received the order information.[46] For purposes of the Paperwork Reduction Act, Commission staff has estimated that the one-time cost of identifying a designated transfer agent in the fund's registration statement would be negligible. The one-time cost of modifying the fund's existing contract with one of its transfer agents would be approximately 4.5 hours and $287.66 per fund. It is estimated that all funds together would spend 17,662.5 hours and $1,129,065.50 to comply with this contract modification requirement.

As noted above, as a result of the proposed amendments, some investors might choose to send order information directly to a designated transfer agent instead of to an intermediary that transmits information through Fund/SERV. In that case, designated transfer agents might have to augment their capacity to handle increased order information and an expected concentration of orders shortly before pricing time. The Commission has no reasonable basis for predicting the increase in orders that may be directed to designated transfer agents, and therefore does not know how to estimate the cost for the increased capacity. An increase in order information directed to designated transfer agents also would result in the transmission of larger numbers of individual orders, rather than smaller numbers of aggregated and netted orders for omnibus accounts. We do not know what, if any, costs to funds would result if there were such an increase in order information.

We believe the costs of these rule amendments will be minimal for long-term investors. Long-term investors (who invest both on their own and through retirement funds) attempt to save for events that are years in the future, such as retirement. They may find a deposit or redemption is delayed by one day because it reached the fund after 4:00 p.m. However, because they have no special information about day-to-day deviations in a fund's NAV from its fair market value, long-term investors are likely to receive a better price as often as they receive a worse one. In addition, because day-to-day changes in NAVs are generally small, the effect on long-term investors who receive a worse price because their orders were received after 4:00 p.m. is likely to be small.

A possible consequence of the proposed amendments is that some long-term investors will choose other financial instruments to avoid the risk of getting the next day's price. These investors may believe the instruments they choose are inferior to mutual funds (which were these investors' first choice). However, this disadvantage is likely to be minimal because products such as exchange-traded funds are available.[47] These instruments offer features very similar to conventional mutual funds but are actively traded intra-day at market-determined prices. In addition, the proposed amendments would allow many investors, for whom mutual funds would be a first choice but for fear of share value dilution resulting from late trading, to invest in mutual funds with greater confidence. If returns on investments in the alternative financial products were higher than the returns on investments in funds that investors would have chosen, investors would benefit. Conversely, if returns on investments in the alternative financial products were lower than the returns on investments in funds that investors would have chosen, investors

would incur costs. The Commission, therefore, cannot quantify the potential costs (or benefits) to investors.

As discussed above, the proposed amendments would include an emergency exception so that orders would receive same-day treatment if, as a result of an emergency, the fund intermediary was unable to transmit the orders, or NSCC or the fund's designated transfer agent was unable to receive the orders.[48] The emergency exception would be available to fund intermediaries only if the chief executive officer of the intermediary certifies to the fund (i) the nature, existence, and duration of the emergency, and (ii) that the intermediary received the orders before the applicable pricing time.[49] A fund, or its designated agent, also would be required to keep a record of each certification it received for six years.[50] The certification requirement would impose costs on the intermediary, and the recordkeeping requirement would impose costs on funds. If an emergency prevented the designated transfer agent or the clearing agency from receiving order information, the chief executive officer of the designated transfer agent or registered clearing agency would have to provide notice of the emergency to the fund.[51] We have not specified the manner in which the chief executive officer must notify the fund, and seek comment on what method these entities are likely to use. The Commission, however, expects emergencies to occur infrequently. Therefore, we believe the costs involved in qualifying for the emergency exception would be minor.[52]

If a fund chooses to select a designated transfer agent to receive order information and the transfer agent accepts this designation, the proposed amendments would impose a recordkeeping requirement on the fund's designated transfer agent. The designated transfer agent would be required to maintain a record of the date and time it receives order information.[53] For purposes of the Paperwork Reduction Act, the Commission staff has estimated that it would take a total of approximately 100 hours and $1,892 per designated transfer agent to comply with the time of receipt recordkeeping requirement. It is estimated that all designated transfer agents together would spend 20,800 hours and $393,536 to comply with this recordkeeping requirement.

## C. Request for Comment

The Commission requests comment on the potential costs and benefits of the proposed rule amendments. We also request comment on the potential costs and benefits of the approach under which intermediaries, in order to be eligible to submit orders to the fund after 4:00 p.m., would be required to adopt certain protections designed to prevent late trading. The Commission also requests comment on the potential costs and benefits of any other alternatives suggested by commenters. We encourage commenters to identify, discuss, analyze, and supply relevant data regarding any additional costs and benefits. For purposes of the Small Business Regulatory Enforcement Act of 1996,[54] the Commission also requests information regarding the potential impact of the proposals on the U.S. economy on an

annual basis. Commenters are requested to provide data to support their views.

## V. PAPERWORK REDUCTION ACT

Certain provisions of the proposed amendments to rule 22c-1 would result in new "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995.[55] The Commission is submitting these proposals to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The title for the collection of information requirements is "Rule 22c-1 under the Investment Company Act of 1940, `Pricing of redeemable securities for distribution, redemption and repurchase.'" An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

To eliminate late trading through fund intermediaries, we are proposing to amend rule 22c-1 to require that all purchase and redemption orders be received by the fund, its designated transfer agent, or a registered clearing agency no later than the time at which the fund prices its securities, in order to obtain the current day's price. As a consequence, certain fund intermediaries, such as broker-dealers, banks, and retirement plan administrators would have to submit orders to the fund before 4:00 p.m. in order for their customers to receive the 4:00 p.m. price. Orders submitted later would have to receive the following day's price. The proposed amendments to rule 22c-1 would allow a fund to designate a transfer agent to receive orders to purchase or redeem fund shares. Orders received by that designated transfer agent no later than the fund's pricing time would receive same-day pricing. The amendments would require that the fund designate the transfer agent in its registration statement filed with the Commission, and include a provision in the fund's contract with the designated transfer agent requiring the transfer agent to receive order information and maintain a record of the date and time it receives the order information.[56] These collection of information requirements would be voluntary, because a fund does not need to select a designated transfer agent unless the fund chooses to have same-day pricing available for orders received by its transfer agent. These collection of information requirements are needed to ensure that designated transfer agents do not allow late trading to occur, and to assist the Commission's examination staff in assessing whether late trading is occurring.

