UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE
COMMISSION,

             Plaintiff,

    vs.

SIMPSON CAPITAL MANAGEMENT, INC.,
ROBERT A. SIMPSON and
JOHN C. DOWLING,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:
:
:
:
:
:
:
:
:

INDEX No. 07 CV 6072 (JGK)
ECF CASE

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

    A.    Rule 22c-1(a) and the Pricing of Mutual Fund Shares ........................ 2

    B.    The Allegations Against the Defendants .............................................. 6

ARGUMENT ........................................................................................................ 9

I.    THE COMPLAINT DOES NOT STATE A VIOLATION OF § 10(B) OR
    PLEAD FRAUD WITH PARTICULARITY ............................................... 10

    A.    The Complaint Does Not Allege Any Manipulative Acts by the
    Defendants ............................................................................................ 11

    B.    The Complaint Does Not Allege Material Misrepresentations by the
    Defendants ............................................................................................ 13

    C.    The Complaint Does Not Allege an Actionable Omission by the
    Defendants ............................................................................................ 18

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

PAGE

## FEDERAL CASES

*AIG Global Securities Lending Corp. v. Banc of America Securities  LLC*,
    254 F. Supp. 2d 373 (S.D.N.Y. 2003) .................................................................... 9-10, 16

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........... 10, 11-12, 13

*Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*,
    2007 U.S. Dist. LEXIS 52546 (S.D.N.Y. July 20, 2007) .................................................18

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) .................................................17

*In re Bayou Hedge Fund Litigation*, 2007 U.S. Dist. LEXIS 59145 (S.D.N.Y. July 31, 2007)......9

*Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955 (2007) ...................................9, 15

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ...........................................................................................11, 18

*In re Charter Comm'ns, Inc.*, 443 F.3d 987 (8th Cir. 2006) .........................................................17

*Chiarella v. United States*, 445 U.S. 222 (1980) .........................................................................18

*Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000) ..............................15

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)......................................................................11

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ....................................................10

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) .......................................................................13

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ...........................................................4

*Lattanzio v. Deloitte & Touche, LLP*, 476 F.3d 147 (2d Cir. 2007) ...........................................17

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...........................................................................10

*Madison Consultants v. FDIC*, 710 F.2d 57 (2d Cir. 1983) ........................................................11

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007)..............................................................17

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................................15

# TABLE OF AUTHORITIEX
(CONTINUED)

PAGE

*Pross v. Baird Patrick & Co.*, 585 F. Supp. 1456 (S.D.N.Y. 1984) ...............................16

*Regents of University of California v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ................................................................17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................10

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ...........................................................9

*SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996) ...................................13, 17

*SEC v. Pimco Advisors Fund Management LLC*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) .......10, 17

*SEC v. U.S. Environmental*, 155 F.3d 107 (2d Cir. 1998) ............................................17

*Santa Fe Indust., Inc. v. Green*, 430 U.S. 462 (1977) ..................................................11

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) ....................................................16-17

*Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971) ..............................16

*Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006) ....................................17

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ..................................15

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, ___ U.S. ___,
    127 S.Ct. 1873 (Mar. 26, 2007) ...........................................................17

*Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ...........17

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) ............................................18

*In re Van der Moolen N.V. Sec. Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................15

*Vento & Co. of N.Y. v. Metromedia Fiber Network, Inc.*,
    1999 U.S. Dist. LEXIS 3020 (S.D.N.Y. Mar. 17, 1999) ..............................4, 17

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ...........................16-17, 18

*Ziemba v. Cascade International Inc.*, 256 F.3d 1194 (11th Cir. 2001) .......................17

TABLE OF AUTHORITIEX
(CONTINUED)

PAGE

## DOCKETED CASES

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, 06-cv-643, Opinion and Order, Doc. No. 92 (S.D.N.Y. Sept. 13, 2007)..................................................14

*SEC v. Mutuals.com, Inc. et al*, 303-cv-2912D, Complaint (N.D. Tex. Dec. 4, 2003) ..................4

## SEC ADMINISTRATIVE PROCEEDINGS

*In re Powell*, SEC Admin. Proc. File No. 3-11794 (Jan. 11, 2005)..................................................4

*In re Pritchard Capital Partners, LLC*, SEC Admin. Proc. File No. 3-12753 (Sept. 7, 2007) .......4

## FEDERAL STATUTES

15 U.S.C. § 78j(b) ..................................................................................................................2, 10

17 C.F.R. § 240.10b-5 ........................................................................................................ 2, 10-11

17 C.F.R. § 270.22c-1(a) ........................................................................................................ *passim*

17 C.F.R. § 270.22c-1(b)(1)....................................................................................................... 2-3

