UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    CIVIL ACTION No. 07 CV 6072 (JGK) |
| | :    ECF CASE |
| SIMPSON CAPITAL MANAGEMENT, INC., | : |
| ROBERT A. SIMPSON and | : |
| JOHN C. DOWLING, | : |
| | : |
| Defendants. | : |
| | : |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

David S. Horowitz (admitted *pro hac vice*)
Amy J. Greer (admitted *pro hac vice*)
Brendan P. McGlynn (admitted *pro hac vice*)
Tami S. Stark (TS 8321)
Jack C. Easton

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100

## TABLE OF CONTENTS

Table of Contents ....................................................................................................... ii

Table of Authorities .................................................................................................. iii

INTRODUCTION ........................................................................................................1

ARGUMENT .................................................................................................................3

I.      DEFENDANTS FAIL TO SATISFY THE STANDARD FOR GRANT OF A
        MOTION TO DISMISS .................................................................................3

II.     RULE 22c-1 OF THE INVESTMENT COMPANY ACT AND DEFENDANTS'
        FRAUDULENT SCHEME..............................................................................4

        A.      Congress Delegated to the Commission the Authority to Protect
                Investors from Dilution and Other Harmful Results...............................6

        B.      Defendants' Interpretation Defies the Congressional and
                Commission Intent to Protect Investors....................................................12

III.    DEFENDANTS' FRAUDULENT LATE TRADING SCHEME VIOLATED SECTION
        10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER........................14

IV.     THE COMMISSION HAS PROPERLY PLEADED A LATE TRADING
        SCHEME ........................................................................................................18

CONCLUSION..............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

PAGE

### FEDERAL CASES

*Aaron v. SEC*, 446 U.S. 680 (1980) ...............................................................................16

*Bright v. Ball Memorial Hospital Assoc.*, 616 F.2d 328 (7th Cir. 1980) ..........................8

*Bruh v. Bessemer Venture Partners III, L.P.*, 464 F.3d 202 (2d Cir. 2006) ...................10

*Chevron, USA, Inc. v. N.R.D.C.*, 467 U.S. 837 (1984) .................................................10

*Cosmas v. Hasset*, 886 F.2d 8 (2d Cir. 1989) .................................................................4

*Croysdale v. Franklin Savings Ass'n.*, 601 F.2d 1340 (7th Cir. 1979)............................8

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)...................................................4

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).......................................................16

*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980) .............................................8

*Gant v. Wallingford Bd. of Education*, 69 F.3d 669 (2d Cir. 1995) .................................3

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)..........................................................3

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998).......................................3

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................. 16, 17

*In re Global Crossing Ltd. Securities Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) .............17

*In re Mutual Funds Investment Litigation*, 384 F. Supp. 2d 845 (D. Md. 2005)...............14, 15, 17

*In re Parmalat Securities Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) .................................16, 18

*Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10 (2d Cir. 2001)........................10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503 (2006) ............................15

*Ouaknine v. MacFarlane*, 897 F.2d 75 (2d Cir. 1990) ...................................................4

*Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000)..........................................10

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462 (1977)......................................................15

*Scheuer v. Rhodes,* 416 U.S. 232 (1974) .......................................................................3

*SEC v. Alexander,* 160 F. Supp. 2d 642 (S.D.N.Y. 2001) .............................................4

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ...........................16

*SEC v. Federighi et al.*, 2005 SEC LEXIS 3284(Dec. 22, 2005) ...................................9

*SEC v. JB Oxford Holdings, Inc.,* 2004 U.S. Dist. LEXIS 29494, slip op.
      (C.D. Cal. Nov. 9, 2004).................................................................................. 17-18

*SEC v. JB Oxford Holdings, Inc. et al.,* Civil Action No. CV 04-7084 PA (VBKx), slip op.
      (C.D. Cal. Aug. 24, 2005)....................................................................................11

*SEC v. Naegeli,* 1993 U.S. Dist. LEXIS 237 (S.D.N.Y. Jan. 12, 1993) .........................4

*SEC v. U.S. Envtl., Inc.,* 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ...................................4, 16

*SEC v. Zandford,* 535 U.S. 813 (2002).....................................................................15, 16

*SIPC v. BDO Seidman, LLP,* 222 F.3d 63 (2d Cir. 2000)................................................3

*Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6 (1971) .................15, 16

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)........................................................3

*United States v. Russo,* 74 F.3d 1383 (2d Cir. 1996)....................................................16

*U.S. v. Bongiorno,* 2006 WL 1140864 (S.D.N.Y. May 1, 2006)...............................17, 18

*U.S. v. Finnerty,* 474 F. Supp. 2d 530 (S.D.N.Y. 2007) ................................................18

*U.S. v. National Ass'n of Securities Dealers, Inc.,* 422 U.S. 694 (1975).................6, 10

## SEC ADMINISTRATIVE PROCEEDINGS

*In the Matter of Paul A. Flynn,* 2006 SEC LEXIS 1766 (Aug. 2, 2006)..................11, 12

*In the Matter of Veras Capital Master Fund, et al.,* 2005 SEC LEXIS 3290
      (December 22, 2005) ...........................................................................................9

## FEDERAL STATUTES

15 U.S.C. § 78j ................................................................................................................15

15 U.S.C. § 78j(b) .............................................................................. 2, 3, 9, 14-18

15 U.S.C. § 80a-22 ...................................................................................6, 7, 13

15 U.S.C. § 80a-22(a) ...............................................................................................6

15 U.S.C. § 80a-22(c) ...............................................................................................6

15 U.S.C. § 80a-22(d) ...............................................................................................7

17 C.F.R. § 240.10b-5 ........................................................................ 2, 3, 9, 14-17

17 C.F.R. § 240.10b-5(a) and (c) ........................................................... 16-18

17 C.F.R. § 270.22c-1 ............................................................. 4-13, 20, 21, 23

17 C.F.R. § 270.22c-1(a) ......................................................................................2, 7

17 C.F.R. § 270.22c-1(b) .....................................................................................7, 12

Fed. R. Civ. P. 9(b) ...........................................................................................4, 24

