UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

    v.

SIMPSON CAPITAL MANAGEMENT, INC.,
ROBERT A. SIMPSON and
JOHN C. DOWLING,

     Defendants.

---

CIVIL ACTION No. 07 CV 6072 (JGK)
ECF CASE

## APPENDIX OF DOCUMENTS OFFERED IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

David S. Horowitz (admitted *pro hac vice*)
Amy J. Greer (admitted *pro hac vice*)
Brendan P. McGlynn (admitted *pro hac vice*)
Tami S. Stark (TS 8321)
Jack C. Easton

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100

# EXHIBIT A

10 of 10 DOCUMENTS

NOTICE OF PROPOSAL TO ADOPT RULE 22c-1 UNDER THE INVESTMENT
COMPANY ACT OF 1940 PRESCRIBING THE TIME OF PRICING REDEEMABLE
SECURITIES FOR DISTRIBUTION, REDEMPTION, AND REPURCHASE, AND TO
AMEND RULE 17a-3(a)(7) UNDER THE SECURITIES EXCHANGE ACT OF 1934
REQUIRING DEALERS TO TIME-STAMP ORDERS

SECURITIES AND EXCHANGE COMMISSION

INVESTMENT COMPANY ACT OF 1940, Release No. 5413; SECURITIES EX-
CHANGE ACT OF 1934, Release No. 8340

1968 SEC LEXIS 109

June 25, 1968

**TEXT:** [*1]

NOTICE IS HEREBY GIVEN that the Securities and Exchange Commission has under consideration the adoption of Rule 22c-1 under the Investment Company Act of 1940 ("Investment Company Act") prescribing the time for pricing redeemable securities of registered investment companies for distribution, redemption, and repurchase. The proposed rule would be adopted pursuant to the authority granted to the Commission in Sections 22(c) and 38(a) of that Act. No-tice is also given that the Commission has under consideration a companion measure in the form of a proposed amend-ment to Rule 17a-3(a)(7) under the Securities Exchange Act of 1934 ("Securities Exchange Act") which would require dealers to time-stamp the receipt of orders from customers. The amendment would be adopted pursuant to the authority granted to the Commission in Sections 17(a) and 23(a) of that Act.

Section 22(c) of the Investment Company Act, by reference to Section 22(a), authorizes the Commission to make rules and regulations applicable to principal underwriters of, and dealers in, the redeemable securities of registered in-vestment companies "for the purpose of eliminating or reducing so far as reasonably practicable any [*2] dilution of the value of other outstanding securities of such company or any other result of such purchase, redemption, or sale which is unfair to holders of such other outstanding securities." Such rules and regulations are authorized with respect to, among other things, the time for computing the minimum price at which any redeemable security issued by an investment com-pany may be purchased from such company and the maximum price at which such security may be sold to such com-pany or at which such security may be surrendered to such company for redemption. Section 38(a) of the Investment Company Act authorizes the Commission to issue such rules as are necessary or appropriate to the exercise of the pow-ers conferred upon the Commission in that Act.

One purpose of proposed Rule 22c-1 is to eliminate or reduce so far as reasonably practicable any dilution of the value of outstanding redeemable securities of registered investment companies through (i) the sale of such securities at a price below their net asset value or (ii) the redemption or repurchase of such securities at a price above their net asset value. Dilution through the sale of redeemable securities at a price below their [*3] net asset value may occur, for ex-ample, through the practice of selling securities for a certain period of time at a price based upon a previously estab-lished net asset value. This practice permits a potential investor to take advantage of an upswing in the market and an accompanying increase in the net asset value of investment company shares by purchasing such shares at a price which does not reflect the increase. An investor may be encouraged to purchase securities in this manner by the practice of announcing the next sale price in advance of the time at which it becomes effective, thereby enabling the investor to time his purchase so as to obtain investment company securities at the lower of two known prices. Based upon its ex-perience in the administration of the Investment Company Act, the Commission believes that such practices have the effect of diluting the value of outstanding redeemable securities of registered investment companies.

Another purpose of proposed Rule 22c-1 is to eliminate or reduce so far as reasonably practicable other results, aside from dilution, which arise from the sale, redemption, or repurchase of securities of registered investment compa-nies and [*4] which are unfair to the holders of such outstanding securities. The Commission believes that the practice

of selling securities for a certain period of time, at a price based upon a previously established net asset value, encourages speculative trading practices which so compromise registered investment companies as to be unfair to the holders of their outstanding securities. This pricing practice allows speculators to buy large blocks of such securities under circumstances where the net asset value of the securities has increased but where the increase in value is not reflected in the price. The speculators hold such securities until the next net asset value is determined and then redeem them at large profits. These speculative trading practices can seriously interfere with the management of registered investment companies to the extent that (i) management may hesitate to invest what it believes to be speculators' money and (ii) management may have to effect untimely liquidations when speculators redeem their securities. Based upon its experience in the administration of the Investment Company Act, the Commission believes that such practices cause unfair results to the holders [*5] of outstanding securities of registered investment companies.

Proposed Rule 22c-1 would prohibit any registered investment company issuing any redeemable security; any person designated in such issuer's prospectus as authorized to consummate transactions in any such security; and any principal underwriter of, or dealer in, any such security from selling, redeeming, or repurchasing any such security except at a price determined in accordance with the provisions of the rule. The proposed rule would require that the price be based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security. Current net asset value is defined by the proposed rule to be that computed on each day during which the New York Stock Exchange is open for trading, not less frequently than twice daily as of three hours after the commencement of trading and as of the time of the close of trading on such Exchange. The effect of the proposed rule would be to prohibit the practice of selling securities for a certain period of time at a price based on a previously established net asset value.

It [*6] should be noted that Rule 2a-4 under the Act defines the term "current net asset value" for use in computing the current price of redeemable securities issued by registered investment companies for the purpose of distribution, redemption, and repurchase.

It also should be noted that Rule 31a-1(b)(1) under the Investment Company Act provides, in pertinent part, that every registered investment company shall maintain and keep current journals or other records of original entry containing an itemized daily record in detail of all sales and redemptions of its own securities. It is expected that registered investment companies will time-stamp, upon receipt, all orders with respect to sales, repurchases, and redemptions of their own securities.

In order to implement proposed Rule 22c-1 under the Investment Company Act, the Commission proposes, as a companion measure, to amend Rule 17a-3(a)(7) under the Securities Exchange Act to require dealers, when selling securities to, or buying securities from, a customer, other than a broker or dealer, to stamp on the memorandum of order the time of receipt. Brokers are already subject to such requirement under subparagraph (a)(6) of Rule 17a-3. [*7]

The text of proposed Rule 22c-1 under the Investment Company Act reads as follows:

"Rule 22c-1. Pricing of Redeemable Securities for Distribution, Redemption and Repurchase.

(a) No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

(b) For the purposes of this Rule, the current net asset value of any such security shall be that computed on each day during which the New York Stock Exchange is open for trading, not less frequently than twice daily as of three hours after the commencement of trading and as of the time of the close of trading on such Exchange."

