UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
SECURITIES AND EXCHANGE            :
COMMISSION,
                                   :
          Plaintiff,
                                   :    INDEX No. 07 CV 6072 (JGK)
   vs.                                  ECF CASE
                                   :
SIMPSON CAPITAL MANAGEMENT, INC.,
ROBERT A. SIMPSON and              :
JOHN C. DOWLING,
                                   :
          Defendants.
------------------------------------- X

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**PAGE**

I. Rule 22c-1 Does Not Reach the Trading Conduct as Alleged in the Complaint ............... 2

II. The Complaint Does Not Properly Allege Securities Fraud ............................................. 4

CONCLUSION .................................................................................................................... 10

## TABLE OF AUTHORITIES

PAGE

### FEDERAL CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................. 7

*In re Altsom Sec. Litigation*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2005) .................................................. 7

*Bowen v. Georgetown University Hospital*,
   488 U.S. 204 (1988) ........................................................................ 2, 4

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ............................................................................ 4

*Chiarella v. United States*,
   445 U.S. 222 (1980) ............................................................................ 8

*Christensen v. Harris Cty*,
   529 U.S. 576 (2000) ............................................................................ 2

*Diamond Roofing Co. v. Occupational Safety & Health Rev. Committee*,
   528 F.2d 645 (5th Cir. 1976) .............................................................. 2

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ............................................................................ 5

*In re Global Crossing Ltd. Sec. Litigation*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) .................................................. 5

*In re Kidder Peabody Sec. Litigation*,
   10 F. Supp. 2d 398 (S.D.N.Y. 1998) .................................................... 7

*In re Lernout & Haupsie Sec. Litigation*,
   236 F. Supp. 2d 161 (D. Mass. 2003) .................................................. 5

*In re Mutual Funds Invest. Litigation*,
   384 F. Supp. 845 (D. Md. 2005) .......................................................... 8

*In re Parmalat Sec. Litigation*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................. 5, 6

*In re Refco Capital Markets Ltd. Brokerage Cust. Sec. Litigation*,
   2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ................................ 5, 8

*Pfizer v. Heckler*,
   735 F.2d 1502 (D.C. Cir. 1984) .......................................................... 2

## TABLE OF AUTHORITIES

**PAGE**

*Regents of the University of California v. Credit Suisse First Boston*,
    482 F.3d 372 (5th Cir. 2007) ...................................................................................... 5

*Riverkeeper, Inc. v. Environmental Protection Agency*,
    475 F.3d 83 (2d Cir. 2007) ......................................................................................... 2

*SEC v. JB Oxford Holdings, Inc.*,
    2004 U.S. Dist. LEXIS 29494 (C.D. Cal. Nov. 9, 2004) ............................................ 8

*SEC v. Zandford*,
    535 U.S. 813 (2002) .................................................................................................... 5

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997) ....................................................................................... 5

*United States v. Bongiorno*,
    2006 WL 1140864 (S.D.N.Y. May 1, 2006) .............................................................. 6

*United States v. Finnerty*,
    474 F. Supp. 2d 530 (S.D.N.Y. 2007) ......................................................................... 6

*United States v. Russo*,
    74 F.3d 1383 (2d Cir. 1996) ....................................................................................... 5

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) ....................................................................................... 4

## OTHER AUTHORITY

*In re Pritchard Capital Partners, LLC*,
    SEC Admin. Proc. File No. 3-12753 (Sept. 7, 2007) ................................................. 9

*SEC v. JB Oxford Holdings, Inc., et al.*,
    No. 04-7084 (C.D. Cal. Aug 24, 2005) ...................................................................... 3

*In re Wall Street Access*,
    SEC Admin. Proc. File No. 3-12452 (Oct. 12, 2006) ................................................ 9

The SEC's brief in opposition confirms that this case is really about the violation of SEC regulations by brokers. The SEC admits that the regulations in question do not apply to the defendants, who are private traders in the marketplace. The SEC further admits that the defendants made no false statements or misleading omissions, owed no fiduciary duties, and did not engage in manipulative trading or sham transactions. Having made these concessions, the SEC nonetheless attempts to pin primary liability for securities fraud on the defendants – an impossible task in light of long-standing Supreme Court and Second Circuit case law.