The proposed rule amendments would contain an exception that would permit investor orders to receive same-day pricing if, as a result of an emergency, a dealer (or its agent) was unable to transmit the orders, or NSCC or the fund's designated transfer agent was unable to receive the orders by the fund's pricing time.[57] The exception would prevent investors from losing the current day's price for orders received by dealers before 4:00 p.m., if those orders could not be transmitted to or received by NSCC or the fund's designated transfer agent by 4:00 p.m. because of, for example, a power failure, hurricane, or other emergency. The emergency exception

would be available to dealers only if the chief executive officer of the dealer certifies to the fund (i) the nature, existence, and duration of the emergency, and (ii) that the dealer received the orders before the applicable pricing time.[58] A fund also would be required to keep a record of each certification it received for six years.[59] In the event an emergency prevented the designated transfer agent or the clearing agency from receiving order information, the chief executive officer of the designated transfer agent or clearing agency would have to provide notice of the emergency to the fund.[60] These information collections are voluntary because they are only required for an exception for orders that are not timely received due to an emergency and, therefore, funds may choose not to rely on the emergency exception. These collections are needed to ensure that the emergency exception is limited to bona fide emergencies that prevent the orders from reaching the fund's designated transfer agent or Fund/SERV by 4:00 p.m. and that late trading is not occurring. The recordkeeping information collection requirement also would assist the Commission's examination staff in assessing whether a particular event constituted an emergency for purposes of the exception.

The proposed amendments would require a fund that chooses to have a designated transfer agent to identify that transfer agent in the fund's registration statement. This information collection would be a one-time event, and the Commission believes that this burden would be negligible. A fund that chooses to select a designated transfer agent also would be required to include in its contract with the transfer agent a provision obligating the transfer agent to receive order information and maintain a record of the date and time the transfer agent receives order information. The Commission staff estimates that there are currently 3,925 funds (3,100 registered open-end investment companies and 825 registered unit investment trusts) and that each fund would select one of its current transfer agents to be its designated transfer agent.[61] As such, each fund would have to modify the existing contract it has with the transfer agent it selects to be its designated transfer agent. This modification would create a one-time burden of 4.5 hours per fund (4 hours by in-house counsel, .5 hours by support staff) or about 17,662.5 burden hours.[62]

Under the proposal, a transfer agent that is designated by the fund would have to maintain records of the date and time it receives order information. There are currently approximately 208 registered fund transfer agents.[63] The Commission estimates that these transfer agents receive approximately 83 million fund share orders per year.[64] Each of the 208 transfer agents, therefore, receives approximately 399,038 orders per year. The Commission estimates that each designated transfer agent would spend approximately 100 hours per year maintaining records of the time it received order information.[65] Thus, the annual aggregate burden hours associated with the time of receipt recordkeeping requirement would be 20,800 hours.[66]

Broker-dealers and funds that choose to rely on the emergency exception

would have collection of information requirements. There are currently approximately 2,203 broker-dealers that are classified as specialists in fund shares.[67] The Commission estimates that each broker-dealer would incur no more than one emergency per year that would qualify for the emergency exception. The Commission also estimates that each broker-dealer is involved in the sale of shares of approximately 300 funds. Thus, approximately 2,203 broker-dealers could be subject to preparing and transmitting one certification each year to each of the 300 funds whose shares they sell, for a total of 300 certifications per year for each broker-dealer. We estimate that the average annual hour burden for all certifications per broker-dealer emergency would be one hour, or one burden hour per year for each broker-dealer.[68] Thus, the annual aggregate burden hours associated with the certification requirement would be 2,203 hours.[69]

The staff estimates that each fund would spend one hour annually, on average, maintaining the records of the certifications required by proposed rule 22c-1(b)(1)(ii). Thus, the annual aggregate burden hours associated with the emergency exception recordkeeping requirement would be 3,925 hours.[70] In total, the collections of information associated with the emergency exception contained in the proposed amendments to rule 22c-1 would entail 6,128 burden hours.[71] Using a three-year period, the average information collection burden under the proposed amendments to rule 22c-1 would be 32,815.5 hours.[72]

We request comment on whether these estimates are reasonable. Pursuant to 44 U.S.C. 3506(c)(2)(B), the Commission solicits comments in order to: (i) evaluate whether the proposed collections of information are necessary for the proper performance of the functions of the Commission, including whether the information will have practical utility; (ii) evaluate the accuracy of the Commission's estimate of the burden of the proposed collections of information; (iii) determine whether there are ways to enhance the quality, utility, and clarity of the information to be collected; and (iv) minimize the burden of the collections of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology.

Persons wishing to submit comments on the collection of information requirements of the proposed amendments should direct them to the Office of Management and Budget, Attention Desk Officer of the Securities and Exchange Commission, Office of Information and Regulatory Affairs, Room 10102, New Executive Office Building, Washington, DC 20503, and should send a copy to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-0609, with reference to File No. S7-27-03. OMB is required to make a decision concerning the collections of information between 30 and 60 days after publication of this Release; therefore a comment to OMB is best assured of having its full effect if OMB receives it within 30 days after publication of this Release. Requests for materials submitted to OMB by the Commission with regard to these collections of information should be in writing, refer to File

No. S7-27-03, and be submitted to the Securities and Exchange Commission, Records Management, Office of Filings and Information Services.