Fed. R. Civ. P. 9(b) ......................................................................................................................1, 9

Fed. R. Civ. P. 12(b)(6)...............................................................................................................1, 9

Defendants Simpson Capital Management, Inc. ("Simpson Capital"), Robert A. Simpson ("Simpson") and John C. Dowling ("Dowling") (collectively, the "Defendants") submit this memorandum in support of their motion to dismiss the complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

This case concerns a private hedge fund, Simpson Capital, managed by Simpson and Dowling, that made millions of dollars for its investors by trading in mutual funds. The Securities and Exchange Commission (the "SEC") alleges that the Defendants' investment strategy involved seeking out broker-dealers who were allegedly willing to execute their orders after 4 p.m., purportedly in violation of duties the broker-dealers owed under SEC regulations and under contracts with various clearing brokers. The fatal flaw in the complaint is that it does not explain why the Defendants – who were not subject to SEC regulation and who owed no duties to clearing brokers or to the allegedly defrauded mutual funds – committed securities fraud. At most, the complaint alleges that the Defendants took advantage of the willingness of other parties to disregard their obligations. Even assuming these allegations are true, they do not state a proper claim for securities fraud against the Defendants, much less with the particularity required by Rule 9(b).

According to the complaint, from May 2000 to September 2003, the Defendants engaged in "late trading," *i.e.*, they bought and sold shares in mutual funds after 4:00 p.m., yet received that day's net asset value ("NAV"). The SEC asserts that the Defendants' trading was contrary to 17 C.F.R. § 270.22c-1(a) ("Rule 22c-1(a)"), a rule promulgated by the SEC under the Investment Company Act of 1940 (the "Investment Company Act"). The SEC has not charged the Defendants with a violation of Rule 22c-1(a), however, because Rule 22c-1(a) does not apply to investors such as the Defendants. Instead, it has charged the Defendants with securities fraud

in violation of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

10b-5 thereunder ("Rule 10b-5"). 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. ¶¶ 78-81.

None of the Defendants are alleged to have made any false or misleading statements;

none are alleged to have assumed any fiduciary duties towards other investors or anyone else. If

false statements were made by anyone, presumably they were made by the broker-dealers who

executed the Defendants' orders, but the complaint does not identify false statements by the

brokers, either. Moreover, the SEC has failed to plead facts sufficient to show that Rule 22c-1(a)

was, in fact, violated.

Assuming the allegations of the complaint to be true, the Defendants made a significant

amount of money by exploiting inefficiencies in the trading market and gaps in the regulatory

regime governing that market. They did so by taking advantage of a lacuna in the regulations

governing mutual fund pricing – regulations that the SEC is in the process of trying to fix – but

without engaging in conduct that was manipulative or deceptive. It is understandable why the

SEC might not subjectively like such activity, and seek to revise the applicable regulations. But

by bringing an action for *fraud* based on this subjective disapproval, the SEC in this case has

overstepped its legal enforcement authority as granted by Congress.

## STATEMENT OF FACTS

**A.      Rule 22c-1(a) and the Pricing of Mutual Fund Shares**

Mutual fund companies and broker-dealers who execute trades in mutual fund shares are

regulated by the SEC pursuant to the Investment Company Act. Because mutual funds consist of

a large basket of underlying equity holdings, their value (also referred to as the "Net Asset

Value" or "NAV") fluctuates constantly as the value of these underlying shares change. The

prices of mutual funds shares are not constantly reset in real time over the course of a day, but

typically are fixed for an entire day at a single price. 17 C.F.R. § 270.22c-1(b)(1); Thomas L.

Hazen and Jerry W. Markham, 23A Broker-Dealer Operations Sec. & Comm. Law ("Hazen & Markham") § 10:24.60 (July 2007).

This price setting process is governed by Rule 22c-1(a), which provides:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

Rule 22c-1 is also known as the "forward pricing" rule because the price assigned to mutual fund shares is not assigned until after the time an order is placed by the investor. Hazen & Markham § 10:24.60. As a result, when an investor purchases or sells (or "redeems") shares in a mutual fund, he does not know the actual price of the shares he is buying or selling until the NAV is next calculated by the fund.

Rule 22c-1(a) contains two other particularly pertinent features. *First*, by its terms, it is directed solely to "investment companies," "underwriter(s)," and "dealer(s)." It does not purport to regulate what investors can do or say, but simply prohibits underwriters and dealers from executing trades at prices other than those determined in compliance with the rule.