Fed. R. Civ. P. 12(b)(6) .............................................................................................3

## OTHER

*Adoption of Rule 22c-1, Investment Company Act Release No. 5519, 1968 SEC LEXIS 171
(Oct. 16, 1968)* ........................................................................................................7, 8

*Amendments to Rules Governing Pricing of Mutual Fund Shares, Investment Company Act
Release No. 26288, 2003 SEC LEXIS 2938 (Dec. 11, 2003)* ..........................................13

*Notice of Proposal to Adopt Rule 22c-1, Investment Company Act Release No. 5413, 1968 SEC
LEXIS 109 (proposed June 25, 1968)* .........................................................................6

*Staff Interpretive Positions Relating to Rule 22c-1, Investment Company Act Release No. 5569,
1968 SEC LEXIS 979 (Dec. 27, 1968)* ........................................................................8

## INTRODUCTION

The Securities and Exchange Commission (the "Commission") alleges that, between May 2000 and September 2003, Defendants Simpson Capital Management, Inc. ("Simpson Capital"), Robert A. Simpson and John C. Dowling conducted a fraudulent scheme by using five separate broker-dealers to place more than 10,700 late trades in over 375 mutual funds.[1] The Complaint alleges, with the requisite particularity, that Defendants systematically, repeatedly and intentionally engaged in late trading in mutual fund shares, and reaped tens of millions of dollars in profits and fees by doing so. Accordingly, Defendants' Motion to Dismiss the Complaint must be denied.

Defendants' acts were intentional and deceptive, and were part of an investment strategy that depended for its success on taking advantage of, and trading on, information received post-4:00 p.m. ET, after the markets closed. ¶¶ 3, 28, 53, 63, 71.[2] In fact, late trading is prohibited for that very reason, to prohibit one trader from obtaining an advantage -- at the expense of other mutual fund shareholders -- when he learns of market moving information after 4:00 p.m. and purchases (or redeems) mutual fund shares at prices set as of 4:00 p.m., *before* that market moving information was released. ¶ 20. Defendants in their Motion to Dismiss the Complaint claim that, at most, they took advantage of what they claim to be a vague rule intended for certain market professionals, and "exploit[ed] inefficiencies in the trading market and gaps in the regulatory regime governing that market." Memorandum in Support of Defendants' Motion to Dismiss ("Motion") at 2. Defendants' self-serving analysis is simply wrong, and their

---

[1]    Late trading is the illegal practice of placing orders to buy, redeem, or exchange mutual fund shares after the 4:00 p.m. Eastern Time ("ET") market close while still receiving the current day's mutual fund price, or net asset value ("NAV"). Late trading harms innocent shareholders in mutual funds by diluting, or lessening, the value of their shares. Complaint ¶ 20.

[2]    All citations to ¶ refer to paragraphs in the Commission's Complaint.

interpretation of Rule 22c-1(a) under the Investment Company Act of 1940 ("Investment Company Act") contradicts the clear and consistent interpretation of that rule, which was intended to prevent the very conduct engaged in by Defendants.

By their Motion, Defendants also ignore the pleaded facts that clearly reveal their state of mind and intent; namely, that they were told repeatedly that late trading was illegal and, they, repeatedly, sought to do it anyway. ¶¶ 30-34, 54-58. As described in great detail in the Complaint, Defendants were warned on numerous occasions that placing trades after 4:00 p.m. ET and receiving that day's NAV was "illegal"; but rather than accept what he was told, Simpson proposed deception in order to evade the law, refusing to accept the warnings. ¶¶ 31-34, 51-56. Choosing to proceed with full knowledge of the unlawful nature of their conduct, Defendants eventually arranged at least five late trading relationships with broker-dealers ("Introducing Brokers"), who in fact acted as conduits through which the Defendants implemented their scheme. ¶ 34. Through their trading, Defendants deceived mutual funds into assigning improper prices to their trades, which benefited Defendants at the expense of mutual fund shareholders. When one of the brokers subsequently refused to continue Defendants' late trading, Defendants closed their accounts and took them to other brokers that improperly allowed late trading. ¶¶ 54-58.

The Commission's Complaint clearly, and in great factual detail, alleges that the Defendants engaged in a deceptive scheme to defraud mutual funds and their shareholders, and, in so doing, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The United States Supreme Court repeatedly has held that the broadly worded antifraud provisions of the federal securities laws should be construed flexibly to effectuate their purposes. Defendants

argue for an impermissibly narrow reading of this important antifraud provision, attacking the Commission's Complaint by mischaracterizing the nature of the Commission's claim. To state a claim for fraud under Section 10(b) and Rule 10b-5 requires neither a misrepresentation, nor an omission, nor a manipulation. Rather, as has been pleaded in the Complaint at issue here, Defendants employed deception and engaged in acts, practices, and courses of business that operated as a fraud upon mutual funds and their shareholders. ¶¶ 1, 36. Accordingly, courts and other tribunals already have held that late trading, such as that described in the Complaint, constitutes an actionable scheme in violation of the antifraud provisions.

## **ARGUMENT**

### I.    **Defendants Fail to Satisfy the Standard for Grant of a Motion to Dismiss**

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true the allegations in the Complaint, and all reasonable inferences must be drawn in the plaintiff's favor. *See SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000); *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). The complaint need only: (i) include a short and plain statement of the claim showing that the Commission is entitled to relief; and (ii) give defendants fair notice of what the Commission's claim is and the grounds upon which it rests. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). This standard is so high that motions to dismiss for failure to state a claim should be denied even if the possibility of ultimate recovery is remote. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Rule 9(b) permits a plaintiff to allege fraudulent intent, or scienter, generally while the circumstances amounting to fraud must be averred with particularity. *See* Fed. R. Civ. P. 9(b). Pleading fraud with particularity generally means that the complaint must allege the "who, what, when, where, and how" of the fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). However, the courts have acknowledged Rule 9(b)'s limited breadth, noting that the rule "must be read together with Rule 8(a), which requires only a short and plain statement of the claim for relief." *SEC v. U.S. Environmental, Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) (*quoting Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990)).