The text of the proposed Commission action under the Securities Exchange Act is as follows:

"Rule 17a-3(a)(7) under the Securities Exchange Act of 1934 is amended by deleting the period [*8] at the end of the sentence and adding'; and, in addition, where such purchase or sale is with a customer other than a broker or dealer, a memorandum for each order received, showing the time of receipt, the terms and conditions of the order, and the account in which it was entered.' As so amended, the subparagraph reads:

A memorandum of each purchase and sale for the account of such member, broker, or dealer showing the price and, to the extent feasible, the time of execution; and, in addition, where such purchase or sale is with a customer other than

1968 SEC LEXIS 109, *

a broker or dealer, a memorandum of each order received, showing the time of receipt, the terms and conditions of the order, and the account in which it was entered."

All interested persons are invited to submit views and comments on proposed Rule 22c-1 under the Investment Company Act and the proposed amendment to Rule 17a-3(a)(7) under the Securities Exchange Act. Written statements of views and comments in respect of the proposed Rule and the proposed amendment should be submitted to the Securities and Exchange Commission, Washington, D.C. 20549 on or before August 1, 1968.  All such communications will be available for public  [*9]  inspection.

By the Commission.

# EXHIBIT B

LEXSEE 1968 SEC LEXIS 171

ADOPTION OF RULE 22c-1 UNDER THE INVESTMENT COMPANY ACT OF
1940 PRESCRIBING THE TIME OF PRICING REDEEMABLE SECURITIES
FOR DISTRIBUTION, REDEMPTION, AND REPURCHASE, AND AMENDMENT
OF RULE 17a-3(a)(7) UNDER THE SECURITIES EXCHANGE ACT OF
1934 REQUIRING DEALERS TO TIME-STAMP ORDERS

SECURITIES AND EXCHANGE COMMISSION

INVESTMENT COMPANY ACT OF 1940, Release No. 5519; SECURITIES
EXCHANGE ACT OF 1934, Release No. 8429

*1968 SEC LEXIS 171*

October 16, 1968

**TEXT:**   [*1]

   On June 25, 1968, the Securities and Exchange Commission published notice (Investment Company Act Release No. 5413; Securities Exchange Release No. 8340) that it had under consideration the adoption of Rule 22c-1 under the Investment Company Act of 1940 ("Investment Company Act") and the amendment of Rule 17a-3(a)(7) under the Securities Exchange Act of 1934 ("Securities Exchange Act") and invited all interested persons to submit their views and comments upon the proposal.  The Commission has considered all the comments and suggestions received and has determined to adopt Rule 22c-1 under the Act in the form set forth below and to adopt the amendment of Rule 17a-3(a)(7) under the Securities Exchange Act as originally proposed.

   Section 22(c) of the Investment Company Act, by reference to Section 22(a), authorizes the Commission to make rules and regulations applicable to principal underwriters of, and dealers in, the redeemable securities of registered investment companies "for the purpose of eliminating or reducing so far as reasonably practicable any dilution of the value of other outstanding securities of such company or any other result of such purchase, redemption, or sale which [*2]  is unfair to holders of such other outstanding securities." Such rules and regulations are authorized with respect to, among other things, the time for computing the minimum price at which any redeemable security issued by an investment company may be purchased from such company and the maximum price at which such security may be sold to such company or at which such security may be surrendered to such company for redemption. Section 38(a) of the Investment Company Act authorizes the Commission to issue such rules as are necessary or appropriate to the exercise of the powers conferred upon the Commission in that Act.

   One purpose of Rule 22c-1 is to eliminate or reduce so far as reasonably practicable any dilution of the value of outstanding redeemable securities of registered investment companies through (i) the sale of such securities at a price below their net asset value or (ii) the redemption or repurchase of such securities at a price above their net asset value. Dilution through the sale of redeemable securities at a price below their net asset value may occur, for example, through the practice of selling securities for a certain period of time at a price based upon a previously [*3]  established net asset value. This practice permits a potential investor to take advantage of an upswing in the market and an accompanying increase in the net asset value of investment company shares

1968 SEC LEXIS 171, *

by purchasing such shares at a price which does not reflect the increase.  An investor may be encouraged to purchase securities in this manner by the practice of announcing the next sale price in advance of the time at which it becomes effective, thereby enabling the investor to time his purchase so as to obtain investment company securities at the lower of two known prices.  Based upon its experience in the administration of the Investment Company Act, the Commission believes that such practices have the effect of diluting the value of outstanding redeemable securities of registered investment companies.

Another purpose of Rule 22c-1 is to eliminate or reduce so far as reasonably practicable other results, aside from dilution, which arise from the sale, redemption, or repurchase of securities of registered investment companies and which are unfair to the holders of such outstanding securities.  The Commission believes that the practice of selling securities for a certain period of time, [*4] at a price based upon a previously established net asset value, encourages speculative trading practices which so compromise registered investment companies as to be unfair to the holders of their outstanding securities.  This pricing practice allows speculators to buy large blocks of such securities under circumstances where the net asset value of the securities has increased but where the increase in value is not reflected in the price.  The speculators hold such securities until the next net asset value is determined and then redeem them at large profits.  These speculative trading practices can seriously interfere with the management of registered investment companies to the extent that (i) management may hesitate to invest what it believes to be speculators' money and (ii) management may have to effect untimely liquidations when speculators redeem their securities.  Based upon its experience in the administration of the Investment Company Act, the Commission believes that such practices cause unfair results to the holders of outstanding securities of registered investment companies.

Rule 22c-1 prohibits any registered investment company issuing any redeemable security; any person [*5] designated in such issuer's prospectus as authorized to consummate transactions in any such security; and any principal underwriter of, or dealer in, any such security from selling, redeeming, or repurchasing any such security except at a price determined in accordance with the provisions of the rule.  The rule requires that the price be based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.  Current net asset value is defined by the rule to be that computed on each day during which the New York Stock Exchange is open for trading, not less frequently than once daily as of the time of the close of trading on such Exchange.  The effect of the rule is to prohibit the practice of selling securities for a certain period of time at a price based on a previously established net asset value.

After consideration of the comments and suggestions received from interested persons, the Commission has determined to substitute a once daily pricing requirement for the twice daily pricing requirement originally proposed. However, the once daily pricing requirement is not [*6] intended to prohibit an investment company from pricing its redeemable securities more frequently if it so wishes.  Furthermore, where an investment company believes that the once daily pricing requirement will be unduly burdensome, it can apply to the Commission for an appropriate exemption.

It should be noted that Rule 2a-4 under the Act defines the term "current net asset value" for use in computing the current price of redeemable securities issued by registered investment companies for the purpose of distribution, redemption, and repurchase.

1968 SEC LEXIS 171, *

It also should be noted that Rule 31a-1(b)(1) under the Investment Company Act provides, in pertinent part, that every registered investment company shall maintain and keep current journals or other records of original entry containing an itemized daily record in detail of all sales and redemptions of its own securities. It is expected that registered investment companies will time-stamp, upon receipt, all orders with respect to sales, redemptions, and repurchases of their own securities.

Any person desiring a Commission order under Section 6(c) of the Investment Company Act granting an exemption from the once daily pricing requirement [*7] of Rule 22c-1 before its effective date may file an application under that Section. Such application should of course be supported with factual data and legal arguments to enable the Commission to make the required finding that the exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of the Act.