The SEC advances the legally baseless theory that the defendants committed securities fraud by acting as the "architects" of a "scheme" in which the offending brokers acted as mere "conduits." According to the SEC, this "scheme" deceived mutual funds and their investors because brokers who submitted the trades for the defendants executed them after 4 p.m., when the mutual funds expected that the brokers would follow Rule 22c-1, which purportedly required brokers to execute the trades prior to 4 p.m.

The SEC thus attempts to ascribe liability to an unregulated private party based on alleged infractions of the rules by regulated broker-dealers, whom the SEC astonishingly characterizes as mere passive conduits of the defendants. In advancing this extraordinary theory, the SEC cites no authority holding that the breach of SEC regulations that govern brokers can be attributed to the customer who retains the broker, on the theory that the broker is a mere conduit for the customer.

The SEC also argues that the conduct engaged in by the defendant's brokers constituted a violation of Rule 22c-1. For the reasons set forth in our moving brief and below, we respectfully submit that the complaint does not adequately set forth facts alleging a violation of this rule, which is a pre-requisite for a finding of liability in this case. But even if the brokers violated

1

Rule 22c-1, liability for securities fraud premised on these violations cannot be placed on the defendants.

I.      **Rule 22c-1 Does Not Reach the Trading Conduct as Alleged in the Complaint**

Rule 22c-1[1] prohibits the sale of mutual fund shares "except at a price based on the current next asset value . . . *which is next computed* after a receipt of a tender [for the security]." 17 C.F.R. § 270.22c-1 (emphasis added). By its plain meaning, the rule allocates to an order a price equal to the NAV set at the time NAVs are *next computed* by the mutual fund. Nowhere does the rule establish a 4 p.m. cut-off for mutual fund trades or provide for a hard cut-off at the time of the applicable market close. And nowhere does the rule mention the time "as of" which mutual funds price their shares, much less mandate that all mutual fund tenders be received by that time.

In its opposition, the SEC nonetheless proposes an alternative interpretation, one which happens to track exactly its own proposed amendment of Rule 22c-1, and it asks the Court to defer to its new construction of the rule.

A court may defer to an agency interpretation of a regulation "only when the plain meaning of the rule itself is doubtful or ambiguous." *Riverkeeper, Inc. v. Environmental Protection Agency*, 475 F.3d 83, 117 (2d Cir. 2007). *Accord Christensen v. Harris Cty*, 529 U.S. 576, 588 (2000); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *Pfizer v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984) ("Deference to agency interpretation is not in order if the rule's meaning is clear on its face.").[2] The Supreme Court has refused to adopt an

---

[1]  Capitalized terms herein have the meaning as defined in the defendants' moving brief.

[2]  Where the plain language of a rule is clear, individuals are entitled to rely upon that language even if the agency promulgating the regulation intended a different result. *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm.*, 528 F.2d 645, 649 (5th Cir. 1976) ("a regulation cannot be construed to mean what an agency intended but did not adequately express"). Thus, the SEC's

2

agency's interpretation, even of its own regulation, where "to defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 476 U.S. at 588.

The portion of Rule 22c-1 at issue in this case is plain and contains no ambiguity. The rule speaks to the time a net asset value "is . . . computed." Adoption of the SEC's alternative position would do precisely what the Supreme Court prohibited in *Christensen* – create a new regulation under the guise of interpreting the original. 476 U.S. at 588.[3]

Moreover, the SEC is incorrect when it refers to its present litigation position with respect to Rule 22c-1 as a "longstanding interpretation." Opp. at 9 n.4. The 1968 Interpretive Release upon which the SEC relies addresses the entirely separate question of how to calculate the time of "*receipt of the [investor's] order*," *i.e.*, whether "it is the time of receipt of an order by a dealer or by an underwriter which will control the price at which the order is executed." *Staff Interpretive Positions Relating to Rule 22c-1*, Invest. Co. Act Rel. No. 5569, 1968 SEC LEXIS 979, at *2 (Dec. 27, 1968) ("Interpretive Release"). Thus, the only use of the phrase "as of" in the Interpretative Release relates to the time stamping of orders by mutual fund underwriters, not to the time for computing NAVs.