## VI. INITIAL REGULATORY FLEXIBILITY ANALYSIS

This Initial Regulatory Flexibility Analysis ("IRFA") has been prepared in accordance with 5 U.S.C. 603. It relates to the amendments to rule 22c-1 under the Investment Company Act that we are proposing in this Release.

### A. Reasons for the Proposed Action

Section I of this Release describes the background and reasons for the proposed action. As discussed above, late trading appears to have been facilitated by fund managers, intermediaries, and investors in violation of our rules.[73] Our investigations are ongoing, but suggest that late trading of fund shares is not isolated, nor limited to any one type of fund or intermediary.[74]

### B. Objectives of the Proposed Action

Section II of this Release discusses the objectives of the proposed amendments. As discussed above, the Commission is proposing amendments to the rule under the Investment Company Act that requires forward pricing of redeemable securities issued by funds. The proposed amendments would deem an order received for purposes of determining the applicable pricing time only when it is received by (i) the fund itself, (ii) the fund's designated transfer agent, or (iii) a clearing agency registered with the Commission.[75]

### C. Legal Basis

The amendments to rule 22c-1 are proposed pursuant to the authority set forth in sections 22(c) and 38(a) of the Investment Company Act.[76]

### D. Small Entities Subject to the Proposed Rule and Amendments

A small business or small organization (collectively, "small entity") for purposes of the Regulatory Flexibility Act is a fund that, together with other funds in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[77] Of approximately 3,925 funds (3,100 registered open-end investment companies and 825 registered unit investment trusts), approximately 163 are small entities.[78] A broker-dealer is considered a small entity if its total capital is less than $500,000, and it is not affiliated with a broker-dealer that has $500,000 or more in total capital.[79] Of approximately 6,800 registered broker-dealers, approximately 880 are small entities, with approximately 400 of these classified as specialists in funds. A transfer agent is considered a small entity if it has: (i) received less than 500 items for transfer and less than 500 items for processing during the preceding six months (or in the

time that it has been in business, if shorter); (ii) transferred items only of issuers that would be deemed "small business" or "small organizations" as defined in rule 0-10 under the Securities Exchange Act of 1934;[80] (iii) maintained master shareholder files that in the aggregate contained less than 1,000 shareholder accounts or was the named transfer agent for less than 1,000 shareholder accounts at all times during the preceding fiscal year (or in the time that it has been in business, if shorter); and (iv) is not affiliated with any person (other than a natural person) that is not a small business or small organization under rule 0-10. We estimate that 40 out of approximately 208 registered fund transfer agents qualify as small entities.

As we discuss above, under the proposed rule amendments, an order placed with a registered broker-dealer (or with any other intermediary) would no longer receive a fund's NAV price calculated on the day the intermediary received the order, unless the order were transmitted to the fund, its designated transfer agent, or a registered clearing agency prior to the pricing time.[81] These amendments would apply to all intermediaries and third-party administrators, including those that fall within the various definitions of small entities. How much these amendments would affect these small entities would be determined largely by the importance these intermediaries and their clients place on receiving the NAV calculated on the day a client places an order.

The Commission staff expects that these rule changes may alter the manner in which some intermediaries transmit their purchase (or redemption) orders to funds, what they charge for their services, and perhaps how they market these services. A broker-dealer, for example, that commits to transmitting its orders to a fund (or to the designated transfer agent or clearing agency) prior to the fund's pricing time may need to modify its existing computer system. Because the Commission and its staff are not familiar with the full range of available technologies associated with these upgrades, we request that commenters address the cost of such upgrades, including specific data when available.

### E. Reporting, Recordkeeping, and Other Compliance Requirements

The proposal would contain one new recordkeeping requirement and one new compliance requirement for funds that choose to designate a transfer agent. If a fund designates a transfer agent, the fund would be required to identify the designated transfer agent in the fund's registration statement filed with the Commission, and include a provision in the fund's contract with the transfer agent requiring the transfer agent to receive order information and maintain a record of the date and time it receives the order information. All funds, regardless of size, would be subject to the reporting requirement and the compliance requirement. The designation of a transfer agent would occur once and involve minimal compliance efforts. The inclusion of the contract provision also would occur once and involve minimal compliance efforts. Funds that are small entities would not be unduly burdened by these requirements.

The proposed amendments also would introduce one new recordkeeping requirement for transfer agents that choose to become a "designated transfer agent." In order to be a designated transfer agent under the proposal, a transfer agent would have to maintain a record of the date and time it receives order information. All designated transfer agents, regardless of size, would be subject to this recordkeeping requirement. The time of receipt recordkeeping requirement for designated transfer agents would be minimal; designated transfer agents that are small entities would not be unduly burdened by the record maintenance duty.

The proposal also would contain new compliance and recordkeeping requirements for a registered broker-dealer that sought to rely on the proposed rule's emergency exception. The exception would permit investor orders to receive same-day treatment if, as a result of an emergency, the dealer (or its agent) was unable to transmit the orders, or NSCC or the fund's designated transfer agent could not receive the orders. The exception would permit investors to receive the same day's price for orders received by a dealer before 4:00 p.m. that could not be transmitted to the fund, its designated transfer agent, or the registered clearing agency (or could not be received by the designated transfer agent or the registered clearing agency) because of, for example, a power failure, hurricane or other emergency. The exception would be available only if the chief executive officer of the dealer certifies to the fund (i) the nature, existence, and duration of the emergency, and (ii) that the orders were received before the applicable pricing time.[82] In addition, a fund, or its designated agent, would be required to keep a record of each certification it receives.[83] If the emergency were experienced by the fund's designated transfer agent or NSCC, the chief executive officer of the designated transfer agent or NSCC would have to provide notice of the emergency to the fund.[84]

All intermediaries and funds, regardless of size, would be subject to these notification and recordkeeping requirements in the event they rely on the exception. Neither the certification that the broker-dealer would be required to send, nor the notification that the designated transfer agent or registered clearing agent would be required to provide as a result of an emergency that delayed the transmission or receipt of orders, is intended to be a lengthy document, and small entities should not bear a disproportionate expense in complying with this condition. Furthermore, because the proposed emergency exception would be optional, a small entity might not use the exception, particularly if it concluded that any costs borne are unlikely to be offset by the resulting benefits. Similarly, the recordkeeping requirements for funds that receive emergency certifications are minimal; funds that are small entities would not be unduly burdened by these record maintenance duties.