*Second*, by its terms, Rule 22c-1(a) creates a requirement that the price of mutual fund shares be set to the NAV "next computed" by the mutual fund company after the receipt of the order to buy or sell the shares in question. Thus, if an investor places an order to buy or sell mutual fund shares at a particular time, the rule instructs the broker-dealer executing the trade to apply the NAV "computed" by the mutual fund company after the "receipt of [the] order." Indeed, this is how the SEC traditionally interpreted the rule. SEC Commission Interpretive Positions Relating to Rule 22c-1, Investment Company Act Release No. 5569 (1967-69 Transfer

Binder), Fed. Sec. L. Rep. (CCH) ¶ 77,640 (Dec. 27, 1968) ("[t]he 'next computed' price means

the next price which goes into effect after receipt of the order.").  Further, although the rule

provides for pricing to be determined with reference to the time the NAV is "next computed," it

does not specify any time or times at which this computation is to be performed, leaving this

matter to the discretion of individual mutual fund companies.

In September 2003, the Attorney General of the State of New York brought a highly-

publicized case against Edward J. Stern and Canary Capital Partners, LLC, accusing them,

among other things, of improperly late trading mutual fund shares (the "Canary Complaint").

The Canary Complaint, which the complaint cites, as well as other subsequent cases, make it

clear that "late trading" was for a time a ubiquitous practice in the mutual fund industry.[1]

---

[1]  The Canary Complaint, a copy of which is attached to the Affirmation of Emma Terrell
("Terrell Aff.") as Exhibit B, may be considered both because it is cited in the complaint (¶ 27),
and because it is a public document subject to judicial notice by the Court.  *Kramer v. Time
Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (holding that a district court can consider
"documents . . . incorporated in the complaint by reference," as well as "documents filed in other
courts . . . to establish the fact of such litigation and related filings."); *Vento & Co. of N.Y. v.
Metromedia Fiber Network, Inc.*, 1999 U.S. Dist. LEXIS 3020, at *11-12 (S.D.N.Y. Mar. 17,
1999) (in deciding a motion to dismiss, district court "can consider documents referenced in the
complaint and documents that are in the plaintiff's possession or that the plaintiff knew of and
relied on in bringing suit.").  The Canary Complaint names a number of broker-dealers that
engaged in late trading, including Kaplan & Co. Securities, Inc. ("Kaplan"), JB Oxford &
Company, Bank of America Securities, and Security Trust Company.  The Canary Complaint
was the first of a number of enforcement actions brought against an array of broker-dealers and
other market participants, accusing them of late trading activity.  *See, e.g.*, *SEC v. Mutuals.com,
Inc.*, 303-cv-2912D, Complaint at ¶ 33 (N.D. Tex. Dec. 4, 2003) ("The defendants routinely
received trading instructions from their customers after 4:00 p.m. EST and executed those trades
as if the instructions had been received prior to 4:00 p.m. EST.") (attached to Terrell Aff. as
Exhibit C); *In re Pritchard Capital Partners, LLC*, SEC Admin. Proc. File No. 3-12753, Order at
¶8 (Sept. 7, 2007) ("From as early as November 2001 through July 2003, Pritchard Capital
allowed some of its mutual fund customers to late trade mutual fund shares.") (attached to Terrell
Aff. as Exhibit D); *In re Powell*, SEC Admin. Proc. File No. 3-11794, Order at ¶ 8 (Jan. 11,
2005) (Broker-dealers implemented a "system" that "allowed Kaplan & Co.'s customers to
capitalize on news events or market changes occurring after the 4:00 p.m. ET close of the stock
market.") (attached to Terrell Aff. as Exhibit E).

In December 2003, the SEC proposed the adoption of a rule requiring a "hard close" of mutual funds that would prevent the filing of any purchase or redemption requests after 4 p.m. Amendments to rules Governing Pricing of Mutual Fund Shares, Release No. IC-26285, File No. S7-27-03 (SEC Dec. 11, 2003) (the "Proposed Rule").  A copy of the Proposed Rule is attached to the Terrell Aff. as Exhibit F.  The Proposed Rule has yet to be adopted.  17 C.F.R. § 270.22c-1(a); *see generally* Hazen & Markham, § 10:24.60.

The complaint asserts that "[m]utual funds generally determine the NAV of mutual fund shares *as of* 4:00 p.m. ET." ¶ 19 (emphasis added).  It also asserts that broker-dealers who are authorized to sell shares of mutual funds typically enter into dealer agreements with the principal underwriters of mutual funds families ("Dealer Agreements"), and that these Dealer Agreements typically obligate broker-dealers to sell the family's mutual funds to their customers in accordance with the funds' prospectuses and the securities laws.  The complaint further asserts that mutual fund prospectuses generally state that the publicly available price for their shares is calculated *as of* 4:00 p.m. or the close of the New York Stock Exchange (typically also 4:00 p.m.) (emphasis added). ¶¶ 37-40.