Under these liberal pleading standards, the Commission has alleged more than sufficient facts, and Defendants' Motion should be denied. In more than 70 factual paragraphs, the Commission has, at a minimum, pled the "who, what, when, where, and how" of the fraud, in a manner sufficient to meet the requirements of Rule 9(b). Furthermore, the Complaint has given Defendants notice of the facts and claims asserted sufficient to permit them to adequately prepare their response. *See SEC v. Alexander*, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001) (*citing Cosmas v. Hasset*, 886 F.2d 8, 11 (2d Cir. 1989)) ("The purpose of Rule 9(b) is, in part, to provide fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading."); *see also SEC v. Naegeli*, 1993 U.S. Dist. LEXIS 237, at *3 (S.D.N.Y. Jan. 12, 1993) (motion to dismiss denied where complaint provided enough information to allow defendant to prepare defense).

## II.    Rule 22c-1 of the Investment Company Act and Defendants' Fraudulent Scheme

The crux of Defendants' Motion hinges on their contention that they were merely exploiting a "lacuna in the regulations governing mutual fund pricing" (referring to Rule 22c-1 of the Investment Company Act) when they set upon a deceptive course of conduct to

fraudulently evade mutual fund late trading restrictions and reaped millions in illegal profits to the detriment of mutual fund long-term shareholders. Motion at 2. However, this so-called "lacuna" does not exist. In order to protect against certain unfair trading practices, the Commission promulgated Rule 22c-1 almost 40 years ago. The Rule specifically defines how mutual fund shares are priced, and its requirements have been well understood by the mutual fund industry, and those who sell mutual funds. Defendants would have this Court interpret the Rule in a manner that would undo its purpose and intent, and allow the very conduct the Rule was designed to prevent.

Defendants argue that Rule 22c-1 has never required that mutual fund orders be submitted by the time as of which the mutual funds determine their NAVs (generally 4:00 p.m.), but rather the deadline is whenever the funds actually complete their NAV calculations -- presumably some indeterminate time that would vary from day to day. Motion at 5-6. Defendants likewise claim that the Commission's late trading allegations are deficient since the Complaint is devoid of any allegation of when the funds actually calculated their NAVs. Motion at 15. The Complaint does not charge Defendants with violating the Rule since it does not apply to them directly, and Defendants further assert that the Commission is somehow overstepping its enforcement authority by bringing fraud charges based on violations of Rule 22c-1. Motion at 16. However, as clearly alleged in the Complaint, Defendants used brokers who are subject to the Rule as part of their late trading scheme, in order to deceive mutual funds, who are also bound by the Rule, and their shareholders.

Defendants adduce not a single legal authority for their arguments -- and for good reason, because no factual or legal support for their interpretation of Rule 22c-1 exists. Ultimately,

Defendants' arguments amount to nothing more than a post hoc justification of their conduct which, if accepted, would stand the mutual fund regulatory framework on its head.

A.    **Congress Delegated to the Commission the Authority to Protect Investors from Dilution and Other Harmful Results**

Congress enacted Section 22 for "the purpose of eliminating or reducing as far as reasonably practicable any dilution of the value of other outstanding securities . . . and any other result . . . which is unfair to holders of such outstanding securities." *See* 15 U.S.C. 80a-22(a) (2005). In Section 22(c) of the Investment Company Act, Congress expressly grants to the Commission the authority to "make rules and regulations applicable to registered investment companies and to principal underwriters of, and dealers in, the redeemable securities of any registered investment company. . . for the accomplishment of the same ends as prescribed in subsection (a) of [Section 22]." *See* 15 U.S.C. 80a-22(c) (2005).

Pursuant to that rulemaking authority, on October 16, 1968, the Commission adopted Rule 22c-1. 17 C.F.R. § 270.22c-1. Rule 22c-1 implemented what is commonly referred to as the "forward pricing rule" to ensure that mutual funds treated shareholders equally in assigning prices to purchases and redemptions. Before adoption of the Rule, mutual funds allowed certain insiders to purchase fund shares at lower prices, which did not reflect the current value of the shares, and then to redeem those shares at the higher market price to the detriment of existing shareholders. *U.S. v. National Ass'n of Securities Dealers, Inc.*, 422 U.S. 694, 707-708 (1975); Notice of Proposal to Adopt Rule 22c-1, Investment Company Act Release No. 5413, 1969 SEC LEXIS 109 (proposed June 25, 1968) (Appendix Exhibit A).[3] This practice enabled the insiders

---

[3]    References to an Appendix Exhibit are to the Appendix of Documents Offered in Support of Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion to Dismiss Complaint, attached hereto.

to take advantage of an upswing in the market, and the accompanying increase in the NAV of mutual fund shares, by purchasing shares at a price which did not yet reflect the increase.

Rule 22c-1 eliminated this arbitrage opportunity by requiring mutual funds to assign the current day's NAV to orders received before the close of the market and the next day's NAV to orders received after the close. Rule 22c-1(a) provides, in pertinent part, that

> [n]o registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in any such security shall sell, redeem, or repurchase any such security except at a price *based on* the current net asset value of such security *which is next computed* after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

(emphasis added). Rule 22c-1(b) further states that the "current net asset value of any such security shall be computed no less frequently than once daily, Monday through Friday, *at the specific time or times during the day that the board of directors of the investment company sets.*" (emphasis added). In addition, Section 22 of the Investment Company Act requires both investment companies, like mutual funds, and dealers to sell mutual fund shares "at a current public offering price described in the prospectus." *See* 15 U.S.C. § 80a-22(d) (2005). Typically, the time during the day that mutual funds disclose in their prospectuses, pursuant to Section 22 and Rule 22c-1, and on which they base their NAVs, is the close of the U.S. markets, generally at 4:00 p.m. ET. ¶¶ 19, 40. The time disclosed in the prospectuses establishes, or freezes, the daily mutual fund price at that time.