In order to implement Rule 22c-1 under the Investment Company Act, the Commission, as a companion measure, has determined to adopt an amendment of Rule 17a-3(a)(7) under the Securities Exchange Act to require dealers, when selling securities to, or buying securities from, a customer, other than a broker or dealer, to stamp on the memorandum of order the time of receipt. Brokers are already subject to such requirement under subparagraph (a)(6) of Rule 17a-3.

The text of Rule 22c-1, adopted by the Commission pursuant to the authority granted to it in Sections 22(c) and 38(a) of the Investment Company Act, is as follows:

Rule 22c-1. Pricing of Redeemable Securities for Distribution, Redemption and Repurchase

(a) No registered investment company issuing any redeemable [*8] security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

(b) For the purposes of this rule, the current net asset value of any such security shall be that computed on each day during which the New York Stock Exchange is open for trading, not less frequently than once daily as of the time of the close of trading on such Exchange.

The text of the Commission action, pursuant to the authority granted to the Commission in Sections 17(a) and 23(a) of the Securities Exchange Act, is as follows:

Rule 17a-3(a)(7) under the Securities Exchange Act of 1934 is amended by deleting the period at the end of the sentence and adding"; and, in addition, where such purchase or sale is with a customer other than a broker or dealer, a memorandum for each order received, showing the time of receipt, the terms and conditions [*9] of the order, and the account in which it was entered." As so amended, the subparagraph reads:

A memorandum of each purchase and sale for the account of such member, broker, or dealer showing the price and, to the extent feasible, the time of execution; and, in addition, where such purchase or sale is with a customer other than a broker or dealer, a memorandum of each order received, showing the time

1968 SEC LEXIS 171, *

of receipt, the terms and conditions of the order, and the account in which it was entered.

In order that investment companies and broker-dealers may have a reasonable period of time to conform their present pricing practices and current prospectuses to the new requirements, Rule 22c-1 under the Investment Company Act and the amendment of Rule 17a-3(a)(7) under the Securities Exchange Act are declared effective at the commencement of business on January 13, 1969.

By the Commission.

# EXHIBIT C

LEXSEE 1968 SEC LEXIS 979

Staff Interpretive Positions Relating to Rule 22c-1

SECURITIES AND EXCHANGE COMMISSION

INVESTMENT COMPANY ACT OF 1940, Release No. 5569

1968 SEC LEXIS 979; 34 FR 382

December 27, 1968

**TEXT:** [*1]

The Securities and Exchange Commission today called attention to interpretive positions its Division of Corporate Regulation has taken relating to Rule 22c-1 which was adopted on October 16, 1968 (Investment Company Act Release No. 5519) and becomes effective at the commencement of business on January 13, 1969.

The staff interpretive positions summarized in this release were taken in response to inquiries directed to the staff. While the views expressed by the staff as set forth in this release are those of persons who are continually working with the provisions of the statutes and rules involved and can be relied upon as representing the views of the division in which they originate, the public is cautioned that the opinions expressed in this release are not, and do not purport to be an official expression of the Commission's views.

The text of the questions together with the responses of the Division of Corporate Regulation follow:

1. The Rule requires that a transaction for a customer in the shares of an investment company must be at the price "which is next computed after receipt" of the customer's order. The "next computed" price means the next price which goes into effect [*2] after receipt of the order. However, the question has arisen whether it is the time of receipt of an order by a dealer or by the fund underwriter which will control the price at which the order is executed. To put the question in a concrete example, assume that a dealer receives a customer's order at 3:15 p.m. and it is time-stamped at that time. The order is transmitted by telephone in the regular course of business from the order room of the dealer to the underwriter of the fund where it is received at 3:45. The fund prices its shares in accordance with Rule 22c-1(b), at 3:30 p.m. at the close of trading on the New York Stock Exchange. Under these circumstances, would the order in question be priced as of 3:30 p.m., i.e., the price next computed after receipt of the order by the dealer, or a price as of the first pricing of the fund on the next business day? If the time of receipt of the order by the dealer is controlling must the underwriter independently verify whether the order is properly entered?

Rule 22c-1 provides that the price at which redeemable investment company shares shall be sold shall be a price based on the net asset value next computed after the order to [*3] purchase the security is received. The Rule contemplates that the time of receipt of the order by the retail dealer is controlling. It is the responsibility of the retail dealer to establish procedures which would assure that upon his receipt of a customer's order it will be transmitted so that it will be received by the underwriter before the time when the price applicable to the customer's order expires, except that where the price is based on the net asset value at the close of the Exchange (e.g., 3:30) it should be transmitted before the close of the underwriter's business day.

When the dealer transmits the order to the underwriter the dealer should inform the underwriter of the exact time the dealer received the order. However, if the dealer's first transmission of the order is by telephone or teletype, it will ordinarily be sufficient if at that time he represents that the order was received by him at a time entitling the customer to the price applicable at a specified time, provided that when he later confirms the order in writing he furnishes to the underwriter detailed information as to the specific time when the order was received. The underwriter would be required [*4] to time-stamp the order as of the time of its initial receipt by him from the dealer (whether by telephone, telegraph or any other means), and the underwriter should retain in his records the dealer's written confirmation showing the dealer's statement of the time the dealer received the order from his customer.

The following examples are intended to illustrate how the pricing provisions apply:

The fund prices at 1:00 p.m. and 3:30 p.m.

(a) A dealer receives a customer's order before 1:00 p.m. The 1:00 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to 3:30 p.m.

(b) A dealer receives a customer's order after 1:00 p.m. but before 3:30 p.m. The 3:30 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to the close of the underwriter's business day.

(c) A dealer receives a customer's order at 4:00 p.m. The 1:00 p.m. price on the next business day would be applicable and the dealer should assure that the underwriter receives the order prior to 3:30 p.m. on such next day. (See also the answer to question 4(b).)

2. Rule 22c-1 refers to the current net asset value [*5] of an investment company security as being "computed." Does the word "computed" as used in the Rule require a pricing of each portfolio security or can an appropriate formula be used in determining net asset value?

As used in the Rule, the word "computed" does require a pricing of each portfolio security not less frequently than once daily as of the time of the close of trading on the New York Stock Exchange. This requirement does not foreclose additional computations using an appropriate formula at times when such Exchange is open for trading. It is the responsibility of those pricing such shares to make certain that the formula is a fair one and results in a price which is a reasonable reflection of current net asset value.

3. In connection with a voluntary or contractual plan for the accumulation of shares of a particular investment company or the automatic liquidation of shares pursuant to a withdrawal program, the investor deals directly with a custodian bank under procedures which are disclosed in each fund prospectus. The custodian bank collates and processes the various payments received on a particular day and at the completion of the processing notifies the fund underwriter [*6] of purchases and liquidation of shares. The time of notification and the time at which such orders are priced as a result of such notification varies somewhat from company to company. Generally speaking, notification is usually made within two business days after receipt by the bank of a customer's instructions and pricing is done as of the close of business of the day on which such instructions are received by the bank or as of the close of the following day. Assuming that in no event would the pricing be done as of a time prior to the actual receipt of the instructions by the custodian bank; that these transactions form part of a systematic investment program; and are entered by mail by customers or in the case of withdrawal accounts are automatic and involve no investment decision, is there any objection under the provisions of Rule 22c-1 if custodian banks and fund underwriters continue to follow the pricing practices described herein?