To the extent the Interpretive Release discusses the relevant time applicable to mutual fund NAV pricing, it confirms the defendants' reading of the rule. The Interpretive Release

---

repeated reference in its opposition to Congressional or agency intent is irrelevant. SEC Opposition to Defendants' Motion to Dismiss Complaint ("Opp.") at 6-8, 11.

[3] Although the SEC succeeded in prompting one district court to adopt its *post hoc* interpretation of Rule 22c-1 in an unreported order, *SEC v. JB Oxford Holdings, Inc., et al.*, No. 04-7084 (C.D. Cal. Aug 24, 2005), the Court is not bound by that ruling. The *JB Oxford* court purported to find ambiguity in the language of the rule, but did not explain the nature of the ambiguity, and thus provides no useful guidance. While choosing to defer to the SEC's litigation-generated interpretation, the *JB Oxford* court conceded that "the SEC does not appear to have considered the possibility that mutual funds might not calculate their net asset values precisely at the times announced," and that the SEC interpretive releases thus did not address the issue. *Id.* at 3.

postulates a hypothetical fund that "prices at 1:00 p.m. and 3:30 p.m." 1968 SEC LEXIS 979, at *4. Contrary to the SEC's view, the Interpretive Release refers to the time that the fund "prices at." It does not refer to the time "as of" which the fund calculates its prices, even though a few lines earlier it uses the phrase "as of" to refer to how mutual fund underwriters should time stamp order receipts.

The only other evidence concerning the Commission's alleged "longstanding interpretation" of Rule 22c-1 consists of administrative actions and complaints from 2005. Opp. at 9 n.4. These enforcement actions, all of which postdate the conduct alleged in the complaint, are *post hoc* positions developed in connection with litigation. Accordingly, they are not entitled to the deference that would be accorded to a formal agency interpretive release. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

In any event, regardless of whether the conduct of the Brokers constituted a violation of Rule 22c-1, such violation would in no way suggest that the defendants (their customers) are liable for securities fraud under Section 10(b). As explained in the defendants' moving brief and further below, even if Rule 22c-1 was violated, the complaint fails to allege a valid claim for securities fraud by the defendants.

**II.    The Complaint Does Not Properly Allege Securities Fraud**

The SEC concedes that the defendants made no misleading statements or omissions, owed no fiduciary duties to anyone in the market, and did not engage in either manipulative or sham transactions. These concessions are fatal to the SEC's case, because absent manipulation or the existence of a fiduciary duty, liability for securities fraud requires a showing of a misleading statement or omission. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.

4

1998).[4]  Mere knowledge of—and even assistance of—another person's fraud is insufficient to create primary liability under Section 10(b).  *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir. 1997).

Finding no support from the case law of the Second Circuit, the SEC relies on a handful of district court cases involving very different factual circumstances than those presented here. First, the SEC relies on cases where the plaintiff alleged that defendants engaged in manipulation-like conduct in the form of sham transactions with the purpose of "'*artificially affecting*' the price of securities." *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 337 (S.D.N.Y. 2004) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)) (emphasis in original).[5]  *See also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504-06 (S.D.N.Y. 2005) (holding that sham securitization and loan transactions that "distorted the prices of Parmalat securities" stated a claim under Section 10(b)).  Because the complaint does not allege the defendants engaged in sham transactions or similar conduct in order to artificially inflate or deflate the prices of securities, these cases are inapposite.