### F. Duplicative, Overlapping, or Conflicting Federal Rules

The Commission has not identified any federal rules that duplicate, overlap, or conflict with the proposed rule or amendments.

### G. Significant Alternatives

The Regulatory Flexibility Act directs the Commission to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities. Alternatives in this category would include: (i) establishing different compliance or reporting standards that take into account the resources available to small entities; (ii) clarifying, consolidating, or simplifying the compliance requirements under the rule for small entities; (iii) using performance rather than design standards; and (iv) exempting small entities from coverage of the rule, or any part of the rule.

The Commission does not presently believe that the establishment of special compliance requirements or timetables under the proposals for small entities is feasible or necessary.[85] Because the proposed amendments arise from a concern that fund shareholders are disadvantaged by abuses of a deadline, exceptions for small entities could compromise the effectiveness of the amended rule. Except for funds that are small entities, the other small entities affected by the proposed amendments (*e.g.*, broker-dealers and designated transfer agents) would have no formal compliance requirements as a result of these proposed amendments.

A recordkeeping requirement would arise for small transfer agents that choose to be a fund's designated transfer agent. The time of receipt recordkeeping requirement is necessary to enable the Commission and its staff to verify that late trading has not taken place. Reporting or compliance obligations would arise for a small broker-dealer that invoked the proposed emergency exception allowing for an order to receive same-day pricing for orders transmitted to the fund, its designated transfer agent, or registered clearing agency after 4:00 p.m. These minimal compliance and reporting requirements would be necessary to enable the Commission and its staff to verify that late trading has not taken place. Accordingly, the Commission cannot further clarify, consolidate, or simplify the requirements associated with this exception.

The Commission is asking for comment on an approach that would allow certain intermediaries to continue to obtain same-day pricing for orders they receive before the pricing time even if they submit those orders to the fund (or its designated transfer agent or a registered clearing agency) after the pricing time. This approach would be available to intermediaries who have technology-based systems, as well as controls, that demonstrably limit the ability of the intermediary to trade after the pricing time.[86] We request comment on any concerns raised by this approach. Assessing the reliability of such technology, for example, may be difficult for funds and the Commission. Would the Commission or its staff need to establish and then verify the standards of such systems?

Moreover, under this approach, small intermediaries desiring same-day pricing might have to choose between potentially costly technological and telecommunication upgrades in order to compete with larger firms. Would this approach place small intermediaries at a disadvantage with respect to

their larger competitors.[87]

## H. Solicitation of Comments

The Commission encourages the submission of comments with respect to any aspect of this IRFA. Comment is specifically requested on the number of small entities that would be affected by the proposed amendments, and the likely impact of the proposals on small entities. Commenters are asked to describe the nature of any impact and provide empirical data supporting the extent of the impact. These comments will be considered in connection with the adoption of the proposed rule and amendments, and reflected in the Final Regulatory Flexibility Analysis.

Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-0609. Comments also may be submitted electronically at the following E-mail address: rule-comments@sec.gov. All comment letters should refer to File No. S7-27-03, and this file number should be included on the subject line if E-mail is used.[88] Comment letters will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW, Washington, DC 20549-0102. Electronically submitted comment letters also will be posted on the Commission's Internet web site (http://www.sec.gov).

## VII. STATUTORY AUTHORITY

The Commission is proposing amendments to rule 22c-1 pursuant to the authority set forth in sections 22(c) and 38(a) of the Investment Company Act [15 U.S.C. 80a-22(c) and 80a-37(a)].

### List of Subjects in 17 CFR Part 270

Investment companies, Reporting and recordkeeping requirements, Securities.

### TEXT OF PROPOSED RULE

For reasons set out in the preamble, Title 17, Chapter II of the Code of Federal Regulations is proposed to be amended as follows:

### PART 270--RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

1. The authority citation for Part 270 continues to read in part as follows:

**Authority:** 15 U.S.C. 80a-1 *et seq.*, 80a-34(d), 80a-37, and 80a-39, unless otherwise noted.

* * * * *

2. Section 270.22c-1 is revised to read as follows:

### § 270.22c-1 Pricing of redeemable securities for distribution, redemption and repurchase.

(a) *Forward pricing required.* It is unlawful for any registered investment company issuing redeemable securities ("fund"), its principal underwriter, and any dealer to sell, redeem, or repurchase a redeemable security issued by the fund at a price other than the price based on the current net asset value established as of the next pricing time after the fund, its designated transfer agent, or a registered clearing agency receives an order to purchase or redeem the security.

(1) *Time.* The fund's board of directors must initially set the time or times during the day as of which the current net asset value of the fund's redeemable securities must be calculated, and may make and approve any changes the board deems necessary.

(2) *Frequency.* The fund must calculate the current net asset value of any redeemable security at least once daily, Monday through Friday, at the specific time or times during the day that the fund's board of directors sets, except on:

(i) Days on which changes in the value of the fund's portfolio securities will not materially affect the current net asset value of the fund's redeemable securities;

(ii) Days during which the fund, its designated transfer agent, and registered clearing agency receives no order to purchase or redeem the fund's redeemable securities; or

(iii) Customary national business holidays described or listed in the prospectus and local and regional business holidays listed in the prospectus.