Based on these allegations, the complaint asserts that illegal late trading occurs whenever an order received after 4 p.m. receives that day's NAV.  ¶¶ 20, 40.  However, the words "as of" do not appear in Rule 22c-1(a).  Indeed, a key purpose of the Proposed Rule was to add this very language.[2]  Rule 22c-1 simply provides that if the tender is made *before* the price is "next computed," the buyer should receive the previously computed price.  If the tender is made *after*

---

[2]  In particular, the Proposed Rule would have amended Rule 22c-1 to provide that mutual funds would be priced "*as of* the next pricing time." (emphasis added).  Terrell Aff., Ex. F at 21.  The SEC explained in the release that this amendment was "designed to prevent the cancellation or modification of orders after the pricing time applicable to the order," *i.e.*, the very conduct alleged in the complaint.  *Id.* at 71.

the price has already been computed, the rule requires the tender to receive the "next computed" price. Thus, a broker-dealer who received an order at 4:30 p.m. and filled it at that day's NAV would not have violated Rule 22c-1(a) if the fund next calculated its NAV at 5:30 p.m.

**B.     The Allegations Against the Defendants**

The complaint alleges that from May 2000 to September 2003, the Defendants entered into arrangements with five broker-dealers (the "Brokers") who were willing to place orders at that day's NAV for trades which were not made until after 4 p.m. ¶¶ 35-37. The complaint alleges that the Defendants were the prime movers of this scheme, and that the Brokers merely "facilitated" the Defendants' wrongdoing. Thus, the complaint alleges that the Defendants were the ones who "devised a method that would falsely represent to mutual funds that trades had been received prior to 4:00 p.m. in order to receive that day's NAV." ¶36. However, the complaint provides no specifics to back up these allegations.

Broker A was the first broker-dealer to execute trades after 4:00 p.m. for the defendants. ¶ 41. According to the complaint, Broker A "facilitated" the Defendants' late trading by emailing a daily position sheet containing Simpson Capital's available cash balance and mutual fund holdings and a "scenario sheet" containing a blank area for Simpson Capital to indicate any orders it wanted executed that day. ¶ 42. By 3:00 p.m., Dowling or an administrative assistant would email or fax a completed scenario sheet showing the proposed trades for that day. *Id.* The completed scenario sheets were "only tentative trading instructions," and Broker A was not authorized to execute them until Simpson Capital confirmed them sometime between 4:00 p.m. and 5:30 p.m. ¶¶ 43-45. There was nothing deceptive about the completed scenario sheets. They "specifically stated that the proposed trades were '[s]ubject to phone confirmation by Robert Simpson, [an administrative assistant], Jack Dowling or [an assistant trader] by 4:30 p.m. today." ¶¶ 42-43.

After receiving a confirming call, Broker A cleared the trades though Bear Stearns, a clearing broker.  ¶ 44.  Bear Stearns gave Broker A direct access to the Mutual Fund Routing System (the "MFRS").  ¶ 45.  The MFRS platform is an electronic trading platform which routes mutual fund orders from the user to the Fund/SERV platform, an automated system for processing purchase and redemption orders of mutual fund shares.  ¶¶ 25-26.  Broker A executed the trades at that day's NAV, even though they were not confirmed until after 4:00 p.m. ¶¶ 45-46.

The allegations as to the remaining four Brokers (Wall Street Access, Kaplan, Broker B and Broker C) are substantially similar.[3]  For example, the orders faxed by Simpson Capital to Wall Street Access were labeled "tentative trades" and stated "Please wait for a call from Simpson Capital for execution."  ¶ 50.  All five Brokers were able to enter Simpson Capital's trades directly into the MFRS.  ¶¶ 45, 65, 72.

The complaint alleges that by applying the NAV for the date on which the Simpson Capital trades were placed, the Brokers acted in violation of Rule 22c-1(a).  ¶ 40.  As noted above, the basis for the allegation that the rule was violated is the assertion that "[m]utual funds generally determine the NAV of mutual fund shares *as of* 4:00 p.m. ET."  ¶ 19.  Nowhere does the complaint indicate at what time mutual funds actually "compute" their NAVs, as opposed to the time "as of" which they are computed, an expression conspicuously absent from the rule. Nor, despite access to all the relevant information, does the complaint make any specific allegations concerning the methods and times of NAV calculations for the mutual funds in which

---

[3]  The complaint alleges that Wall Street Access, one of two registered representatives at Broker B, and Broker C time stamped the tentative trades sheets before 4:00 p.m.  ¶¶ 52, 66, 72. However, the complaint does not explain what purpose, if any, these time stamps served.

Simpson Capital traded, aside from some vague observations about what funds "generally" do. ¶ 17.