In the release accompanying the adoption of Rule 22c-1 (the "Adoption Release"), the Commission made clear that it intended for the Rule to further Congress's intent by: (i) eliminating or reducing dilution of share value; and (ii) preventing speculative trading. *See Adoption of Rule 22c-1*, Investment Company Act Release No. 5519, 1968 SEC LEXIS 171 at

7

*2-4 (October 16, 1968) (Appendix Exhibit B). In the Adoption Release, the Commission warned that the "practice of selling securities for a certain period of time, at a price based upon a previously established net asset value encourages speculative trading practices which so compromise registered investment companies as to be unfair to the holders of their outstanding securities." *Adoption of Rule 22c-1*, 1968 SEC LEXIS 171 at *4. Because mutual funds calculate their NAV daily at or as of 4:00 p.m., the value of the securities in the fund are "established" at that time.

The Commission staff's Interpretive Release published by the Commission in December 1968 provides instruction to the Court and erases any doubt that Rule 22c-1 requires that the mutual funds' specified "as of" time for computing their NAV is the cut-off time for filling an order at a price based on that computation. *See Staff Interpretive Positions Relating to Rule 22c-1*, Investment Company Act Release No. 5569, 1968 SEC LEXIS 979 (December 27, 1968) (Appendix Exhibit C). The Interpretive Release is not only consistent with the Commission's stated purpose in adopting the Rule, but also with Congress's express intent to protect investors, and should be given deference by this Court. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980); *see also Bright v. Ball Memorial Hospital Assoc.*, 616 F.2d 328, 333 n.1 (7th Cir. 1980) (while staff interpretations are not binding on the court, they are "entitled to substantial deference 'because of the important interpretive powers granted to the agency . . .'") (*quoting Croysdale v. Franklin Savings Ass'n.*, 601 F.2d 1340, 1344 n. 4 (7th Cir. 1979)).

The Interpretive Release utilized a hypothetical fund with two daily pricing times (1:00 p.m. and 3:30 p.m.) to demonstrate that for an order to be filled at a price based on the "current net asset value," the dealer must receive the order before the specified "as of" time. *See Staff Interpretive Positions Relating to Rule 22c-1*, 1968 SEC LEXIS 979 at *4. The Interpretive

8

Release makes clear that the order cut-off point is that specified time, *with no adjustment for the amount of time required for calculating a dollar amount, for the "current net asset value." See id.* (emphasis added). The Interpretive Release provides additional examples using the hypothetical fund described above to illustrate the application of Rule 22c-1:

> (a) A dealer receives a customer's order before 1:00 p.m. The 1:00 p.m. price would be applicable. . . .; (b) A dealer receives a customer's order after 1:00 p.m. but before 3:30 p.m. The 3:30 p.m. price would be applicable. . . .; (c) A dealer receives a customer's order at 4:00 p.m. The 1:00 p.m. price on the next business day would be applicable. . .

*See id.* Hypothetical (c) makes it clear that the Commission and its staff interpreted Rule 22c-1 to require an investor to receive the next day's NAV when a dealer receives the trade after the time at or as of which the mutual fund calculates its NAV. *See id.* In the 39 years since it published the Interpretive Release, the staff's interpretation of the Rule's requirements has remained uncontradicted, by the Commission or by any court.[4]

As described more fully below, the Defendants' late trading scheme resurrected this arbitrage opportunity by devising a method to deceive the mutual funds into pricing their trades at the current day's NAV when they should have received the next day's NAV. Simpson and Dowling were told and therefore knew that late trading was illegal. ¶¶ 30-34. Nonetheless, they found intermediaries willing to assist them in deceiving the funds into assigning the current day's

---

[4]    The Commission's numerous enforcement actions based upon "late trading" are consistent with the Commission's longstanding interpretation of Rule 22c-1. In fact, in addition to actions against broker-dealers as referenced in Defendants' Motion, at 4 fn. 1, the Commission has charged those in Defendants' position, hedge funds and their managers, with violating Section 10(b) of the Exchange Act and Rule 10b-5 for late trading. *See In the Matter of Veras Capital Master Fund, et al.,* Exchange Act Release No. 53011, 2005 SEC LEXIS 3290 (December 22, 2005)(settled action finding hedge funds, hedge fund managers, and fund traders liable for violations of Section 10(b) and Rule 10b-5 for late trading); *SEC v. Federighi et al.,* Lit. Rel. No. 19510, 2005 SEC LEXIS 3284(Dec. 22, 2005)(action in which Commission charged hedge fund managers with, among other things, violations of Section 10(b) and Rule 10b-5 for late trading).

NAV to their post-4:00 p.m. trades. ¶ 34, 35. Just like those mutual fund insiders before the implementation of Rule 22c-1, the Defendants purchased shares in a rising market at the current day's price with advance information that the next day's price would be higher (or sold shares in a falling market with advance information). ¶¶ 3, 20, 28, 53, 71. They, in turn, realized an immediate appreciation in the market value of their investments at the expense of existing shareholders, whose equity interests were diluted by corresponding amounts. Thus, by being able to buy into the mutual funds at less than the actual value of the shares at the time of their purchases, Defendants defrauded mutual funds and their innocent shareholders by siphoning off more than $57 million in profits.[5] ¶¶ 4, 20, 35, 75-78. *See U.S. v. National Ass'n of Securities Dealers, Inc.*, 422 U.S. 694, 707-708 at fn. 17 (1975).

Because the Commission's purpose for promulgating Rule 22c-1 is consistent with Congress's intent, the Court should follow the Commission's guidance and adopt its interpretation. Courts have recognized that the Commission's reasonable interpretation of a statute that it administers, including its promulgation of rules and regulations interpreting or implementing the statute, is entitled to deference. *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000); *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001). When Congress empowers an agency such as the Commission, "to elucidate a specific provision of the statute by regulation," "such legislative regulations are given·controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *See Chevron, USA, Inc. v. N.R.D.C.,* 467 U.S. 837, 843-44 (1984); *see also Bruh v. Bessemer Venture Partners III, L.P.,* 464 F.3d 202, 207 (2d Cir. 2006) (a court is obligated to accept the Commission's interpretation so long as it represents "a plausible construction of the language of the actual regulation").