Under the circumstances set forth in the question dealing with the time of pricing shares with respect to instructions received by custodian banks for purchases of shares under systematic plans and liquidation of shares in withdrawal programs, [*7] there would be no objection if the price is determined on the basis of the closing price of the day that the bank receives the customer's instructions. In order to assure proper pricing, the bank should date-stamp each customer's instruction on receipt.

4. (a) What is the preferred procedure to be followed in conforming the present language in prospectuses to the requirements of Rule 22c-1 with respect to the pricing methods of investment companies?

It would be preferable, if the only change in a prospectus is to conform present pricing language to the requirements of Rule 22c-1, that such a change be accomplished by the filing of a supplemental prospectus pursuant to Rule 424 under the Securities Act and not by post-effective amendment to a registration statement. At least three additional copies of the supplemental prospectus, clearly marked to show the changes, should be forwarded to the chief of the branch which has been processing previous filings of the registrant.

(b) Would the following be acceptable as disclosure in the prospectus of pricing procedures under Rule 22c-1 assuming a particular fund would continue to price twice a day at 1:00 p.m. and 3:30 p.m. *

* Companies desiring to price once a day or at more frequent intervals than twice a day should make appropriate adjustments in the sample language.

[*8]

1968 SEC LEXIS 979, *; 34 FR 382

Effective on January 13, 1969, the public offering price will continue to be computed twice daily at 1:00 p.m., and at the close of the New York Stock Exchange, normally 3:30 p.m., New York City time. The offering prices so determined will become effective as of 1:00 p.m. and 3:30 p.m. Order for shares of the fund received by dealers prior to 1:00 p.m. New York City time and received by the underwriter prior to 3:30 p.m. New York City time will be confirmed at the offering price effective 1:00 p.m. on the same date; orders received by dealers after 1:00 p.m. and prior to 3:30 p.m. New York City time and received by the underwriter prior to    PM [time zone] [close of the underwriter's business day] will be confirmed at the offering price effective at 3:30 p.m. Orders received by dealers subsequent to 3:30 p.m. New York City time and prior to 1:00 p.m. New York City time of the next business day and received by underwriters prior to 3:30 p.m. of the next business day will be confirmed at the offering price effective at 1:00 p.m. on that next day.

The proposed language would be an acceptable method of disclosing pricing procedures pursuant to Rule 22c-1. Of course, adequate disclosures [*9] of repurchase and redemption procedures would also have to be made.

The Commission expects to release additional staff interpretations on the Rule from time to time as the need arises.

# EXHIBIT D

DOCKETED ON CM

SEP 7 2005

BY___ VW___ 026

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 04-7084 PA (VBKx) | | Date | August 24, 2005 |
|---|---|---|---|---|
| Title | Securities & Exchange Commission v. JB Oxford Holdings, Inc., et al. | | | |

Present: The Honorable   PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| C. Kevin Reddick | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**         IN CHAMBERS — COURT ORDER

Before the Court are cross-motions for partial summary judgment filed by defendant National Clearing Corporation ("NCC") (Docket No. 71) and plaintiff Securities and Exchange Commission ("SEC") (Docket No. 96) with respect to the SEC's second cause of action for violation of Rule 22c-1. Although defendants JB Oxford Holdings, Inc., James Lin, Kraig Kibble, and James Lewis are not named in the Third Amended Complaint's second cause of action for violation of Rule 22c-1, they have joined in NCC's motion (Docket Nos. 74-76).

The SEC's Third Amended Complaint alleges a variety of securities law violations arising out of NCC's alleged facilitation of "late trading" and "market timing" of mutual fund shares. The SEC defines "late trading" as "the practice of placing orders to buy or sell mutual fund shares after 4:00 p.m. Eastern time, the time as of which mutual funds typically calculate their net asset value ('NAV'), but receiving the price based on the NAV already determined as of 4:00 p.m." Third Amended Complaint, ¶ 3. The SEC alleges that late trading "enables the trader to profit from market events that occur after 4:00 p.m. but that are not reflected in that day's price." Id. Neither motion implicates the SEC's market timing or Rule 10b-5 securities fraud allegations.

The SEC's late trading allegations specify that NCC entered into procedural agreements with institutional investors in which the institutional investors would send an e-mail to NCC between 2:00 p.m. and 4:00 p.m. with a spreadsheet listing that day's potential trades. Id., ¶ 27. The institutional investors would then notify NCC sometime after 4:00 p.m. if NCC should execute or cancel the potential trades. Id. For instance, Lawrence Powell, the former Director of Institutional Asset Management for Kaplan & Company Securities, has admitted that he facilitated the trades of his company's institutional investors through NCC, that Kaplan "submitted trades to NCC on behalf of its clients, in general, each day after 4:00 p.m. Eastern time," and that "[i]n general, Kaplan's institutional asset management group's clients submitted those mutual fund trades to Kaplan after 4:00 p.m. Eastern." Declaration of Lawrence Powell, ¶ 4. NCC is alleged to have entered into these procedural agreements and made the late trades despite some mutual fund dealer agreements which provided for a 4:00 p.m. Eastern cut-off time for trades to receive the current day's net asset value. Third Amended Complaint, ¶ 32.

SEND

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-7084 PA (VBKx) | Date | August 24, 2005 |

| Title | Securities & Exchange Commission v. JB Oxford Holdings, Inc., et al. |

Rule 22c-1 establishes the "forward pricing rule" which requires that purchases or sales of mutual fund shares must be priced at the next net asset value of the fund calculated after the order is received. The SEC promulgated Rule 22c-1 pursuant to the Investment Company Act of 1940, 15 U.S.C. §§ 80a-80b. Among other things, the Investment Company Act requires both investment companies and dealers to sell mutual fund shares "at a current public offering price described in the prospectus." 15 U.S.C. § 80a-22(d). Rule 22c-1(a) states:

> No registered investment company issuing any redeemable security, no
> person designated in such issuer's prospectus as authorized to consummate
> transactions in any such security, and no principal underwriter of, or dealer
> in, any such security shall sell, redeem, or repurchase any such security
> except at a price based on the current net asset value of such security
> which is next computed after receipt of a tender of such security for
> redemption or of an order to purchase or sell such security . . . .

17 C.F.R. § 270.22c-1(a). Rule 22c-1(b) requires that "[t]he current net asset value of any such security shall be computed no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets . . . ." 17 C.F.R. § 270.22c-1(b)(1).

NCC contends, as defendants argued when they moved to dismiss the SEC's First Amended Complaint, that the SEC must have evidence that a purchaser received a price other than that actually "next computed" to state a violation of Rule 22c-1(a). According to NCC, "next computed" must mean the time at which the fund actually performs its net asset value calculation.[1] The SEC counters that it must only submit evidence that a purchaser receive a price other than that "as of" the time the fund sets for its calculation. Here, for instance, with funds which state in their prospectuses that they determine their net asset values "at the close of regular trading" on the New York Stock Exchange, the SEC's interpretation would render any order received or confirmed after 4:00 p.m. Eastern time but which received that day's price, a "late trade" in violation of Rule 22c-1(a) regardless of when the fund actually performed its net asset value calculation.