Indeed, in *Global Crossing*, Judge Lynch was careful to cabin his opinion, holding that "Subsection (a) and (c) of [Rule 10b-5] may only be used to state a claim . . . for the underlying deceptive devices or frauds themselves, and not as 'a short cut to circumvent Central Bank's limitations on liability . . . .'" 322 F. Supp. 2d at 337 n.17 (citing *In re Lernout & Haupsie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003)).  In *In re Refco Capital Markets Ltd. Brokerage*

---

[4]  The SEC, contradicting Second Circuit precedent, posits a gapingly broad doctrine of securities fraud that would cover virtually any conduct that is "'dishonest'" or might harm "'investor confidence.'" Opp. at 16 (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 493 (S.D.N.Y. 2005)).  The cases it relies upon, however, are entirely inapposite – for example, *SEC v. Zandford*, 535 U.S. 813, 819 (2002) involved a breach of fiduciary duty by a broker-dealer, and *United States v. Russo*, 74 F.3d 1383 (2d Cir. 1996) was a classic manipulation case.

[5]  The viability of these cases is uncertain, and the Second Circuit has yet to address squarely the scope of scheme liability presented in these cases.  *Cf. Regents of the University of California v. Credit Suisse First Boston*, 482 F.3d 372, 387, n.27 (5th Cir. 2007) (contending that the courts in *Global Crossing* and similar scheme liability cases had "gone awry" in expanding liability for deception beyond misleading statements and omissions).

*Cust. Sec. Litig.*, 2007 WL 2694469 at *7 (S.D.N.Y. Sept. 13, 2007), Judge Lynch elaborated further, holding that "the most basic element of all fraud claims is that the victim must be deceived by the *perpetrator's* words or actions . . . .[I]t is therefore necessary to identify the sense in which the conduct was deceptive, as opposed to merely untoward." *See also Parmalat*, 367 F. Supp. 2d at 497 ("[A]ny deceptive device or practice [other than manipulation] requires that someone misrepresent or omit something at some point").

Secondly, the SEC relies on *United States v. Finnerty*, 474 F. Supp. 2d 530 (S.D.N.Y. 2007) and *United States v. Bongiorno*, 2006 WL 1140864 (S.D.N.Y. May 1, 2006), in which specialists on the New York Stock Exchange were charged with violations of Rule 10b-5 based on their alleged violation of Stock Exchange rules that prohibited them from trading for their own accounts at favorable prices, instead of making those prices available to public customers. *Finnerty*, 474 F. Supp. 2d at 532; *Bongiorno*, 2006 WL 1140864, at *2.  In both cases, the court held that even if the specialists did not speak directly with public customers, they nonetheless could be held liable if the evidence demonstrated that customers had a prior expectation that the specialists would not divert the favorable prices for their own accounts, and that expectation was frustrated.  *Finnerty*, 474 F. Supp. 2d at 539-42; *Bongiorno*, 2006 WL 1140864, at *7.[6]

The regulatory "expectation" theory of liability set forth in *Finnerty* and *Bongiorno* has no application to this case.  The complaint does not allege that mutual funds, mutual fund investors, or anyone else had any expectation concerning the conduct of the defendants.  Moreover, specialists are subject to extensive, published stock exchange and SEC regulations,

---

[6] In *Finnerty*, the court found that the government had failed to introduce sufficient evidence of customer expectations (notwithstanding the existence of extensive New York Stock Exchange rules governing specialist conduct) and therefore overturned the guilty jury verdict.  474 F. Supp. 2d at 542.  In *Bongiorno*, the court held that the government had met its evidentiary burden.  *Bongiorno* is on appeal to the Second Circuit under the caption *United States v. Michael Hayward & Michael Stern*, 07-0331.

6

whereas the defendants are not subject to the SEC's late trading regulations. Accordingly, there could be no rational expectation that they would conduct themselves in accordance with them.