(b) *Exceptions permitted.* Notwithstanding paragraph (a) of this section:

(1) *Emergencies.* (i) The fund may deem an order to have been received by the fund, its designated transfer agent, or a registered clearing agency immediately before the applicable pricing time if:

(A) An emergency prevents a dealer (or any agent of the dealer) from timely transmitting the orders to the fund, its designated transfer agent, or a registered clearing agency; and the chief executive officer of the dealer provides a written certification to the fund as to the nature, existence, and duration of the emergency, and that the orders were received by the dealer before the applicable pricing time; or

(B) An emergency prevents a designated transfer agent or registered clearing

agency from timely receiving orders, and the chief executive officer of the designated transfer agent or registered clearing agency notifies the fund as to the nature, existence, and duration of the emergency.

(ii) The fund, or its designated agent, must maintain a written record of each certification it receives under paragraph (b)(1)(i)(A) for at least six years after the end of the fiscal year in which it receives the report, the first two years in an easily accessible place.

(2) *Transactions through conduit funds.* A fund may deem receipt of an order to have occurred immediately before the applicable pricing time if the fund, its designated transfer agent, or registered clearing agency receives the order from a registered investment company that invests in the fund in reliance on section 12(d)(1)(E) of the Act (15 U.S.C. 80a-12(d)(1)(E)).

(3) *Secondary market transactions.* A sponsor of a unit investment trust ("trust") engaged exclusively in the business of investing in eligible trust securities (as defined in § 270.14a-3(b)) may sell or repurchase trust units in a secondary market at a price based on the offering side evaluation of the eligible trust securities in the trust's portfolio, determined at any time on the last business day of each week, effective for all sales made during the following week, if on the days that such sales or repurchases are made the sponsor receives a letter from a qualified evaluator stating, in its opinion, that:

(i) In the case of repurchases, the current bid price is not higher than the offering side evaluation, computed on the last business day of the previous week; and

(ii) In the case of resales, the offering side evaluation, computed as of the last business day of the previous week, is not more than one-half of one percent ($5.00 on a unit representing $1,000 principal amount of eligible trust securities) greater than the current offering price.

(4) *Insurance company separate accounts.* A registered separate account offering variable annuity contracts may apply the initial purchase payment for any such contract at a price based on the current net asset value of the contract established as of the next pricing time:

(i) Not later than two business days after receipt of the order to purchase by the insurance company sponsoring the separate account ("insurer"), if the contract application and other information necessary for processing the order to purchase (collectively, "application") are complete upon receipt; or

(ii) Not later than two business days after an application which is incomplete upon receipt by the insurer is made complete, provided that, if an incomplete application is not made complete within five business days after receipt:

(A) The prospective purchaser is informed of the reasons for the delay; and

(B) The initial purchase payment is returned immediately and in full, unless the prospective purchaser specifically consents to the insurer retaining the purchase payment until the application is made complete.

(5) *Mergers.* Any fund may adjust the price of its redeemable securities sold pursuant to a merger, consolidation or purchase of substantially all of the assets of a company that meets the conditions specified in § 270.17a-8.

(c) *Definitions.* For purposes of this section,

(1) *Designated transfer agent* means the single registered transfer agent (as defined in section 3(a)(25) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(25))) that is designated, in the fund's registration statement filed with the Commission, and is required by written contract to receive order information and maintain a record of the date and time it receives the order information.

(2) *Initial purchase payment* means the first purchase payment submitted to the insurer by, or on behalf of, a prospective purchaser.

(3) *Order* means a direction to purchase or redeem a specific number of fund shares or an indeterminate number of fund shares of a specific value. Each order is deemed to be irrevocable as of the next pricing time after the fund, its designated transfer agent, or registered clearing agency receives it. If a fund, its designated transfer agent, or registered clearing agency receives a direction to purchase redeemable securities of the fund using the proceeds of a contemporaneous order to redeem a specific number of shares of another fund (an exchange), the first fund may deem the direction to purchase its redeemable securities to be an order.

(4) *Pricing time* means the time of day as of which the fund calculates the current net asset value pursuant to paragraph (a)(1) of this section.

(5) *Prospective purchaser* means either an individual contract owner or an individual participant in a group contract.

(6) *Qualified evaluator* means any evaluator that represents it is in a position to determine, on the basis of an informal evaluation of the eligible trust securities held in a unit investment trust's portfolio, whether:

(i) The current bid price is higher than the offering side evaluation, computed on the last business day of the previous week; and

(ii) The offering side evaluation, computed as of the last business day of the previous week, is more than one-half of one percent ($5.00 on a unit representing $1,000 principal amount of eligible trust securities) greater than the current offering price.

By the Commission.

J Lynn Taylor
Assistant Secretary

Date: December 11, 2003

_____

1  We do not edit personal, identifying information, such as names or E-mail addresses, from electronic submissions. Submit only information you wish to make publicly available.

2  17 CFR 270.22c-1(a). The rule also applies to any other person designated in the fund's prospectus as authorized to receive purchase orders or tenders of securities for redemption. *Id.*

3  *See* 17 CFR 270.22c-1(b)(1). The rule provides exceptions from the daily pricing requirement for: (i) days on which changes in the value of the fund's portfolio securities will not materially affect the current NAV of the fund's redeemable securities; (ii) days during which the fund does not receive an order for purchase or redemption of fund shares; and (iii) customary national business holidays and local and regional business holidays listed in the fund's prospectus. *Id.*

4  Thus, a fund's NAV generally reflects the closing prices of the securities it holds. For securities that are not listed on exchanges or for which there are otherwise no readily available market values, a fund's board of directors must establish a fair value for the securities. *See* 15 U.S.C. 80a-2(a)(41)(B)(ii).

5  In this Release, we will assume for convenience that all funds choose to price their securities daily as of 4:00 p.m. Some funds, however, price their securities more than once per day, and many funds price their securities earlier than 4:00 p.m.