The complaint is as notable for the allegations it does not make as for the allegations it contains:

- The complaint does not allege that the Defendants fall into any category to which Rule 22c-1(a) applies (namely, registered investment companies that issue redeemable securities, persons designated in such issuer's prospectus as authorized to consummate a transaction in any such security, principal underwriters of such security, and dealers in any such security).

- The complaint does not allege that Simpson Capital, a private investor, executed any trades.  Instead, it makes clear that all trades were entered into the computerized MFRS trading system by the Brokers.  ¶¶ 25-26, 45, 67, 72.

- The complaint does not allege that the Defendants had anything other than arms-length business relationships with the Brokers.

- The complaint does not allege that the Defendants provided any special compensation to the Brokers for executing trades after 4:00 p.m.

- The complaint does not identify any fiduciary or other special relationship with any person – including the mutual funds or fellow investors – that would have obligated the Defendants to reveal their trading strategies or activities.

- The complaint does not identify any statement or representation concerning the trades that the Defendants made to anyone other than a Broker, all of whom were familiar with the Defendants' desire to have their trades executed after 4:00 p.m. Indeed, the complaint does not identify any alleged false or misleading statement made by the Defendants at all, an unusual and typically fatal shortcoming in a case brought under §10(b) of the Exchange Act.

## ARGUMENT

In deciding a motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). However, the plaintiff's obligation to provide the grounds of his relief "'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *In re Bayou Hedge Fund Litigation*, 2007 U.S. Dist. LEXIS 59145, at *22 (S.D.N.Y. July 31, 2007), quoting *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955, 1964 (2007). Further, as the Supreme Court recently noted, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should…be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atlantic*, 127 S.Ct. at 1966; *Roth,* 489 F.3d at 517.

Under Fed. R. Civ. P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To meet the requirements of Rule 9(b), a complaint must specify the statements that the plaintiff contends were fraudulent, identify the speaker and state where and when the statements were made, and explain why the statements were fraudulent. *AIG Global Securities Lending Corp. v. Banc of America Securities*

*LLC*, 254 F. Supp. 2d 373, 382 n.2 (S.D.N.Y. 2003).  *See also ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  This burden cannot be discharged with "[a]llegations that are conclusory or unsupported by factual assertions." *ATSI,* 493 F.3d at 99, citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).  The requirements of Rule 9(b) apply with equal force whether the SEC or a private person brings the allegations.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000); *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 462 (S.D.N.Y. 2004).

## I.

### THE COMPLAINT DOES NOT STATE A VIOLATION OF § 10(B) OR PLEAD FRAUD WITH PARTICULARITY

The complaint asserts a single claim for securities fraud, based on alleged violation of Rule 10b-5, as promulgated under Section 10(b) of the Exchange Act.

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

Rule 10b-5, 17 CFR § 240.10b-5, provides that it shall be unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

It is important to note that by invoking Rule 10b-5, the SEC has not expanded the scope of the Defendants' liability. Rule 10b-5 "cannot exceed the power granted the Commission by Congress under § 10(b)." *Santa Fe Indust., Inc. v. Green*, 430 U.S. 462, 473 (1977). Accordingly, the SEC states a claim under Rule 10b-5 only if the conduct can be fairly viewed as "'manipulative or deceptive' within § 10(b)." *Id*. at 473-74. *See also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act."); *ATSI*, 493 F.3d at 99 (liability under § 10(b) requires either material misrepresentations or "manipulative acts"); *Madison Consultants v. FDIC*, 710 F.2d 57, 61 (2d Cir. 1983) ("an essential ingredient in any 10b-5 case is that the defendants have engaged in some form of manipulation or deception.").

The "claim" section of the complaint merely parrots the language of the Rule 10(b)-5(a), (b) and (c). It does not state what part of the rule the Defendants allegedly violated, nor does it attempt to match particular factual allegations to the subsections of the rule. Because the complaint does not set forth its underlying theory of liability, we examine the elements of manipulation and deception in turn.

## A.     The Complaint Does Not Allege Any Manipulative Acts by the Defendants

The word "manipulation" is "virtually a term of art when used in connection with securities markets." *Santa Fe Industries,* 430 U.S. 462, 476-77. As the *Santa Fe* Court explained, "manipulation" refers "to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id*. *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *ATSI*, 493 F.3d at 100 (manipulation requires "a showing that an alleged

-11-

manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security").

To plead manipulation, a complaint must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102. The complaint does not allege that the Defendants made wash sales, matched orders, rigged prices or engaged in other similar conduct. Nor does it allege that the so-called late trading had any effect on the market for mutual fund shares.