---

[5]     This unfairness is not materially different from that inherent in unlawful insider trading, where a trader can purchase a security for less than it is worth by reason of the trader's possession of information as to a security's actual worth that is not available to the market.

Accordingly, consistent with the intent of Congress and the Commission, Rule 22c-1 is designed to protect investors from dilution, speculative trading, and other harmful results. This intent can only be effectuated if the Court interprets Rule 22c-1 to require a mutual fund to assign the next day's NAV to any trade placed after the time as of which the mutual fund has disclosed in its prospectus that it calculates its NAV.

Courts interpreting Rule 22c-1 have upheld the interpretation of the Commission and its staff. Courts and other tribunals agree that a reading of Rule 22c-1 that permits mutual fund investors to trade a fund's shares after the "as of" time, yet still receive that day's price, directly contradicts the Commission's longstanding interpretation of the Rule and Congress's intent to protect investors. *See SEC v. JB Oxford Holdings, Inc. et al.*, Civil Action No. CV 04-7084 PA (VBKx), slip op. at 4 (C.D. Cal. Aug. 24, 2005)(Appendix Exhibit D)(on summary judgment the court deferred to the Commission's interpretation of Rule 22c-1, which is that for purposes of pricing mutual fund transactions, the relevant time is the time "as of" which a fund values its holdings rather than the time that a fund actually performs the NAV calculation); *In the Matter of Paul A. Flynn*, Initial Decision Release No. 316, 2006 SEC LEXIS 1766 at *74-75 (Aug. 2, 2006) (Initial Decision) and Securities Act Rel. No. 8737 (Aug. 31, 2006) (Notice that Initial Decision has become final) (concluding that the "NAV that is next computed" means the time as of which the mutual fund sets for its calculation in order to be consistent with Rule 22c-1's language and purpose and finding that, although Rule 22c-1 does not apply to the hedge funds that traded, the hedge fund's late trading "was a scheme, practice, or course of business intended to defraud mutual funds and their shareholders.").

**B.    Defendants' Interpretation Defies the Congressional and Commission Intent to Protect Investors**

Defendants argue that the Complaint fails to allege a violation of Rule 22c-1 because the Complaint does not state when the mutual funds through which they late traded *actually* calculated their NAVs. Motion at 15. However, the time at which a mutual fund *actually* calculates its NAV is irrelevant under Rule 22c-1, because the NAV relates back to the price previously established as of the mutual fund's adopted 4:00 p.m. ET cut-off. Defendants frame their argument by attempting to attack the well established interpretation of Rule 22c-1 and repeatedly cite to the phrase "next computed" in Rule 22c-1, insisting that it refers to the time that mutual funds actually complete their calculation of the NAV, not the time *as of which* they compute the NAV for the day – typically 4:00 p.m. Motion at 3-6, 15-16. As discussed previously, however, Defendants ignore the fact that Rule 22c-1 expressly provides that the "next" time at which the NAV is to be "computed" for purposes of the rule is a *fixed time, established by the mutual funds' Board of Directors*. Rule 22c-1(b), *supra*. A mutual fund cannot "fix" such a time if it will vary from day to day depending on when the fund actually completes it calculation. *Flynn*, 2006 SEC Lexis 1766 at *74.

In addition, Defendants' argument strains logic, in view of the very purpose of Rule 22c-1, to prevent dilution. An interpretation of Rule 22c-1 that would allow dealers to provide their customers with the same day's NAV on mutual fund trades submitted until the actual point of NAV calculation – without regard to the "as of" calculation time disclosed by mutual funds – would lead to dilution of share value, speculative trading, and unfair treatment of investors. This was the very conduct the Rule was designed to curtail. Under this interpretation, Rule 22c-1 would permit an investor to submit trades up to one second before a mutual fund *actually*

12

performs the calculation of its NAV by authorizing a secret cut-off time by which to submit trades. The effect would render meaningless the time publicly disclosed in a mutual fund's prospectus and eviscerate Section 22 and the Rule. Such an interpretation of Rule 22c-1 is nothing more than an attempted post hoc justification for the Defendants' conduct and defies the very essence of Section 22 and Rule 22c-1.

Moreover, Defendants claim that the Commission's 2003 proposal to adopt a 4:00 p.m. "hard close" for mutual fund trading somehow supports their interpretation of Rule 22c-1 is equally baseless. Motion 5-6. Among other things, the proposing release for the amendment indicates that the rule is being amended in order to make its circumvention more difficult and to make rule violations more easily detectable. *See Amendments to Rules Governing Pricing of Mutual Fund Shares*, Investment Company Act Rel. No. 26288, 2003 SEC LEXIS 2938 (Dec. 11, 2003)(Attached as Exhibit F to Defendants' Motion). The proposed amendment was not designed to alter the price that a mutual fund would assign to trades as Defendants contend. Rather, the stated purpose of the proposed amendment was to eliminate the additional time after 4 p.m. that had previously been allotted to intermediaries for processing and transmitting trades to the mutual funds because mutual funds had no effective way to discern whether trades had been received by those intermediaries prior to 4 p.m. *Id.* at *13-14. The fact that the prior rule was violated, and that those violations were not easily detected, does not mean that the wrongdoing was permissible. The proposed amendments do not change the way the Rule has been enforced, applied, or interpreted. Defendants' conduct is just as unlawful under the prior rule as it is under the proposed amended rule.[6]

---

[6]    In Footnote 2 of their Motion, Defendants incorrectly claim that the allegations in the Complaint merely involve "the cancellation or modification of orders after the pricing time applicable to the order." Motion at 5. This is not true. The Complaint sets forth in detail that Defendants placed nearly all of their orders for the first time *after* 4:00 p.m. The lists of pre-4:00 p.m. tentative trades Defendants sent to their