When interpreting regulations, the Court "must give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct.

---

[1] Although Rule 22c-1(b) requires that "[t]he current net asset value . . . shall be computed no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets," many funds apparently do not perform the net asset value calculation until several hours after the time set by the fund's board of directors. According to the prospectuses of at least some of the funds traded by NCC, the funds use the values of the funds' holdings "as of" that time even when the funds do not perform the calculations at the stated time.

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 04-7084 PA (VBKx) | Date: August 24, 2005 |
| Title | Securities & Exchange Commission v. JB Oxford Holdings, Inc., et al. | |

2381, 2386, 129 L. Ed. 2d 405 (1994) (citing <u>Martin v. Occupational Safety and Health Review Comm'n</u>, 499 U.S. 144, 150-51, 111 S. Ct. 1171, 1175-76, 113 L. Ed. 2d 117 (1991)). As the Supreme Court explained:

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."

<u>Id.</u> at 512, 114 S. Ct. at 2386-87, 129 L. Ed. 2d 405 (citations omitted) (quoting <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414, 65 S. Ct. 1215, 1217, 89 L. Ed. 1700 (1945) and <u>Gardebring v. Jenkins</u>, 485 U.S. 415, 430, 108 S. Ct. 1306, 1314, 99 L. Ed. 2d 515 (1988)); <u>see also</u> <u>Alhambra Hosp. v. Thompson</u>, 259 F.3d 1071, 1074 (9th Cir. 2001).

In ruling on defendants' Motions to Dismiss, the Court was at least preliminarily persuaded by defendants' interpretation of Rule 22c-1(a) which focuses on the time a fund actually performs its net asset value calculation rather than the time "as of" which the fund values its holdings. Nevertheless, in reviewing the language of Rule 22c-1(a), the Court cannot now conclude that defendants' "reading is compelled by the regulation's plain language" or that the SEC's interpretation is "plainly erroneous or inconsistent with the regulation." <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512, 114 S. Ct. at 2386-87, 129 L. Ed. 2d 405. Accordingly, the SEC's interpretation of the regulation is entitled to deference.

Despite the fact that the SEC does not appear to have considered the possibility that mutual funds might not calculate their net asset values precisely at the times announced by the funds prior to the revelation in 2003 of alleged abuses in the mutual fund industry, the SEC has, since 1968 when it adopted Rule 22c-1, consistently stated that the regulation was designed to prevent:

> [A]ny dilution of the value of outstanding redeemable securities of registered investment companies through (i) the sale of such securities at a price below their net asset value or (ii) the redemption or repurchase of such securities at a price above their net asset value. Dilution through the sale of redeemable securities at a price below their net asset value may occur, for example, through the practice of selling securities for a certain period of time at a price based upon a previously established net asset value. This practice permits a potential investor to take advantage of an upswing in the market and an accompanying increase in the net asset value

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-7084 PA (VBKx) | Date: August 24, 2005 |
|---|---|---|

| Title | Securities & Exchange Commission v. JB Oxford Holdings, Inc., et al. |
|---|---|

> of investment company shares by purchasing such shares at a price which
> does not reflect the increase.

Adoption of Rule 22c-1, Investment Company Act of 1940, Release No. 5519 (Oct. 16, 1968); see also Exemption from Section 22(d), Investment Company Act of 1940, Release No. 13183 (Apr. 22, 1983) ("[T]he concern of dilution of fund assets arising from 'riskless trading' by insiders was addressed by the adoption of rule 22c-1 under the Act, which prohibits 'backwards pricing' and requires instead 'forward pricing' whereby the price of shares is based upon a fund's net asset value per share next determined after receipt of an order for purchase (generally at the close of business on the day of a sale), rather than the previous day. Rule 22c-1, by eliminating the possibility of a purchaser or seller taking advantage of any discrepancy between a fund's current net asset value and a sales price based upon the previous day's net asset value, renders retail price maintenance unnecessary as a method of preventing dilution from riskless insider trading.").

Rule 22c-1's requirement that the purchaser or seller of a mutual fund receive a price "based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security" is, at most, ambiguous as to whether it refers to the time when the net asset value is actually computed or the time "as of" when its value is computed. Because of this ambiguity, the SEC's interpretation is entitled to deference. Accordingly, the SEC's failure to produce evidence of when any particular fund actually calculated its net asset value does not preclude the SEC from prevailing on its Rule 22c-1 claim. Instead, the SEC must only establish that NCC sold, redeemed, or repurchased mutual fund shares after the "as of" time stated in the prospectuses but allowed its clients to receive a price based on the previously determined net asset value. The evidence submitted by the SEC in support of its motion establishes that this is exactly what NCC did.

In its Opposition to the SEC's motion, NCC asserts that it cannot be liable for violating Rule 22c-1 even if the Court adopts the SEC's interpretation because NCC did not receive adequate notice that its conduct violated the regulation. "Due process requires that 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" Upton v. SEC, 75 F.3d 92, 98 (2d Cir. 1996) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298-99, 33 L. Ed. 2d 921 (1972)). Although courts must defer to an agency's interpretation of its own regulations, such deference is no t appropriate "if doing so would penalize an individual who has not received fair notice of a regulatory violation." Id. (noting that "[t]his principle applies, albeit less forcefully, even if the rule in question carries only civil rather than criminal penalties"). In determining whether imposing liability for violating a regulation amounts to a due process violation, courts "ask whether 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform . . . .'" Trinity Broad. v. FCC, 211 F.3d 618, 628 (D.C. Cir. 2000) (quoting General Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

SEND

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-7084 PA (VBKx) | Date | August 24, 2005 |
|---|---|---|---|

| Title | Securities & Exchange Commission v. JB Oxford Holdings, Inc., et al. |
|---|---|

However, the Court need not address NCC's due process argument at this time.[2]  Although the SEC's motion requests that the Court impose both injunctive and monetary penalties against NCC for its violations of Rule 22c-1, the Court believes that the granting of such relief is premature.  The facts alleged in support of the SEC's Rule 10b-5 claims overlap with the Rule 22c-1 claim.  The Rule 10b-5 claims against the defendants are still pending.  Declining to sanction NCC at this stage avoids the potential of penalizing NCC twice for the same conduct.  Additionally, because NCC has sold its mutual fund clearing business, has no intention of re-entering that field, and is not currently engaged in late trading, there is no immediate need to enter an injunction prohibiting NCC from committing future violations of Rule 22c-1.  Accordingly, the Court will wait until the factual record is more developed before it determines what, if any, penalties it should impose on NCC and whether it received adequate notice that its conduct violated the regulation.  Because the Court has not penalized NCC, it has not yet been deprived of its due process rights.  The Court therefore declines to address NCC's due process argument at this time.

For all of the foregoing reasons, the Court denies NCC's Motion for Summary Judgment and grants, in part, the SEC's Motion for Summary Judgment.  Specifically, the Court determines, as a matter of law, that the NCC's facilitation of late trading violated Rule 22c-1.  At this time, the Court declines to address NCC's due process argument and finds that it would be premature to impose penalties or injunctive relief against NCC.

IT IS SO ORDERED.