The SEC's response to the complaint's failure to allege any deceptive nexus between the defendants and the alleged victims – the mutual funds and their investors – is the contention that the defendants should be held liable as "architects" or "conduct[ors] [of] a fraudulent scheme," because they allegedly "enlisted the Introducing Brokers as conduits for their trading." Opp. at 1, 14. The SEC's rhetoric is not connected to any valid doctrinal basis for securities fraud liability,[7] and argumentative labels do not satisfy the requirement of Federal Rule of Civil Procedure 9(b) that fraud must be stated with particularity. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (holding that "allegations that are conclusory" are insufficient to state a fraud claim under Rule 9(b)). The SEC's use of verbal invective does not compensate for its failure to explain how the defendants (as opposed to the brokers) deceived mutual funds or their investors within the meaning of the securities laws.

Taking the allegations of the complaint in the light most favorable to plaintiff, they demonstrate merely that defendants were aware of the possible impropriety involved when Brokers placed trades after 4:00 p.m., but nonetheless sought out Brokers who were willing to place them. As the defendants in this case were "retail" traders, all of their purchases and sales of mutual fund shares had to be executed by the Brokers, and the complaint plainly indicates that

---

[7] Although a few cases in this District have discussed the concept of "conduit" in connection with securities fraud claims, the SEC does not cite these cases and they involve very different factual circumstances. *See In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998) (holding that statements of a corporate parent could be attributed to a corporate subsidiary where the parent did no more than "collect the information [from the subsidiary] and transcribe it onto the page"); *In re Altsom Sec. Litig.*, 454 F. Supp. 2d 187 (S.D.N.Y. 2005) (same). The concept of "conduit" as used in *Kidder* and *Altsom* has no application to the SEC's complaint. The Brokers, far from being passive shells operating within the same corporate umbrella as the defendants, are entirely separate, regulated entities. Moreover, the Brokers cannot logically be deemed to "conduits" for false statements made by the defendants, when the SEC concedes that the defendants did not make any false statements.

7

the Brokers executed trades after 4 p.m. as part of their ordinary course of business.[8] Thus, at best, the allegations of the complaint support an inference that defendants had knowledge of regulatory violations of others, obtained an economic advantage from those violations, and did nothing to reveal or prevent those violations. Such conduct is insufficient to make out a case of securities fraud. *Chiarella v. United States*, 445 U.S. 222 (1980) (holding that in the absence of a duty to another, taking "unfair advantage" does not constitute securities fraud); *Refco*, 2007 WL 2696669, at *9 n.7 (holding that "bad conduct" is not fraud absent deception of another).[9]

The very structure of Rule 22c-1(a) leads inevitably to the conclusion that the Brokers, and not their customers, were the primary actors in the alleged late trading. Not only does the rule directly apply to the Brokers (and not their customers), but it also tasks the Brokers (and not their customers) with the responsibility of informing the mutual fund's underwriter of the time at which the Broker received the order. Interpretive Release, 1968 SEC LEXIS 979, at *3. Thus, any false misrepresentation made to the mutual funds concerning the timing of orders could only come from the Brokers. In short, contrary to the SEC's contention, the defendants were in no position to "deceive the mutual funds into believing their trades had not in fact been placed before 4:00 p.m." Opp. at 20.

Indeed, in prior enforcement actions, the SEC has acknowledged that the regulatory scheme assigns responsibility for compliance with Rule 22c-1 to brokers, as opposed to their customers. For example, in its cease-and-desist order against broker Pritchard Capital Partners

---

[8]   Memorandum in Support of Defendants' Motion to Dismiss, at 14-15.

[9]   The SEC relies on *In re Mutual Funds Invest. Litig.*, 384 F. Supp. 845 (D. Md. 2005) for the proposition that "late trading is inherently fraudulent." Opp. at 14-15. The court in that case did not explain why section 10(b) liability could be attributed to traders not bound the SEC's late trading rules, a conclusion at odds with the law of the Second Circuit. *SEC v. JB Oxford Holdings, Inc.*, CV 04-07084, 2004 U.S. Dist LEXIS 29494 (C.D. Cal. Nov. 9, 2004), also cited by the SEC at Opp. at 17-18, is inapposite, because the defendant in *JB Oxford* was a clearing Broker, and hence was alleged to have effected trade executions in direct violation of Rule 22c-1.