6  A "transfer agent" is any person who engages on behalf of a securities issuer, or on behalf of itself as an issuer of securities, in (a) countersigning the issuer's securities when issued; (b) monitoring issuance of the securities to prevent unauthorized issuance; (c) registering the transfer of the securities; (d) exchanging or converting the securities; or (e) transferring record ownership of the securities by book entry (*i.e.*, record entry of ownership without issuing a physical certificate). *See* 15 U.S.C. 78c(a)(25). Transfer agents are registered with and regulated by the Commission. *See* 15 U.S.C. 78q-1(c).

7  Such intermediaries that are not registered as broker-dealers need to consider whether the securities activities that they are undertaking are brokerage activities that require them to register as broker-dealers. Section 3(a)(4) of the Securities Exchange Act of 1934 ("Exchange Act") defines a broker as a person engaged in the business of effecting transactions in securities for the account of others. It includes several exceptions for certain bank activities. *See* 15 U.S.C. 78c(a)(4). Section 15 of the Exchange Act essentially makes it unlawful for a broker or dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills)" unless the broker or dealer is registered with the Commission. *See* 15 U.S.C. 78o(a)(1).

8  A large portion of these investors invest through tax-advantaged retirement plans, such as 401(k) accounts. About one-third of all mutual fund shares are held through retirement accounts. *See* Investment Company Institute, *Mutual Funds and the U.S. Retirement Market in 2002*, Fundamentals, June 2003, at 1, 2.

9    *See supra* note 7.

10   Some intermediaries submit one aggregated purchase order and one aggregated redemption order in a single "batch." Others submit orders in multiple batches in the course of the day. The intermediary will batch customer orders it receives during the day at various times, with a 4:00 p.m. cut-off time for orders that are included in the last batch transmitted to the fund's primary transfer agent for same-day pricing. Orders received by the intermediary after the last cut-off time are included in a batch of orders transmitted to the fund's primary transfer agent for next-day pricing.

11   A "clearing agency" is a person that acts as an intermediary in making payments or deliveries (or both) in connection with transactions in securities, or that provides facilities for comparing data with respect to the terms of securities transactions to reduce the number of settlements or the allocation of securities settlement responsibilities. *See* 15 U.S.C. 78c(a)(23)(A). A clearing agency is a self-regulatory organization, and its rules of operation are subject to approval by the appropriate federal regulatory agency. *See* 15 U.S.C. 78c(a)(26), 78s(b).

12   Shares of exchange-traded funds ("ETFs"), however, are cleared through NSCC and the Depository Trust Company. An ETF typically is a registered open-end investment company with shares that trade intra-day at market-determined prices. *See* Actively Managed Exchange-Traded Funds, Investment Company Act Release No. 25258, nn. 6-8 and accompanying text (Nov. 8, 2001) [66 FR 57614 (Nov. 15, 2001)].

13   "Fund/SERV" is an acronym for the Mutual Fund Settlement, Entry and Registration Verification Service. Only NSCC members who are Fund/SERV participants may use the system. Funds or their distributors are NSCC members, who designate the primary transfer agent to receive information on share transactions on the fund or distributor's behalf.

14   The primary transfer agent provides Fund/SERV with its electronic confirmation of the order, and Fund/SERV forwards those confirmations back to the clearing brokers. In 2002, Fund/SERV processed 83 million fund transactions at a value of $1.3 trillion. *See DTCC Business Volumes Set Records in 2002*, The Depository Trust & Clearing Corporation, Press Release (May 5, 2003) (available at http://www.dtcc.com/PressRoom/2003/2002review.html).

15   *See* Staff Interpretive Position Relating to Rule 22c-1, Investment Company Act Release No. 5569 (Dec. 27, 1968) (rule 22c-1 "contemplates that the time of receipt of the order by the retail dealer is controlling" for purposes of determining the price obtained by the dealer). *See also* Charles Schwab & Co., Inc., SEC Staff No-Action Letter (July 7, 1997) (the time an order was received by a person designated in the fund's prospectus will be deemed the time the order was received for purposes of rule 22c-1).

16   *See, e.g.,* In the Matter of Steven B. Markovitz, Investment Company Act Release No. 26201 (Oct. 2, 2003).

17   *See* Testimony of Stephen M. Cutler Concerning Recent Commission Activity to Combat Misconduct Relating to Mutual Funds Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs, 108th Cong., 1st Sess., 11-15 (Nov. 3, 2003).

18  *See* Adoption of Rule 22c-1 Under the Investment Company Act of 1940 Prescribing the Time of Pricing Redeemable Securities for Distribution, Redemption, and Repurchase, and Amendment of Rule 17a-3(a)(7) Under the Securities Exchange Act of 1934 Requiring Dealers to Time-Stamp Orders, Investment Company Act Release No. 5519 (Oct. 16, 1968) [33 FR 16331 (Nov. 7, 1968)]. *See also* 17 CFR 240.17a-3(a)(6)(i) (requiring broker-dealers to record each brokerage order and information pertaining to the order, including the time the order was received and the time of entry).

19  Under the rule, orders submitted to various intermediaries, such as third-party administrators, would not be considered orders received by the "fund," even if those intermediaries are agents of the fund.

20  *See* proposed rule 22c-1(a).

21  The general requirement of the rule would be subject to a few limited exceptions. *See infra* Section II.C.

22  *See, e.g.,* Letter from Robert G. Wuelfing, *The Spark Institute, Inc.*, to Paul F. Roye, Director, *Division of Investment Management, Securities and Exchange Commission*, and Cynthia M. Fornelli, Deputy Director, *Division of Investment Management, Securities and Exchange Commission* (Oct. 31, 2003) ("*Spark Institute Letter*") (available in the public comment file). Another administrator has noted that orders would have to be placed several hours earlier than 4:00 p.m. *See* Testimony of E. Scott Peterson, Global Practice Leader of Defined Contribution Services, Hewitt Associates, Submitted for the Record, U.S. Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs, Hearing on Mutual Funds, Trading Practices and Abuses that Harm Investors, 108th Cong., 1st Sess. 6 (Nov. 3, 2003).