The complaint also contains no allegation that the Defendants' trading activity affected the price of mutual funds' shares or led others to purchase or sell mutual fund shares at an artificial price. While the complaint alleges that the Defendants purchased mutual fund shares at an advantageous price, and that the value of other shares were "diluted," it does not state what this dilution entailed, much less that it artificially affected the price of mutual fund shares.[4]

In fact, given the way mutual fund pricing works, the Defendants' trading could not have artificially affected the price of any mutual fund shares. As noted above, from the point of view of investors, the Defendants' trading did not send any pricing signal, because investors in mutual funds do not know what price they will pay until after the NAV is calculated. Moreover, the price of a mutual fund's shares turns on the value of its underlying holdings or its NAV. ¶ 15 ("The price of a mutual fund's shares is based on the value of the securities (and other assets)

---

[4] As employed by commentators and academics, "dilution" simply refers to the fact that a purchaser (such as Simpson Capital) obtains the benefit of any increase in value in the underlying securities of the mutual funds from the time the purchase is effected, whereas the price paid by the purchaser may not be converted into additional securities until a later time. *See, e.g.*, Hazen & Markham § 10:24.60 ("[T]he late trader [pays] cash on the day when he bought the mutual funds at their 4:00 p.m. NAV. That cash may not be invested in time to capture the fluctuation in value."). This marginal "dilution" effect only impacts the net returns enjoyed by mutual fund holders on their investment. It has no effect on the price or NAV of mutual fund shares which are fixed in accordance with the Rule 22c-1 calculation.

held by the mutual fund"). Therefore, an order to purchase or redeem shares in a mutual fund – regardless of when it is executed – cannot have a material effect on the NAV because it does not have any impact of the value of the underlying investments of the mutual fund.

This is a fatal flaw. As the Second Circuit recently explained, "a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security" is a fundamental prerequisite to a manipulation claim. *ATSI*, 493 F.3d at 100 (citing *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). Absent allegations demonstrating that an "activity 'artificially' affects a security's price in a deceptive manner," a manipulation complaint cannot stand. *ATSI*, 493 F.3d at 100.

**B.    The Complaint Does Not Allege Material Misrepresentations by the Defendants**

The classic § 10(b) case involves a defendant who made a false or misleading statement in connection with the purchase or sale of securities.

To state a claim for relief under § 10(b) and Rule 10b-5 based on a misrepresentation theory, the SEC must allege that the defendant made a material misrepresentation, with scienter, in connection with the purchase or sale of securities. *SEC v. First Jersey Securities*, 101 F.3d 1450, 1467 (2d Cir. 1996). As discussed above, such allegations must be made with particularity.

The complaint does not allege that the Defendants made any false or misleading statements. The only statements attributed to the Defendants are communications about trading with the Brokers. No defendant is alleged to have had any communications with the mutual funds that were allegedly defrauded by the Defendants' late trading.

The statements made by the Defendants to the Brokers consist entirely of trading orders or discussions about future trading orders. None of these statements are alleged to have been false or misleading. To the contrary, the complaint alleges that when Simpson Capital

transmitted its trades to the Brokers, they were accurately described as provisional, typically bearing a plain label to that effect such as "tentative trades." ¶ 50. The complaint makes it clear that the Brokers knowingly accepted these provisional trades, willingly executed them after 4:00 p.m., and deliberately assigned pricing based on that day's NAVs. ¶¶ 36, 42, 46, 50-53, 61-63, 65-67, 72-73. There is no allegation that the Defendants misled the Brokers as to any of these aspects of trading. *See In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, 06-cv-643, Opinion and Order, Doc. No. 92, at 17, 19 & n.7 (S.D.N.Y. Sept. 13, 2007) (attached to Terrell Aff. as Ex. G) (holding that there is no deception where defendant acts contrary to SEC regulations if defendant does not purport to obey those regulations).

Nor does the complaint describe any false statements made by the Brokers. The complaint alleges that three of the Brokers time stamped the tentative trade sheets before 4 p.m. (¶¶ 52, 66, 72), but these time stamps were literally true. The tentative trade sheets were in fact received before 4 p.m. Although a literally truthful statement can sometimes be misleading, the complaint does not describe *how* these time stamped documents – clearly marked tentative – defrauded anyone. It does not explain how they were used by the Brokers (if at all), nor does it assert that they were provided to or relied on by anyone else.