Finally, despite Defendants' arguments to the contrary, Defendants' fraudulent scheme clearly involved violations of Rule 22c-1. Motion at 15. As stated, the Complaint does not charge Defendants with violating the Rule since it does not apply to them directly. However, the Rule does apply to the Introducing Brokers used by Defendants, clearing brokers, and the mutual funds whose shares Defendants traded. ¶¶ 37-40. In furtherance of their fraudulent scheme, Defendants recruited individuals at the Introducing Brokers who, in fact, processed Defendants' post-4:00 p.m. trades in violation of the Rule. By enlisting the Introducing Brokers as conduits for their trading, the Defendants were able to deceive the mutual funds into unknowingly assigning the current day's NAV to their post-4:00 p.m. trades. As one court has noted, it is particularly apt to hold hedge fund traders liable under Section 10(b) of the Exchange Act and Rule 10b-5 for this conduct because they were the "architects" of the late trading scheme as well as the beneficiaries, receiving the profits "siphoned off from mutual funds." *In re Mutual Funds Investment Litigation,* 384 F. Supp. 2d 845, 856 (D. Md. 2005).

## III.    Defendants' Fraudulent Late Trading Scheme Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

The Commission's Complaint explicitly alleges that the Defendants, by late trading, conducted a fraudulent scheme to defraud mutual funds and their shareholders, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. ¶¶ 1, 35-36. In their Motion, Defendants entirely ignore the Commission's fraudulent scheme allegation, and claim that the Commission's Complaint must be dismissed because it fails to allege material misrepresentations or

---

brokers on so-called "scenario sheets" were part of the mechanics of the fraud, were not actual orders, and were never placed into the Mutual Fund Routing System by their brokers. In fact, the Introducing Brokers were not authorized to enter any trades for Defendants until receiving a subsequent, post-4:00 p.m. telephone call. When Defendants placed their trades after 4:00 p.m. they were not "canceling" or "modifying" previous orders because they had yet to place their orders. Indeed, Rule 22c-1 was never intended to govern "tentative" orders, which the brokers had no authority to process without Defendants' approval.

omissions or a classic "manipulation," which they contend is a "term of art" referring to practices "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Motion at 11. This overly narrow interpretation of Section 10(b) and Rule 10b-5 ignores the plain language of the statute, the rule, and legal precedents that have recognized the expansive application of the law to include a wide array of deceptive practices used to defraud investors. Indeed, as one court recently observed, "[l]ate trading is itself illegal, and therefore . . . a scheme, practice, or course of business effectuating late trading is inherently fraudulent" and noted that "[i]t would certainly seem odd to say that late trading -- a demonstrably illegal act -- does not fit within a rule that forbids the use of any manipulative or deceptive device." *In re Mutual Funds Inv. Litig.* 384 F. Supp. 2d 845, 857-58 (D. Md. 2005).

Section 10(b) of the Exchange Act makes it "unlawful for any person...to use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j (2006). *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976)). In its application, the courts consistently have read Section 10(b) flexibly to bar deceptive practices or contrivances that touch the sale or purchase of securities. *See, e.g., SEC v. Zandford,* 535 U.S. 813, 819, 822 (2002); *Santa Fe Indus.*, 430 U.S. at 475-76; *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 (1971).

Rule 10b-5, which implements the statute, "broadly prohibits deception, misrepresentation, and fraud in connection with the purchase and sale of securities." *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S. Ct. 1503, 1509 (2006). Each of Rule 10b-5's three subsections describes particular categories of prohibited conduct. Subsection (a) prohibits "any device, scheme,

or artifice to defraud." Subsection (b) prohibits material misrepresentations and omissions. Subsection (c) prohibits the use of "any act, practice, or course of business that operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5 (2006).[7]

Section 10(b) and Rule 10b-5 were not intended to cover only a few strictly defined categories of misbehavior, as Defendants' analysis suggests. Rather, they were enacted as part of an effort "to insure honest securities markets and thereby promote investor confidence." *In re Parmalat Securities Litig.*, 376 F. Supp. 2d 472, 493 (S.D.N.Y. 2005)(citations omitted). As the court in *Parmalat* observed, "the language of Section 10(b) and subsections (a) and (c) is quite broad and . . . the Supreme Court has emphasized repeatedly that Section 10(b) 'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" 376 F. Supp. 2d at 501 (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).

As the Second Circuit noted in *United States v. Russo*:

> [t]he Supreme Court has interpreted Section 10(b) and Rule 10b-5 expansively in accordance with congressional intent to minimize fraud in securities trading . . . . The purpose of the Section and its implementing regulations is to prevent fraud, whether it is "a garden type variety of fraud, or present[s] a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

74 F.3d 1383, 1390 (2d Cir. 1996) (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971)).

Defendants attack the Commission's Complaint for failing to allege a material misrepresentation or omission, or a traditional manipulation. However, none of these types of allegations is required to establish a violation of the antifraud provisions. A violation of "Rule

---

[7]    Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 701-702 (1980). Scienter is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). *SEC v. U.S. Envtl., Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000). However, as this Court recognized in *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002), the Commission need not prove investor reliance, loss causation, or damages in an action under Section 10(b) or Rule 10b-5.

10b-5(a) or (c) does not require an allegation that the defendant made a statement, as liability is premised *on a course of deceptive conduct* undertaken by the defendant, rather than on misrepresentations or omissions." *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005)(emphasis added). As one court has observed:

> It is apparent from Rule 10b-5's language and the case law interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant. . . Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements.