Initials of Preparer

cc:

---

[2]    NCC made the same due process argument in support of its earlier Motion to Dismiss.  In denying that portion of the motion, the Court stated: "Unlike a statute of limitations defense, which may appear on the face of the pleading, Defendants' argument that they did not have adequate notice that their conduct violated the securities laws is not appropriate to raise through a motion to dismiss.  The Court therefore declines to dismiss the [First Amended Complaint] on this basis." November 9, 2004 Minute Order Granting in Part and Denying in Part Defendants' Motions to Dismiss the First Amended Complaint, p. 9.  Despite having made the argument previously, NCC did not affirmatively raise the due process issue as a basis for its summary judgment motion.  One might argue that to now accept NCC's due process argument would, in essence, result in the issuance of a judgment in favor of NCC based on an argument in which it did not move.  However, for the reasons stated, the Court need not determine whether NCC's due process argument is properly before the Court.

# EXHIBIT E

10 of 38 DOCUMENTS

**Securities & Exchange Commission v. JB Oxford Holdings, Inc. et al.**

**Case No.: CV 04-07084 PA (VBKx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**2004 U.S. Dist. LEXIS 29494**

**November 9, 2004, Decided**
**November 9, 2004, Filed**

**COUNSEL:** [*1] For Securities and Exchange Commission, Plaintiff: Jessica Rigley Marren, Karen L Matteson, Lorraine B Echavarria, Michele Wein Layne, Sam S Puathasnanon, Sandra J Harris, SEC -- Securities & Exchange Commission, Los Angeles, CA.

For JB Oxford Holdings Inc, National Clearing Corporation, Defendants: Francisca M Mok, James L Sanders, McDermott Will & Emery, Los Angeles, CA.

For James G Lewis, Defendant: C Phillip Campbell, Jr, Shumaker Loop & Kendrick, Tampa, FL; David A Fleissig, Matthew S Dontzin, The Dontzin Law Firm, New York, NY; Jason D Kogan, Ronald J Nessim, Bird Marella Boxer Wolpert Nessim, Drooks and Lincenberg, Los Angeles, CA; Michael G Sanderson, Shumaker Loop and Kendrick, Toledo, OH.

For Kraig L Kibble, Defendant: Joel A Thvedt, Knott and Glazier, Los Angeles, CA; Michael L Fazio, Thad A Davis, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA.

For James Y Lin, Defendant: Jeffrey H Rutherford, Lightfoot Vandevelde Sadowsky and Levine, Los Angeles, CA; Laurent Sacharoff, Susan E Brune, Theresa Trzaskoma, Brune and Richard, New York, NY.

**JUDGES:** HONORABLE PERCY ANDERSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** PERCY ANDERSON

**OPINION**

*CIVIL MINUTES -- GENERAL*

[*2] **PROCEEDINGS:** IN CHAMBERS -- COURT ORDER

Before the Court are Motions to Dismiss filed by JB Oxford Holdings, Inc. and National Clearing Corporation (Docket No. 15), James Lin (Docket No. 18), and Kraig Kibble (Docket No. 20) (collectively "Defendants"). Plaintiff Securities and Exchange Commission ("SEC") has already amended its Complaint once as a matter of right. Defendants' Motions to Dismiss challenge the sufficiency of the First Amended Complaint ("FAC"). The time for defendant James Lewis to respond to the FAC has not yet expired. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for October 25, 2004 is vacated, and the matters taken off calendar.

The SEC's FAC alleges a variety of securities law violations arising out of Defendants' alleged facilitation of "late trading" and "market timing" of mutual fund shares. The FAC defines "late trading" as "the practice of placing orders to buy or sell mutual fund shares after 4:00 p.m. Eastern time, the time as of which mutual funds typically calculate [*3] their net asset value ('NAV'), but receiving the price based on the NAV already determined as of 4:00 p.m." FAC, P 3. The SEC alleges that late trading "enables the trader to profit from market events that occur after 4:00 p.m. but that are not reflected in that day's price." *Id.* The FAC defines "market timing" to include "(a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing." *Id.*, P 4. The SEC acknowledges that although market timing is "not illegal *per se*" but nevertheless "can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs

Case 1:07-cv-06072-JGK-DCF    Document 20-2    Filed 10/26/2007    Page 23 of 27

Page 2
2004 U.S. Dist. LEXIS 29494, *

borne by other shareholders to accommodate frequent buying and selling of shares by the market timer." *Id.*

Defendant JB Oxford Holdings, Inc. ("JBOH") is a holding company which provides clearing and execution services through its subsidiary National Clearing Corporation ("NCC"). *Id.*, PP 8 & 9. Defendant James Lewis [*4] was a member of the board of directors, the president, and the chief operating officer of JBOH from approximately 1999 until April 2004. Mr. Lewis also served as president and chief executive officer of NCC from 1999 until December 2003. *Id.*, P 10. Defendant Kraig Kibble was NCC's assistant vice president of operations from January 2002 through September 2002. *Id.*, P 11. Mr. Kibble has been NCC's director of operations since he received a promotion in September 2002. *Id.* Throughout Mr. Kibble's tenure at NCC, he is alleged to have supervised NCC's mutual fund department and to have overseen the trading of NCC's institutional investors. *Id.* Defendant James Lin has been vice president of correspondent services at NCC since at least May 2002. *Id.*, P 12. In that role, Mr. Lin has been responsible for attracting additional correspondent brokers and negotiating clearing agreements between those brokers and NCC. *Id.*

The FAC's late trading allegations specify that NCC entered into procedural agreements with institutional investors in which the institutional investors would send an e-mail to NCC between 2:00 p.m. and 4:00 p.m. with a spreadsheet listing that day's potential [*5] trades. *Id.*, P 26. The institutional investors would then notify NCC sometime after 4:00 p.m. if NCC should execute or cancel the potential trades. *Id.* NCC is alleged to have entered into these procedural agreements and made the late trades despite some mutual fund dealer agreements which provided for a 4:00 p.m. Eastern cut-off time for trades to receive the current day's NAV. *Id.*, P 31.

The FAC's market timing claims involve NCC's alleged efforts to facilitate its institutional investors' circumvention of the mutual funds' efforts to limit market timing. The FAC contends that mutual funds attempt to track and restrict market timing through client identifiers such as customer account numbers, representative codes, and office codes. *Id.*, P 36. According to the FAC, once a fund identifies a market timer, the fund will reject trades and restrict that investor's trades for a period of time. *Id.*, P 37. Funds will sometimes prohibit repeat market timers from trading in the fund. *Id.* NCC reportedly received hundreds of "kick-out letters" rejecting its clients' attempted market timing. *Id.*, P 39. The FAC alleges that Defendants assisted the market timing of its [*6] institutional investors by providing the investors with multiple client identifiers, including different account numbers, representative codes, and office codes, to prevent the funds from identifying the market timers. *Id.*, P 41. The

FAC contends that NCC opened over one hundred accounts for one client and at least forty-eight accounts for another client over a fifteen-month period and facilitated almost 25,000 market timing trades in at least seventy-four fund families. *Id.*, P 42. Trading of these "cloned" accounts allegedly generated $ 6.7 million in gains for the two clients. *Id.*

The FAC alleges a violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), against all defendants, a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all defendants, and a violation of Rule 22c-1, 17 C.F.R. § 270.22c-1, against NCC. The SEC seeks injunctive relief, disgorgement, and penalties against all defendants. Defendants challenge the [*7] sufficiency of all three of the SEC's claims.