LLC ("Pritchard"), the SEC alleged that Pritchard improperly permitted its customers to submit late trades.[10] *In re Pritchard Capital Partners, LLC*, SEC Admin. Proc. File No. 3-12753 at ¶¶ 27, 29 (Sept. 7, 2007) (attached to the Affirmation of Emma Terrell dated Nov. 30, 2007 "Terrell Aff." as Ex. A). The SEC further alleged a number of improper actions by Pritchard, such as failing to document trades properly, failing to maintain required books and records, and failing to supervise individual brokers. *Id.* at ¶¶ 30-31. Similarly, in its cease-and-desist order against Wall Street Access, another firm with whom the defendants are alleged to have traded, the SEC contended that it was the brokerage firm that was responsible for executing the alleged late trades. *In re Wall Street Access*, SEC Admin. Proc. File No. 3-12452 at ¶ 1 (Oct. 12, 2006) (Terrell Aff. Ex. B). The SEC in that case further contended that Wall Street Access, by and through Gene Mancinelli and other employees, "utilized deceptive tactics" to confuse the mutual funds and "provided advice to their hedge fund customers" concerning how to place trades. *Id.* at ¶¶ 1, 14-15. These allegations are repeated in substance in the SEC's civil complaint against Mancinelli individually. Complaint filed October 2, 2006 in *SEC v. Mancinelli*, 06-CV-7885, at ¶¶ 49-61 (Terrell Aff. Ex. C). At no point did the SEC suggest that Wall Street Access or Pritchard were mere passive conduits for their customers; on the contrary the cease-and-desist orders emphasize the specific independent actions and omissions of the Brokers in alleged violation of their statutory duties.

Quite simply, it is extraordinary that the agency charged with administering a comprehensive scheme of broker-dealer regulation would take the position that brokers who breach SEC regulations imposed on them can be deemed to be the passive conduits of their customers. The entire statutory scheme overseen by the SEC, in its application to brokers,

---

[10] Based on the factual allegations of the complaint (including the alleged trading periods and clearing brokers), it is the understanding of the defendants that Pritchard is Broker B in the complaint.

9

operates on the diametrically opposed view that brokers are independent fiduciaries, charged with their own statutory and regulatory obligations separate and apart from any rules applicable to other market participants. The rules on late trading are a perfect example: the regulations oblige brokers, not their customers, to ensure appropriate prices are assigned and to generate and maintain appropriate time of trade information and trading records. Interpretive Release, 1968 SEC LEXIS 979, at *3-4. If the violation of those rules can be the predicate for securities fraud, then it is the Brokers, not the customers who are primarily liable for the violation.

## CONCLUSION

For the reasons set forth above, and in the Memorandum in Support of the Motion to Dismiss, dated September 18, 2007, the defendants respectfully request that the complaint be dismissed with prejudice in its entirety.

| | |
|---|---|
| New York, New York<br>Dated: November 30, 2007 | COOLEY GODWARD KRONISH LLP<br><br>By:     /s/ Alan Levine<br>    Alan Levine (AL-1073)<br>    Celia Goldwag Barenholtz (CGB-9126)<br>    Jason Koral (JK-1044)<br>    Emma Terrell (ET-1414)<br><br>1114 Avenue of the Americas<br>New York, New York  10036<br>(212) 479-6000<br><br>*Attorneys for Defendants*<br>*Simpson Capital Management, Inc.*<br>*and Robert A. Simpson*<br><br><br>CLAYMAN & ROSENBERG<br><br>By:     /s/ Charles E. Clayman<br>    Charles E. Clayman (CC-0346)<br>    Thomas C. Rotko (TR-9339)<br><br>305 Madison Avenue, Suite 1301<br>New York, New York 10165<br>(212) 922-1080<br><br>*Attorneys for Defendant John C. Dowling* |

11