23  Several groups have urged us to adopt such an approach. *See, e.g.,* Letter from Marc E. Lackritz, President, *Securities Industry Association*, to Paul F. Roye, Director, *Division of Investment Management, Securities and Exchange Commission* (Oct. 31, 2003); *Spark Institute Letter*, *supra* note 22. *See also* Letter from Edward L. Yingling, Executive Vice President, *American Bankers Association*, to Paul F. Roye, Director, *Division of Investment Management, Securities and Exchange Commission* (Nov. 12, 2003); Letter from Steve Bartlett, President, *The Financial Services Roundtable*, to Paul Roye, Director, *Division of Investment Management, Securities and Exchange Commission* (Nov. 10, 2003); Letter from Geof Gradler, Senior Vice President and Head, Office of Government Affairs, *Charles Schwab & Co., Inc.*, to Paul F. Roye, Director, *Division of Investment Management, Securities and Exchange Commission*, Cynthia M. Fornelli, Deputy Director, *Division of Investment Management, Securities and Exchange Commission,* and Douglas J. Scheidt, Chief Counsel, *Division of Investment Management, Securities and Exchange Commission* (Oct. 27, 2003) (advocating similar approaches). Each of the letters cited is available in the public comment file.

24  These protections would be required for intermediaries other than the fund's designated transfer agent or the registered clearing agency.

25  We use the term "receive" in the proposed rule text for purposes of proposed rule 22c-1 only. Receipt of an order in NSCC's Fund/SERV refers only to its role as an electronic communication hub that transmits fund orders from the broker-dealer to the appropriate mutual fund processor.

26  *See* proposed rule 22c-1(a). The proposed amendments would retain the requirements in the current rule concerning the frequency and time of determining NAV, but would reorganize and reword those provisions. The proposed amendment would use the phrase "based on the current net asset value established as of the next pricing time" instead of the phrase "based on the current net asset value which is next computed." This amendment is intended to clarify the current requirement that orders received after the pricing time, but before calculation of the NAV is complete, do not receive same-day pricing.

27  The proposed rule defines "designated transfer agent" to mean the single registered transfer agent, as defined in section 3(a)(25) of the Securities Exchange Act of 1934 [15 U.S.C. 78c(a)(25)], that is designated, in the fund's registration statement, and required by written contract to receive order information and maintain a record of the date and time it receives the order information. *See* proposed rule 22c-1(c)(1).

28  Although orders would have to be received by Fund/SERV or the designated transfer agent by 4:00 p.m. to ensure same-day pricing, the clearing agency and designated transfer agent each may complete its processing after the pricing time.

29  *See supra* notes 6, 11.

30  Some groups have endorsed this approach. *See* Statement of Paul G. Haaga, Jr., Chairman, Investment Company Institute on "Mutual Funds: Who's Looking Out for Investors," Before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises of the Committee on Financial Services, 108th Cong., 1st Sess. (Nov. 4, 2003) (available at http://www.ici.org/statements/tmny/03_house_haaga_tmny.html); Letter from David B. Yeske, President, *The Financial Planning Association,* to William H. Donaldson, Chairman, *Securities and Exchange Commission* (Nov. 7, 2003) (available in the public comment file).

31  The proposed amendments would not impose any new recordkeeping requirements on transfer agents in general.

32  *See* proposed rule 22c-1(c)(3).

33  *Id.*

34  The rule preserves three existing exceptions. The first permits sales of unit investment trust shares in the secondary market involving backward pricing under conditions that do not dilute existing shareholders' interest in the trust. S*ee* proposed rule 22c-1(b)(3). The second permits insurance company separate accounts to price initial purchase payments up to two days after receipt of a complete contract application and up to five days while obtaining additional information to complete the application. *See* proposed rule 22c-1(b)(4). The third permits a fund to adjust the price of its redeemable securities sold pursuant to a sale, merger, consolidation, or purchase of substantially all the assets of certain companies. *See* proposed rule 22c-1(b)(5).

35  *See* proposed rule 22c-1(b)(1)(i).

36  *See, e.g.*, Amendment to Pricing Rule and Adoption of Rule on Pricing of Redemptions, Investment Company Act Release No. 14559 (June 6, 1985) (distinguishing circumstances, such as a natural disaster or other external occurrence, that constitute an emergency for purposes of rule 22c-1, from other circumstances, such as internal operational difficulties, that do not).

37  *See* proposed rule 22c-1(b)(1)(i)(A).

38   The fund, or its designated agent, would be required to keep the records for six years, the first two years in an easily accessible location. *See* proposed rule 22c-1 (b)(1)(ii).

39   *See* proposed rule 22c-1(b)(1)(i)(B).

40   Proposed rule 22c-1(b)(2).

41   Conduit funds rely on section 12(d)(1)(E) of the Act, and include most insurance company separate accounts. *See* 15 U.S.C. 80a-12(d)(1)(E). Section 12(d)(1)(E) permits a fund's acquisition of securities issued by another fund if, among other requirements, the security is the only investment security the acquiring fund holds (or the securities are the only investment securities the acquiring fund holds if it is a registered unit investment trust that issues two or more classes or series of securities, each of which provides for the accumulation of shares of a different fund). The separate account invests the proceeds from the sale of interests in variable annuity and variable life insurance contracts in shares of the underlying mutual fund according to the directions of the investor in the insurance contract. "Master-feeder funds" typically are arrangements in which two or more funds invest in a single fund. Investors purchase shares in the "feeder" fund, which is an open-end fund and a conduit to the master fund. *See* H.R. Rep No. 622, 104th Cong. 2d Sess., at 41 (1996).

42   It has been estimated that shareholders lose as much as $400 million per year as a result of late trading. *See* Eric Zitzewitz, *How Widespread is Late Trading in Mutual Funds?* (Sept. 2003) <http://gobi.stanford.edu/ResearchPapers/Library/RP1817.pdf>.