While the complaint alleges that the Defendants "devised a method that could falsely represent to mutual funds that trades had been received prior to 4 p.m." (¶ 36), it does not describe the specific "method" devised by the Defendants, offer any explanation of how and when it was communicated to the mutual funds, or describe the manner in which these funds were misled. *See Refco*, at 17 ("In order to coherently allege deceptive conduct, plaintiffs must identify (1) the source of the misunderstanding falsely created by defendants . . . and (2) conduct that violates that understanding."). Furthermore, other allegations of the complaint are

inconsistent with the assertion that the Defendants devised the late trading scheme employed by the Brokers. According to the Wall Street Access representative with whom the Defendants discussed late trading at the inception of the relationship, the execution of such orders was a "standard routine." ¶ 51. Kaplan did not learn how to execute orders after 4:00 p.m. from the Defendants; it engaged in late trading on behalf of at least 20 customers starting in early 2000 (¶ 61), nearly two years before its started executing late trades for Simpson Capital. ¶ 59. While plaintiff's allegations are entitled to deference, the Court need not accept speculative or general allegations that are contradicted by other allegations of the complaint. *See, e.g., Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *In re Van der Moolen N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 396 (S.D.N.Y. 2005) ("[T]he truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted").

Indeed, the only improper aspect of the alleged scheme is the contention that the Brokers who placed the Defendants' orders allegedly violated Rule 22c-1(a) and, by extension, the Dealer Agreements. But the complaint does not actually establish a violation of Rule 22c-1(a) or a breach of the Dealer Agreements because it does not specify when the funds traded by the Defendants actually computed their NAVs. The SEC's allegation that under Rule 22c-1, orders received after 4:00 p.m. "must" be executed based the NAV calculated the next day is a legal conclusion that need not be accepted as true on a motion to dismiss. *Bell Atlantic*, 127 S. Ct. at 1965 (citing *Papasan v. Allain*, 478 U. S. 265, 286 (1986)). As set forth above, Rule 22c-1(a) requires only that the price of mutual fund shares be set to the NAV "next computed" by the mutual fund company after the receipt of the order to buy or sell the shares in question. The SEC has pled its complaint as if the Proposed Rule had been adopted and in place during the relevant

time period, and only addresses the separate issue of the time "as of" which NAVs are computed. *See*, *e.g.*, ¶¶ 17, 19, 40.[5] Even those allegations are made in cursory and generalized fashion: the complaint's bare bones allegations that mutual funds "generally" compute prices "as of" a certain time are inadequate under Rule 9(b), especially given the SEC's access to detailed information about the specifics of the funds the Defendants traded.

But even if one accepts the allegation that the Brokers violated Rule 22c-1(a) and breached their Dealer Agreements, the complaint does not establish securities fraud. Merely breaking a rule or breaching a contract does not establish securities fraud. *Shemtob v. Shearson, Hammill & Co*., 448 F.2d 442, 445 (2d Cir. 1971) (mere breach of contract or of a stock exchange rule does not constitute securities fraud); *Pross v. Baird Patrick & Co.*, 585 F. Supp. 1456, 1460 (S.D.N.Y. 1984) (without deception, trades executed in violation of brokerage agreement "cannot be converted into a fraud claim under § 10(b) and Rule 10b-5"); *AIG Global Securities*, 254 F. Supp. 2d at 385 (alleging that a party failed to abide by an express contractual commitment "is insufficient to satisfy Rule 9(b)'s requirement that the plaintiffs allege why the representations were fraudulent"). Thus, the most that can be said about the Defendants is that they took advantage of the Brokers' willingness to play fast and loose with their obligations. These allegations are not sufficient to hold the Defendants' liable for securities fraud.

Finally, the time stamps – the only conceivably false statement mentioned in the complaint – were not placed on orders by the Defendants. They were put there by the Brokers, and are therefore not "statements" by the Defendants. The Second Circuit has adopted a "'bright line' test" under which "a defendant must actually make a false or misleading statement in order

---

[5] Indeed, the SEC's release accompanying the publication of the Proposed Rule acknowledges that the very conduct alleged in the complaint – cancellation or confirmation of orders after 4 p.m. – was effectively permitted under Rule 22c-1(a), a perceived regulatory shortcoming that motivated the SEC to suggest the adoption of the Proposed Rule. Terrell Aff., Ex. F.

to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998), quoting *Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir. 1997).[6]  And while the SEC has the authority to assert an aiding and abetting charge, it has not done so.  The allegations, even read liberally, limit the Defendants' role in the alleged "scheme" to  placing orders with the knowledge that they would be executed by Brokers after 4:00 p.m.  Knowledge of a fraud, even

---

[6]  The Second Circuit's approach is consistent with that taken by the Eighth, Fifth, Eleventh and Tenth Circuits (*In re Charter Comm'ns, Inc.*, 443 F.3d 987 (8th Cir. 2006); *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007); *Ziemba v. Cascade Int'l. Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001);  *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996)), and inconsistent with the approach taken by the Ninth Circuit (*Simpson v. AOL Time Warner*, 452 F.3d 1040, 1048 (9th Cir. 2006)).  The Supreme Court granted *certiorari* in *Charter*, under the caption *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, ___ U.S. ___, 127 S.Ct. 1873 (Mar. 26, 2007)), and oral argument is scheduled for October 9, 2007.