*In re Global Crossing Ltd. Securities Litigation*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004). *See also U.S. v. Bongiorno*, 2006 WL 1140864, at *7 (S.D.N.Y. May 1, 2006) ("defendants' crabbed interpretation would narrow the reach of Section 10(b) in a way inconsistent with the statute's text and purpose"); *In re Alstom*, 406 F. Supp. 2d at 474 ("subsections (a) and (c) of Rule 10b-5 encompass a wide range of activities and are not limited to the prohibition of market manipulation").[8]

Other courts that have considered the question have found that late trading by a hedge fund may constitute a scheme to defraud the mutual funds and the other mutual fund shareholders in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). *See In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 857-58 (D. Md. 2005) (denying motion to dismiss Section 10(b) claims against, among others, hedge funds for late trading in mutual fund shareholder class action, finding that defendants were, in effect, the "architects" of late trading scheme); *SEC v. JB Oxford*

---

[8]    Since the Commission is not claiming that Defendants are liable under a misrepresentation or omissions theory, the issue of whether the Complaint alleges false or misleading statements by Defendants is irrelevant. Accordingly, Defendants' lengthy argument concerning the "bright line" test is nothing more than a ploy to distract the Court. Motion at 16-17. Moreover, the fact that the Complaint does not allege that Defendants directly communicated with the funds and, instead, used third party broker-dealers to enter their trades does not absolve them of liability. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 336-37 (S.D.N.Y. 2004) (finding primary scheme violation where defendant "masterminded" sham transactions and was the "chief architect and executor" of the scheme).

*Holdings, Inc.*, 2004 U.S. Dist. LEXIS 29494, at *15, 16, slip. op. at 8 (C.D. Cal. Nov. 9, 2004)(Appendix Exhibit E)(in an action alleging that a broker-dealer and its parent company facilitated illegal late trading and market timing, the court rejected Defendants' motion to dismiss the Commission's Section 10(b) and Rule 10b-5 claims, noting that "Rule 10b-5 prohibits manipulative practices per se and not only those activities resembling common law fraud. . . . [C]lauses (a) and (c) of the Rule make no reference to a requirement that defendants charged under the rule must fail to disclose material facts for their conduct to be proscribed").

Therefore, in ruling on Defendants' Motion, the proper inquiry for this Court under Section 10(b) and Rule 10b-5(a) and (c) is whether the Complaint specifies the deceptive acts, and identifies who performed those acts, when the acts were performed, and what effect the scheme had on investors. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 493. This Court has described a "deceptive" act as one which "tends to deceive" or "has power to mislead." *See, e.g., U.S. v. Finnerty*, 474 F. Supp. 2d 530, 537-538 (S.D.N.Y. 2007); *Bongiorno*, 2006 WL 1140864, at *7.

## IV.     The Commission Has Properly Pleaded a Late Trading Scheme

The Commission's Complaint, in great detail, describes the methods used by Defendants to implement their late trading scheme, the Defendants' deceptive acts and when they occurred, and the harm caused to mutual funds and their shareholders. For the purposes of ruling on Defendants' Motion, all of these facts must be accepted as true. Defendants' ultimate deception was the late trading itself. For each of the 10,700 trades that Defendants authorized after 4:00 p.m. ET, they deceived mutual funds into assigning an improper price, and harmed mutual fund shareholders. Defendants do not dispute that every one of their 10,700 late trades was placed after 4:00 p.m. ET. Instead, with nothing else to argue, they boldly assert that there was nothing improper about what they did.

The Commission's Complaint alleges that, from May 2000 to September 2003, defendants Simpson and Dowling, through Simpson Capital, engaged in a scheme to place thousands of trades after 4:00 p.m. ET and improperly receive that day's NAV, either with the intent to deceive the mutual funds and the fund shareholders, or in reckless disregard that innocent mutual fund investors were being defrauded. ¶¶ 1, 35-36. Defendants, by late trading in the manner described in the Complaint, realized approximately $57 million in ill-gotten gains for the Simpson Funds, and caused corresponding harm to innocent shareholders in the affected mutual funds, by diluting the value of their shares. That is, by receiving prices they were not entitled to, Defendants' late trading resulted in a transfer of $57 million from the mutual funds and their shareholders to the Simpson Funds. ¶ 4. In addition, as a result of the fraudulent trading, defendant Simpson personally earned at least $19 million in fees and profits, and defendant Dowling received more than $996,000 in salary and bonuses during the time the Defendants conducted the late trading scheme. ¶ 5.

As described in the Complaint, the ability to late trade was crucial to Defendants' trading strategy, and success. Late trading allowed the Defendants to profit from market events, futures markets information, and other fluctuations that occurred after the market closed and, therefore, were not reflected in that day's NAV. Simpson and Dowling monitored the futures markets and used news and other information disseminated after the market closed to make their trading decisions. ¶¶ 3, 28, 71. Simpson was primarily responsible for all investment decisions at Simpson Capital and was assisted by Dowling, the head trader, who had knowledge of and implemented all decisions. Dowling executed trading instructions and, together with Simpson, established the late trading scheme with, at least, the five introducing broker-dealers described in the Complaint. ¶¶ 11-13, 24.

The dealer agreements that the Introducing Brokers and their clearing brokers entered into with the distributors, or principal underwriters, of various mutual fund families typically required them to sell the fund families' mutual funds in accordance with the federal securities laws, including Rule 22c-1, and the terms of the mutual funds' prospectuses. ¶¶ 37-39. The mutual fund prospectuses for the funds through which the Defendants late traded generally stated that the fund's NAV was calculated as of 4:00 p.m. ET or as of the close of the New York Stock Exchange (which is typically also 4:00 p.m. ET). ¶ 40. Thus, the five Introducing Brokers used by the Defendants were subject to Rule 22c-1 and, as discussed previously, they were required to receive customer orders to purchase, redeem, or exchange shares of a fund no later than 4:00 p.m. ET to be executed at that day's NAV. ¶¶ 37-40. Trades placed after 4:00 p.m. had to receive the next day's NAV. Other mutual fund investors complied with fund prospectus disclosures mandated by Rule 22c-1 and were entitled to expect that others would also comply.

However, complying with the law was inconsistent with Defendants' late trading strategy. In order for Defendants to implement their strategy, they needed to be able to place trades after 4:00 p.m. and still receive that day's NAV, which would have resulted in the mutual funds violating Rule 22c-1. ¶ 18. Thus, Defendants needed to deceive the mutual funds into believing their trades had in fact been placed before 4:00 p.m. ¶¶ 30-34, 54-58. Their trading required deception because Simpson and Dowling were told, and therefore knew, that it was illegal to place trades after 4:00 p.m. and receive that day's NAV, a fact which Defendants fail to address in their Motion. ¶¶ 30-34, 54-58, 69-71.