*Legal Standard*

Generally, plaintiffs in federal court are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While the Federal Rules allow a court to dismiss a cause of action for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), they also require all pleadings to be "construed so as to do substantial justice." Fed. R. Civ. P. 8(f). "Given the Federal Rules' simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)). *See also Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct 99, 102, 2 L. Ed. 2d 80 (1957) ("A motion may not be granted unless [*8] it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."; *Daniel v. County of Santa Barbara*, 288 F.3d 375, 380 (9th Cir. 2002) (quoting *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000)). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Daniel*, 288 F.3d at 380 (quoting *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir.2000). The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6). *See, e.g., Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997) ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim.") (internal citations omitted).

The more stringent pleading requirements of Federal Rule of Civil Procedure 9(b) apply to allegations of

fraud. "In all averments of fraud or mistake, the circum-
stances constituting fraud or mistake shall be stated with
particularity. Malice, intent, knowledge, [*9] and other
condition of mind of a person may be averred generally."
Fed. R. Civ. P. 9(b). "Rule 9(b) requires particularity as
to the circumstances of the fraud -- this requires pleading
facts that by any definition are evidentiary': time, place,
persons, statements made, explanation of why or how
such statements are false or misleading." *Decker v.
GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d
1541, 1548 n.7 (9th Cir. 1994); *see also Moore v. Kay-
port Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.
1989) ("A pleading is sufficient under rule 9(b) if it iden-
tifies the circumstances constituting fraud so that a de-
fendant can prepare an adequate answer from the allega-
tions. While statements of the time, place and nature of
the alleged fraudulent activities are sufficient, mere con-
clusory allegations of fraud are insufficient.") (citing
*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439
(9th Cir. 1987)).

### Section 17(a) Claim

The SEC alleges that Defendants' facilitation of late
trading and market timing violated Section 17(a) of the
Securities Act. Section 17(a) makes it unlawful:

> For [*10] any person in the offer or sale
> of any securities . . . by the use of any
> means or instruments of transportation or
> communication in interstate commerce or
> by use of the mails, directly or indirectly

> > (1) to employ any device,
> > scheme, or artifice to de-
> > fraud, or

> > (2) to obtain money or
> > property by means of any
> > untrue statement of a mate-
> > rial fact or any omission to
> > state a material fact neces-
> > sary in order to make the
> > statements made, in light
> > of the circumstances under
> > which they were made, not
> > misleading; or

> > (3) to engage in any
> > transaction, practice, or
> > course of business which
> > operates or would operate
> > as a fraud or deceit upon
> > the purchaser.

15 U.S.C. § 77q(a).

Though few courts have defined "seller" for pur-
poses of Section 17(a), those that have appear to adopt
the definition of "seller" under Section 12 of the Securi-
ties Act adopted by the Supreme Court in *Pinter v. Dahl*,
486 U.S. 622, 645-47, 108 S. Ct. 2063, 2077-79, 100 L.
Ed. 2d 658 (1988). *See Buford White Lumber Co. Profit
Sharing and Sav. Plan & Trust v. Octagon Properties,
Ltd.*, 740 F. Supp. 1553, 1568-69 (W.D.Ok. 1988) ("Sec-
tion 17(a), [*11] as Defendant notes, applies to those
who offer or sell securities. Offer' and sell' share the
same definitions for purposes of Section 17(a) as they do
for Section 12. Accordingly, the Supreme Court's expli-
cation of the application of these definitions in *Pinter v.
Dahl* is equally pertinent when violations of Section
17(a) are alleged.") (citing 15 U.S.C. § 77b(3)); *see also
Montcalm County Board of Comm'rs v. McDonald & Co.
Securities, Inc.*, 833 F. Supp. 1225, 1237 (W.D. Mi.
1993); *Wheaten v. Mathews Holmquist & Assocs.*, 1995
U.S. Dist. LEXIS 167, No. 94 C 1134, 1995 WL 12523,
at * 14 (N.D. Il. Jan. 10, 1995). According to the Su-
preme Court, a "seller" includes those "who urged the
buyer to purchase" the securities or acted as "a securities
vendor's agent who solicited the purchase . . . even
though the agent himself did not pass title." *Pinter*, 486
U.S. at 644, 108 S. Ct. at 2077. The definition of "seller"
includes only those who "successfully solicits the pur-
chase, motivated at least in part by a desire to serve his
own financial interests or those of the securities owner."
*Id.* at 647, 108 S. Ct. at 2078. Those [*12] who act
"merely to assist the buyer" are not "sellers." *Id.* Simi-
larly, "securities professionals . . . whose involvement is
only the performance of their professional services" are
not sellers. Id. at 651, 108 S. Ct. at 2081; *see also More
v. Kayport Package Express, Inc.*, 885 F.2d 531, 535-36
(9th Cir. 1989) (applying Pinter).

Defendants, relying on the cases borrowing the defi-
nition of "seller" from Section 12 for Section 17(a)
claims, contend that they are not liable for violating Sec-
tion 17(a) because they are not "sellers" within the mean-
ing of the statute. The SEC, ignoring the cases relied
upon by Defendants, asserts -- without supporting au-
thority -- that unlike private litigants, Section 12's restric-
tive definition of "seller" should not apply to a Section
17(a) claim brought by the SEC. Absent any authority or
argument that Section 12's definition of "seller" does not
apply to a Section 17(a) claim brought by the SEC, the
Court concludes that a defendant must be a "seller" as
defined by the Supreme Court in *Pinter v. Dahl* to state a
claim under Section 17(a). Here, Defendants are not al-
leged to have passed title in the mutual funds to [*13]
their investor clients or to have solicited their clients to
purchase particular securities. In fact, the allegations

contained in the FAC are to the contrary. Specifically, the investors are alleged to have informed NCC of the funds the investors wished to purchase. *See, e.g.* FAC, P 26. Defendants are not alleged to have solicited purchases in particular funds or to have benefitted financially from their clients' investment decisions except as a fixed percentage of assets under management. Id., P 21. Accordingly, Defendants are not "sellers" within the meaning of Section 17(a). Because Section 17(a) "applies only to sellers", *Aaron v. SEC*, 446 U.S. 680, 687, 100 S. Ct. 1945, 1950, 64 L. Ed. 2d 611, and Defendants are not "sellers," the Court dismisses the FAC's first claim for relief for violations of Section 17(a).

*Rule 22c-1 Claim*

The FAC's Rule 22c-1 claim involves the allegations of late trading and is alleged only against NCC. Rule 22c-1 states:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal [*14] underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security. . . .

17 C.F.R. § 270.22c-1(a). Rule 22c-1 requires that "[t]he current net asset value of any such security shall be computed no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets. . . ." 17 C.F.R. § 270.22c-1(b)(l).