43   *See supra* notes 11-12 and accompanying text.

44   Some have estimated that orders would have to be submitted from two to four hours before pricing time. *See* Tom Lauricella, *Funds, Regulators Seek Balanced Fix in U.S. Industry*, Wall St. J. Eur., Oct. 31, 2003 at M1.

45   Some administrators of 401(k) plans have informed us that they likely would not be able to process any purchase or redemption requests the same day they are made due to the myriad of rules governing 401(k) plans. *See supra* note 22 and accompanying text.

46   *See* proposed rule 22c-1(c)(1).

47   *See supra* note 12.

48   *See* proposed rule 22c-1(b)(1)(i).

49   *See* proposed rule 22c-1(b)(1)(i)(A).

50   The fund would be required to keep the records for six years, the first two years in an easily accessible location. *See* proposed rule 22c-1(b)(1)(ii).

51   *See* proposed rule 22c-1(b)(1)(i)(B).

52  Notification for emergencies preventing the receipt of orders by the designated transfer agent or NSCC could be by telephone or in writing and would not need to be certified. Therefore, the notification requirement would involve minimal, if any, costs. For purposes of the Paperwork Reduction Act, the Commission staff has estimated that it would take a total of approximately 1 hour and $163.53 per broker-dealer to comply with the certification requirement. It is estimated that all broker-dealers together would spend 2,203 hours and $360,246 to comply with the certification requirement. For purposes of the Paperwork Reduction Act, the Commission staff has estimated that it would take a total of approximately 1 hour and $18.92 per fund to comply with the recordkeeping requirement. It is estimated that all funds together would spend 3,925 hours and $74,261 to comply with the recordkeeping requirement.

53  *See* proposed rule 22c-1(c)(1).

54  Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

55  44 U.S.C. 3501.

56  *See* proposed rule 22c-1(c)(1).

57  *See* proposed rule 22c-1(b)(1)(i).

58  *See* proposed rule 22c-1(b)(1)(i)(A).

59  The fund would be required to keep the records for six years, the first two years in an easily accessible location. *See* proposed rule 22c-1(b)(1)(ii).

60  *See* proposed rule 22c-1(b)(1)(i)(B).

61  These numbers are based on Commission filings and are current as of the end of September 2003.

62  3,925 funds x 4.5 hours = 17,662.5 hours.

63  The number of fund transfer agents is based on Form TA-2 filings with the Commission between January 1, 2003 and November 11, 2003.

64  The Commission staff estimates that transfer agents receive approximately half of the total number of fund share orders made each year. Fund/SERV processes the other half of the total number of fund share orders made each year. In 2002, Fund/SERV processed 83 million fund transactions. *See supra* note 14. Based on that information, the Commission estimates that there were 166,000,000 total fund share orders processed in 2002. Transfer agents received approximately half of those 166,000,000 orders. Therefore, transfer agents directly received approximately 83,000,000 fund share orders. We request comment on our estimate of the number of fund orders submitted directly to designated transfer agents.

65  For purposes of this supporting statement, the Commission assumes that transfer agents receive most fund share orders electronically, and that designated transfer agents would maintain the records of the time of receipt electronically.

66  208 transfer agents x 100 hours = 20,800 hours.

67  The number of broker-dealers is based on year-end 2002 Commission filings.

68  Because the certification to each of the 300 funds would be based on the same emergency, the information required to be included in the certification would be the same for each of the 300 certifications. Therefore, little time would be required after the preparation of the first certification to prepare the remaining certifications.

69  2,203 broker-dealers x 1 hour = 2,203 hours.

70  3,925 funds x 1 hour = 3,925 hours.

71  2,203 hours for the certification of the emergencies + 3,925 hours maintaining records = 6,128 hours.

72  The average of the first year burden of 44,590.5 hours (17,662.5 hours for the contract modification collection of information + 20,800 hours for the time of receipt recordkeeping collection of information + 6,128 hours for the emergency exception collections of information) and the burden of 26,928 hours for each of the next two years (20,800 hours for the time of receipt recordkeeping collection of information + 6,128 hours for the emergency exception collections of information) is 32,815.5 hours.

73  *See supra* note 17 and accompanying text.

74  *See supra* notes 16-17 and accompanying text.

75  *See* proposed rule 22c-1(a).

76  15 U.S.C. 80a-22(c), 80a-37(a).

77  17 CFR 270.0-10.

78  Some or all of these entities may contain multiple series or portfolios. If a registered investment company is a small entity, the portfolios or series it contains are also small entities.

79  17 CFR 240.0-10.

80  17 CFR 240.0-10(h).

81  The proposal would permit exceptions in very limited circumstances. *See* proposed rule 22c-1(b).

82  *See* proposed rule 22c-1(b)(1)(i)(A).

83  The fund would be required to keep these records for six years, the first two years in an easily accessible location. *See* proposed rule 22c-1(b)(1)(ii). The fund would not have to keep a record of the notices it receives from its designated transfer agent or NSCC.

84  *See* proposed rule 22c-1(b)(1)(i)(B).

85  The proposal would permit exceptions in very limited circumstances, such as well-documented emergencies that prohibit timely transmission. *See* proposed rule 22c-1(b)(1)(i).

86  *See supra* notes 23-24 and accompanying and following text.

87  We have found through investigations and examinations of transfer agents that clients of broker-dealers that have a small volume of business in fund share transactions rely on paper-based applications in 10-40% of mutual fund share transactions. There is no discernible time sensitivity in this mode of fund investment, in which account applications and bank checks are sent to funds or their transfer agents through regular or express mail.

88  Comments on the IRFA will be placed in the same public file that contains comments on the proposed rule and amendments themselves.

*http://www.sec.gov/rules/proposed/ic-26288.htm*