The Second Circuit has recognized four exceptions to the bright line rule, none of which apply here.  The first exception involves liability attributed to a controlling corporate officer who completely dominates an entity committing fraudulent conduct.  *See SEC v. First Jersey Securities*, 101 F.3d 1450, 1471-72 (2d Cir. 1996) (upholding primary liability for owner/President/CEO of offending company when he "engaged in the purposeful planning" of fraudulent conduct and "orchestrated every facet" of fraud at branch office level).  The Second Circuit has subsequently indicated that *First Jersey* is limited to situations involving control persons.  *Wright*, 152 F.3d at 176 ("We held Brennan liable for securities fraud as a 'controlling person,' that is, for fraud planned and directed by upper level management.").  The second exception is manipulation cases, in which the trading activity constitutes the manipulative act.  *SEC v. U.S. Environmental*, 155 F. 3d 107, 112 (2d Cir. 1998) (holding that "execut[ion] [of the] manipulative buy and sell orders" is a basis for primary liability in a manipulation case).  The *U.S. Environmental* theory of primary liability cannot apply in misrepresentation cases or it would "swallow" the bright line test for primary liability established by the Second Circuit in *Wright* and *Shapiro*.  *SEC v. Pimco Advisors Fund Management LLC*, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004).  Thirdly, a principal can be held liable as a primary violator for statements made by its agents in the course of carrying out their agency.  *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); *Vento & Co.,* 1999 U.S. DIST. LEXIS 3020, at *37-39.  Finally, third parties such as accountants can be held liable for securities fraud when they issue statements and have a "special relationship with the investing public."  *Overton v. Todman & Co.*, 478 F.3d 479, 488 (2d Cir. 2007) (holding accountants liable for knowingly releasing misleading certified audit opinion); *but see Lattanzio v. Deloitte & Touche, LLP*, 476 F.3d 147, 155-56 (2d Cir. 2007) (dismissing complaint against accountants alleging that they knowing assisted in drafting and filing misleading quarterly statements, in the absence of a certified audit opinion).

if accompanied by substantial assistance in its preparation, is insufficient to trigger primary liability absent a fraudulent misrepresentation. *Wright*, 152 F. 3d at 175-76.

## C.    The Complaint Does Not Allege an Actionable Omission by the Defendants

"When an allegation of securities fraud in violation of Section 10(b) and Rule 10b-5 is based upon a nondisclosure of material information, 'there can be no fraud absent a duty to speak.'" *Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, 2007 U.S. Dist. LEXIS 52546, at *11 (S.D.N.Y. July 20, 2007), quoting *Chiarella v. United States*, 445 U.S. 222, 235 (1980). *See also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994). A duty to disclose arises only in the context of a fiduciary relationship or "similar relationship of trust and confidence." *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir. 1991) (en banc). "Where a complaint does not allege any basis for a duty to disclose, a claim based upon nondisclosure of material information cannot be sustained." *Alexandra*, *supra*, at *12-13.

The Defendants cannot be liable on an omission theory because as investors in mutual funds, they owed no special duties to the Brokers, the funds they invested in, or the other shareholders of those funds. As a private investment company, Simpson Capital's only duties were to its own investors. There would be no reason for a mutual fund or another investor to believe that Simpson Capital or the other defendants would act in any way other than for their own private economic benefit. Indeed, the complaint does not allege the existence of any fiduciary duty owed by the Defendants to any allegedly defrauded party.

## CONCLUSION

For the reasons set forth above, the Defendants respectfully request that the complaint be

dismissed with prejudice in its entirety.

New York, New York                COOLEY GODWARD KRONISH LLP
Dated: September 18, 2007


By:      /s/ Alan Levine
    Alan Levine (AL-1073)
    Celia Goldwag Barenholtz (CGB-9126)
    Jason Koral (JK-1044)
    Emma Terrell (ET-1414)

1114 Avenue of the Americas
New York, New York  10036
(212) 479-6000

*Attorneys for Defendants*
*Simpson Capital Management, Inc.*
* and Robert A. Simpson*



CLAYMAN & ROSENBERG


By:      /s/ Charles E. Clayman
    Charles E. Clayman (CC-0346)
    Thomas C. Rotko (TR-9339)

305 Madison Avenue, Suite 1301
New York, New York 10165
(212) 922-1080

*Attorneys for Defendant John C. Dowling*