In 1998 and 1999, Simpson had asked a broker-dealer's president if he could submit trades after 4:00 p.m. ET and receive that day's NAV. On both occasions, the president rejected Simpson's requests, telling him that the practice was illegal. On a later occasion, Simpson again proposed a

plan to the broker-dealer's president for allowing Simpson Capital to submit trades after 4:00 p.m.

As proposed by Simpson, the broker-dealer would time-stamp blank order tickets before 4:00 p.m.

Simpson would then call after 4:00 p.m. to actually place the order.  Simpson suggested that,

because broker-dealers often receive a large number of trades just prior to 4:00 p.m., and that it

necessarily requires time after 4:00 p.m. to enter those trades into the clearing broker's computer

system, it would not appear abnormal for a post-4:00 p.m. entry time to be recorded in the computer

system.  He further proposed that broker-dealer personnel could then later fill in the trade

information on the blank order tickets with the pre-4:00 p.m. order time stamp, thus providing

evidence, if needed, that the trade had been received before 4:00 p.m.  In other words, Simpson

proposed an elaborate deception.  The president again rejected Simpson's request, and again told

him that his proposal was illegal.  ¶¶ 31-32.  Subsequently, one of Simpson Capital's employees

who was experienced in mutual fund trading also told Simpson that placing trades after 4:00 p.m.

and receiving that day's NAV was illegal.  ¶ 33.

Defendants ignored what they had been repeatedly told -- that late trading was illegal --

and instead they devised a scheme that would continue for several years.  Defendants knew they

could exploit how mutual fund trades were processed through the trading platform known as the

Mutual Fund Routing System ("MFRS").  They knew that certain broker-dealers, including those

who ultimately participated in Defendants' fraud, had the ability to enter the trades into the

MFRS system until approximately 5:30 p.m.  Finally, Defendants knew that the mutual funds

assigned the current day's NAV to all trades received before the MFRS system shut down, at

approximately 5:45 p.m.  ¶¶ 32, 51-55, 69-71.  Because both introducing and clearing brokers

were required to sell mutual fund shares in accordance with Rule 22c-1, all trades entered into

the MFRS system and assigned the current day's NAV were required to have been placed no later than 4:00 p.m. ET.  ¶ 18, 40.

Ultimately, Defendants identified individuals at five broker-dealers who agreed to participate in Defendants' late trading scheme.  The Complaint recites in great detail how the Defendants found unscrupulous industry professionals at these Introducing Brokers to do what Defendants wanted.  The Introducing Brokers were nothing more than conduits through which the Defendants implemented their scheme.  ¶¶ 41-74.

Defendants executed their scheme by submitting trades after 4:00 p.m. ET (often as late as 5:30) with the explicit understanding that the trades would be processed through the MFRS system and receive that day's NAV.  The trading mechanics at each Introducing Broker were similar, and involved the submission of proposed trades on "scenario sheets" before 4:00 p.m.  However, Defendants did not make their trading decisions until after 4:00 p.m., and the Introducing Brokers were not authorized to submit any of the proposed trades until a subsequent call, after 4:00 p.m., by Simpson, Dowling or another employee of Simpson Capital.  ¶¶ 41-74.

Defendants claim there is nothing deceptive about their use of the "scenario sheets." However, they played a critical role in the fraudulent scheme.  One reason Defendants sent the Introducing Brokers the "scenario sheets" before 4:00 p.m. was to give them the opportunity to queue their potential trades in the MFRS systems.  This enabled Simpson and Dowling to call and authorize any number of trades on the scenario sheets as late in the day as possible before the MFRS shut down, and afforded Defendants more time to incorporate after-market information into their trading decisions.  The second reason for the scenario sheets was to provide Defendants with "evidence" that their trades were placed before 4:00 p.m., in a manner remarkably similar to what Simpson had previously proposed to the president of the broker-dealer.  Defendants sent

the scenario sheets before 4:00 p.m., and at least three of the Introducing Brokers time-stamped them when received. ¶¶ 32, 52, 66, 72.

Simpson's and Dowling's own recorded words provide the best evidence of what they knew and intended. Recorded telephone calls with Wall Street Access trader Gene Mancinelli establish Simpson's and Dowling's intent to circumvent Wall Street Access' 4:00 p.m. trading restrictions. ¶¶ 51-55. From the inception of the relationship, Simpson was clearly concerned about his ability to place trades "in after 5, 5:30" and Mancinelli assured him that "by all means, I'll play the game as much as I can play." After Wall Street Access implemented a new policy of allowing only bona fide corrections to be processed after 4:00 p.m., Simpson and Dowling later agreed to falsely characterize their late trades as "corrections" so they could continue to late trade. ¶ 51-57. Ultimately, when Mancinelli's superiors would not let him "play the game" any longer, and required him to obey the securities laws, Defendants left this broker, and moved on to others. ¶ 58.

In carrying out their scheme, Defendants strove to take as much time after the close of the market as possible to make their trading decisions and submit their late trades. This gave them a distinct advantage the average shareholder did not have -- the ability to consider after-market news in their trading decisions and to effect post-closing trades at the same day's NAV. In essence, by their fraudulent conduct, Defendants traded without the limitations of Rule 22c-1 and with the result that their trading wrought all of the harm on the mutual funds that Rule 22c-1 was intended to prevent.

## CONCLUSION

For all of the reasons stated above, the Commission has properly alleged violations of the federal securities laws with respect to Defendants' late trading scheme, and has complied with the pleading requirements of Rule 9(b). Accordingly, Defendants' Motion to Dismiss the Complaint should be denied.

Respectfully submitted,


_____ s/ David S. Horowitz _____
David S. Horowitz (admitted *pro hac vice*)
Amy J. Greer (admitted *pro hac vice*)
Brendan P. McGlynn (admitted *pro hac vice*)
Tami S. Stark (TS-8321)
Jack C. Easton

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100

Dated: October 26, 2007