Defendants contend that the FAC's failure to allege even a single instance when one of NCC's clients purchased mutual fund shares at a price other than that "which is next computed" renders the Rule 22c-1 claim fatally defective. The parties dispute whether the current language of Rule 22c-1 prohibits Defendants' alleged late trading activities or if the SEC is instead attempting to retroactively apply a currently-pending proposed revision to Rule 22c-1 to Defendants. In support of its claim, the [*15] SEC points to language in some mutual funds prospectuses indicating that the funds compute their net asset values as of 4:00 p.m. Eastern time. Defendants counter, however, that a fund's stated time for calculating its net asset value is not necessarily the time at which the value of the fund is actually computed. The SEC appears

to acknowledge that the funds may not have computed their net asset values precisely at the times specified in their prospectuses. *See* SEC's Opposition, p. 10, ll. 15 to 22 ("In the instances where the funds do not calculate the NAV at 4:00 p.m. Eastern time, but rather as of that time, they utilize the portfolio valuations as of 4:00 p.m. Eastern time. Placing or confirming orders after valuations are taken but before the NAV is calculated provided a window of opportunity for NCC's institutional customers to profit from exploiting after-market news and information made public between 4:00 p.m. Eastern time and the time the calculation is made by the fund -- the very practice the Commission is attempting to curb.").

The Court need not resolve the regulatory interpretation issue raised by the Defendants. Nor need it engage in the type of heightened review [*16] of the FAC's factual allegations advocated by Defendants. Rule 22c-1 does not prohibit fraudulent conduct. As a result, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) does not apply to the Rule 22c-1 claim. At this stage of the litigation, the SEC must only put NCC on notice of its claim that NCC allowed its clients to purchase mutual fund shares at a price other than that which was next computed after NCC's clients' placed their orders. Only at a later stage in the proceedings will the SEC be required to come forward with at least one specific instance when NCC actually allowed a client to buy shares of a mutual fund at a price other than the one next computed. NCC's Motion to Dismiss the Rule 22c-1 claim is therefore denied.

*Section 10(b) and Rule 10b-5 Claims*

The FAC also alleges that Defendants' alleged facilitation of late trading and market timing violated Section 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . [*17] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to Section 10(b), the SEC promulgated Rule 10b-5 which makes it unlawful:

> For any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of

any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Rule 10b-5 prohibits manipulative practices *per se* and not only those activities resembling common law fraud. . . . Clauses [*18] (a) and (c) of the Rule make no reference to a requirement that defendants charged under the rule must fail to disclose material facts for their conduct to be proscribed. That conduct is covered by clause (b)." *United States v. Charnay*, 537 F.2d 341, 351 (9th Cir. 1976). Although scienter is a necessary element of an SEC enforcement action brought pursuant to Section 10(b) and Rule 10b-5, "the SEC need not prove reliance. . . ." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *see also SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) ("A showing of scienter is an element of an enforcement action pursuant to the antifraud provisions of the Securities Acts. Scienter is a mental state embracing intent to deceive, manipulate, or defraud.'") (citations omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S. Ct. 1375, 1381, 47 L. Ed. 2d 668 (1976)).

Defendants contend that the FAC's late trading allegations fail to state a claim that they employed "any device, scheme, or artifice to defraud" or engaged "in any act, practice, or course of business which operates or would operate as [*19] a fraud or deceit upon any person. . . ." 17 C.F.R. § 240.10b-5(a) & (c). [1] Defendants alternatively argue that the FAC's Section 10(b) and Rule 10b-5 late trading allegations do not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). The Court is not prepared, on this record, to conclude that late trading, as defined in the FAC, could never be considered a deceptive device, scheme, artifice, or practice in violation of Rule 10b-5(a) or (c). Moreover, by identifying some of the investors involved, some of the funds they allegedly traded, the time period involved, and the approximate number late trades, the FAC has alleged sufficient facts "constituting fraud so

that a defendant can prepare an adequate answer from the allegations." *Moore*, 885 F.2d at 540. Accordingly, the Court finds that the late trading allegations state a claim under Section 10(b) and Rule 10b-5 and do so with the specificity required by Federal Rule of Civil Procedure 9(b). The Court therefore denies Defendants' Motions to Dismiss the SEC's Section 10(b) and Rule 10b-5 [*20] late trading claim.

    1   The SEC does not contend that Defendants' facilitation of late trading involved misleading statements or omissions under 17 C.F.R. § 240.10b-5(b).

Defendants similarly argue that the FAC's market timing allegations fail to state a claim under Section 10(b) and Rule 10b-5. Defendants further argue that the FAC's market timing allegations do not satisfy Rule 9(b)'s heightened pleading requirements. The Court finds, however, that the FAC's allegations concerning the "cloning" of account numbers to circumvent the mutual funds efforts to prevent market timing sufficiently allege a deceptive device, scheme, artifice, or practice in violation of Rule 10b-5(a) or (c). The Court further finds that the FAC's allegations are sufficiently particular to satisfy Rule 9(b), both with respect to the substantive claim and that Defendants acted with scienter.

Defendant JBOH separately argues that the FAC fails to state a claim against it because the FAC is devoid of [*21] allegations about what JBOH did other than operate a subsidiary, NCC, which is alleged to have facilitated the late trading and market timing. The SEC argues that JBOH is vicariously liable not for NCC's conduct, but for the conduct of James Lewis, who served simultaneously as JBOH's president and chief operating officer and NCC's president and chief executive officer. *See In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) ("While McKesson HBOC is not liable as successor to HBOC, it is vicariously liable for the fraud of its own officers."). At the motion to dismiss stage, the Court must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *see also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (finding that in considering allegations of scienter in a private securities class action, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."). Here, the allegations concerning Lewis' [*22] role at both JBOH and NCC, on balance, support an inference that his role in the market timing activities was acting to benefit JBOH. Accordingly, the Court denies JBOH's Motion to Dismiss.

2004 U.S. Dist. LEXIS 29494, *

*Defendants' Due Process Argument*

Defendants alternatively argue that because market timing, as the SEC admits, is "not illegal *per se*" and Rule 22c-1 does not clearly prohibit the type of late trading Defendants are alleged to have facilitated, due process requires that the FAC be dismissed. "For a complaint to be dismissed because the allegations give rise to an affirmative defense the defense clearly must appear on the face of the pleading.'" *McCalden v. California Library Ass'n,* 955 F.2d 1214, 1219 (9th Cir. 1992) (quoting 5A C. Wright & A. Miller, *Federal Practice & Procedure* § 1357 (2d ed. 1990)). Unlike a statute of limitations defense, which may appear on the face of the pleading, Defendants' argument that they did not have adequate notice that their conduct violated the securities laws is not appropriate to raise through a motion to dismiss. The Court therefore declines to dismiss the FAC on this basis.

*Conclusion*

For the foregoing reasons, [*23] the Court grants in part, and denies in part, Defendants Motions to Dismiss. Specifically, the Court dismisses the FAC's Section 17(a). The Court denies Defendants' Motions to Dismiss the Rule 22c-1 claim and the late trading and market timing claims under section 10(b) and Rule 10b-5. "Dismissal with prejudice is proper under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Bautista v. Los Angeles County,* 216 F.3d 837, 842 (9th Cir. 2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45, 78 S. Ct 99, 102, 2 L. Ed. 2d 80 (1957)). The Court therefore dismisses the Section 17(a) claim with leave to amend. The SEC shall file a Second Amended Complaint within twenty (20) days of the date of this Order.

IT IS SO ORDERED.