# EXHIBIT B

CORRECTED

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 8749 / October 12, 2006

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 54596 / October 12, 2006

**INVESTMENT COMPANY ACT OF 1940**
Release No. 27517 / October 12, 2006

**ADMINISTRATIVE PROCEEDING**
File No. 3-12452

| | |
|---|---|
| In the Matter of<br><br>WALL STREET ACCESS,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940 |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 15(b), and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Wall Street Access ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial

Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that

### Summary

1. Wall Street Access, a registered broker-dealer, permitted its hedge fund customers to market time, and in one case late trade, mutual funds. Specifically, from April 2001 through October 2001, Wall Street Access accepted and executed more than 2,000 late trades in mutual funds for one customer. Registered representative ("RR") Gene T. Mancinelli ("Mancinelli") permitted a hedge fund customer ("Hedge Fund A") routinely to place orders to purchase, redeem or exchange mutual fund shares well after 4:00 p.m. ET, the time as of which funds calculate their net asset value ("NAV"). Mancinelli was well aware that the late trades would receive that day's NAV as opposed to the next trading day's NAV. Additionally, Mancinelli utilized deceptive tactics, such as using multiple accounts and multiple RR numbers, to hide the identity of his market timing customers from mutual funds, and otherwise facilitate his customers' market timing strategies.

### Respondent

2. **Wall Street Access** is a registered broker-dealer located in New York, New York. Wall Street Access was formed as a partnership in 1981. It has been registered as a broker-dealer since 1981.

### Background

3. In March 2001, Wall Street Access hired Mancinelli and other employees to develop a fixed income business with an expectation that he would also develop a mutual fund trading business. Wall Street Access had dealer agreements with numerous mutual funds' primary underwriters. Wall Street Access was also a correspondent firm of a clearing firm, and Wall Street Access was authorized to sell mutual funds pursuant to the clearing firm's dealer agreements with mutual funds.

4. Wall Street Access' and its clearing firm's dealer agreements contained provisions requiring the broker-dealers to sell the mutual fund shares in accordance with the federal securities laws. In addition, most dealer agreements contained some version of the following provision:

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

> You are to offer and sell shares of each Fund only at the public offering price which shall then be currently in effect, and only in the manner and in accordance with the terms of the current prospectus and statement of additional information (hereafter, the "prospectus") and new account application for each such Fund.

Many of the mutual funds with which Wall Street Access and its clearing firm had dealer agreements had restrictions or prohibitions on market timing in their prospectuses.

5.   The mutual fund prospectuses also disclosed the time that the NAV was set for purposes of determining the price at which shareholders may buy or redeem mutual fund shares. These prospectuses generally required that orders to purchase, redeem or exchange shares of a fund must be received no later than 4:00 p.m. ET to effect transactions at that day's NAV.

### Wall Street Access Expands Its Market Timing, Late Trading Business

6.   In April 2001, Mancinelli and another RR each had one customer that market timed mutual funds. Wall Street Access' market timing business then grew quickly. By October 2001, Wall Street Access had fourteen customers who were market timing mutual funds.

7.   In April 2001, Hedge Fund A began late trading through Wall Street Access. Hedge Fund A would typically fax a sheet of proposed trades prior to 4:00 p.m. ET, which was labeled "tentative trades." The faxed sheet of proposed trades functioned as an order ticket. The faxed spreadsheet also stated, "Please wait for a call from [Hedge Fund A] for execution." Hedge Fund A would then contact Wall Street Access employees after 4:00 p.m. ET and instruct them to execute all or some of the proposed trades, change certain trades, or cancel certain trades, with the understanding that these trades would be executed at that day's NAV. Hedge Fund A often late traded in mutual funds with whom Wall Street Access had dealer agreements.

8.   Recordings of telephone conversations demonstrate that Wall Street Access allowed Hedge Fund A to late trade. Hedge Fund A would often call Wall Street Access with its post 4:00 p.m. ET orders. On occasion, Wall Street Access employees called Hedge Fund A after 4:00 p.m. ET to ask whether Hedge Fund A wanted to trade that day. On numerous occasions, the taped phone calls show that Wall Street Access was willing to process trades even after 5:00 p.m. ET at Hedge Fund A's request.

### Wall Street Access Knew Late Trading Was Improper

9.   In approximately May 2001, Wall Street Access' former Vice-Chairman asked Wall Street Access' compliance officer and general counsel (the "General Counsel") about late trading. On June 11, 2001, the General Counsel followed up on the discussion with an email to the Vice-Chariman regarding "Purchases & Sales of Mutual Fund Shares." The email indicated that "[p]ermitting a customer to cancel an accepted order after 4:00 would appear to be inconsistent with Rule 22c-1 [under the Investment Company Act] and may open [Wall Street Access] up to liability for causing a disadvantage to other shareholders in the mutual fund. Therefore, [Wall

3

Street Access] should have a hard cut-off time for acceptance and cancellation of mutual fund orders that corresponds to the time that the mutual fund does their NAV calculation."

10. Later on June 11, 2001, the Vice-Chairman forwarded this email to all relevant Wall Street Access employees, including Mancinelli. The Vice Chairman added:

> I asked [the General Counsel] to review under what circumstances we could accept trades in mutual funds after 4PM. The attached memorandum explains our policy. Please make sure we advise our clients.
>
> The only trades which should be excepted [sic] after 4PM are corrections.

11. Despite receiving this email, Mancinelli continued to permit Hedge Fund A to late trade. In fact, just four days later, on June 15, 2001, Mancinelli called a Wall Street Access employee at 5:02 p.m. ET and stated he "just got a phone call from [a Hedge Fund A representative], he needs to make a move." Mancinelli then directed the employee to execute trades in five of Hedge Fund A's accounts.

12. Hedge Fund A's late trading continued unabated until mid-October 2001.

**Mancinelli Utilized Deceptive Practices to Facilitate His Customers' Market Timing**

13. Mancinelli and his team also utilized deceptive practices to facilitate Mancinelli's customers' market timing of mutual funds. As an initial matter, after Mancinelli's customers placed market timing trades in mutual funds, Mancinelli and other employees received letters from mutual funds complexes warning that the funds prohibited market timing and in some cases the funds prohibited future trading in their funds entirely. For example, a mutual fund complex sent three letters to Mancinelli dated September 10, 2001, which each stated that the listed accounts had "excessive exchange activity" and that it would "not tolerate abusive exchange activity due to the burden it places on other fund shareholders." The September 10, 2001 letters stated that the mutual fund complex would reject all orders for the listed accounts effective immediately. Further, the September 10, 2001 letters stated the mutual fund complex would not accept any future investments on behalf of these Wall Street Access customers.

14. To facilitate their customers' market timing trading, Wall Street Access employees provided advice to their hedge fund customers. For example, on March 7, 2001, a Wall Street Access supervisor instructed an RR to pass on information to a market timing customer that would "help keep them below the radar screen."

15. Mancinelli and his team understood that using multiple accounts would help facilitate customers' ability to market time. Wall Street Access opened multiple accounts for each market timing customer. For example, Hedge Fund A opened ten accounts at Wall Street Access.

16.  Mancinelli and his team also used multiple RR numbers to help disguise their customers' market timing trading. Mutual fund complexes often identified market timers through the RR number on the brokerage account. If the RR used a different RR number for his customer accounts, he could deceive the mutual fund and enable his customer to trade in a mutual fund even after one account had been blocked. Specifically, Mancinelli used other employees' RR numbers, along with his own, to facilitate his customers' market timing strategies. For example, Hedge Fund A accounts had at least four different RR numbers, even though Mancinelli was the sole RR for these customers.

17.  For example, on June 27, 2001, a mutual fund representative spoke to Mancinelli and informed him that his customers' accounts were restricted indefinitely from doing business with the mutual fund complex due to his customers' market timing activity. Additionally, on July 3, 2001, the same mutual fund complex sent a letter to Mancinelli that again stated that excessive exchanges were occurring in the brokerage accounts and that this exchange activity had a detrimental effect on fund performance. The letter further notified Mancinelli that, among other things, the fund complex would not allow any of his customers to make any future exchanges. Mancinelli, however, continued to allow his customers to trade in the complex's mutual funds. For example, on October 1, 2001, Mancinelli's customer placed additional trades in the mutual fund with a different account that had a different employee's RR number on the account. After subsequent trading, the mutual fund complex eventually blocked this account as well.

### Wall Street Access Failed to Maintain Required Books and Records

18.  Wall Street Access was unable to locate and produce to the Commission staff the vast majority of order tickets relating to trades executed for certain customers, including Hedge Fund A.

### Wall Street Access Profited From Market Timing and Late Trading

19.  Wall Street Access charged its customers an administrative fee for its services. Under this fee arrangement, the customer paid a percentage of the fair market value of the accounts for which Mancinelli executed market timing trades. From April 2001 through October 2001, Wall Street Access received approximately $250,000 in administrative fees from its one late trading and other market timing customers. In addition to the administrative fees, Wall Street Access received other fees and commissions from the mutual funds. From April 2001 through October 2001, mutual funds paid Wall Street Access fees and commissions of approximately $214,897.

### VIOLATIONS OF THE SECURITIES LAWS

20.  As a result of the conduct described above, Wall Street Access willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder which prohibit fraudulent conduct in the offer and sale of securities and in connection with the purchase or sale of securities. Specifically, Wall Street Access participated in a fraudulent

scheme to permit Hedge Fund A to place trades in mutual funds after the close of the United States equity markets, but nonetheless receive same-day NAV pricing. Wall Street Access consistently executed Hedge Fund A's post 4:00 p.m. ET trading instructions as though Wall Street Access had received the instructions before 4:00 p.m. Additionally, Wall Street Access utilized deceptive practices to conceal its customers' market timing trading from mutual funds.

21.     As a result of the conduct described above, Wall Street Access willfully violated Section 15(c) of the Exchange Act and Rule 10b-3, which prohibit a broker or a dealer from effecting any transaction in, or inducing or attempting to induce the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance. Specifically, Wall Street Access participated in a fraudulent scheme to permit Hedge Fund A to place trades in mutual funds after the close of the United States equity markets, but nonetheless receive same-day NAV pricing. Wall Street Access consistently executed Hedge Fund A's post 4:00 p.m. ET trading instructions as though Wall Street Access had received the instructions before 4:00 p.m. Additionally, Wall Street Access utilized deceptive practices to conceal its customers' market timing trading from mutual funds.

22.     As a result of the conduct described above, Wall Street Access willfully violated Section 17(a) of the Exchange Act and Rule 17a-4 thereunder, which require that broker-dealers preserve certain books and records, including order tickets required to be made pursuant to Rule 17a-3. Wall Street Access failed to preserve order tickets, including order tickets reflecting Hedge Fund A's trading.

23.     As a result of the conduct described above, Wall Street Access willfully violated Rule 22c-1 promulgated under Section 22(c) of the Investment Company Act, which prohibits dealers in a mutual fund's shares, among others, from executing a trade in that mutual fund's shares at that day's NAV if the trade was received after the time as of which the mutual fund has calculated that day's NAV (e.g., 4:00 p.m. ET). Wall Street Access, which had dealer agreements with the primary underwriters of several mutual funds that were late traded by Hedge Fund A, received numerous orders for trades in those mutual funds after 4:00 p.m. ET, yet executed the trades at the current day's NAV.
.

**Undertaking**

24.     <u>Ongoing Cooperation</u>.  In determining to accept the Offer, the Commission has considered the following undertaking by Wall Street Access:

Wall Street Access shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings to which the Commission is a party relating to or arising from the matters described in the Order. In connection with such cooperation, Wall Street Access has undertaken:

        a.     To produce, without service of a notice or subpoena, any and all documents and other information requested by the Commission's staff;

6

      b.      To use its best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

      c.      To use its best efforts to cause its employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

      d.      That in connection with any testimony of Wall Street Access to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, Wall Street Access:

            i.      Agrees that any such notice or subpoena for Wall Street Access' appearance and testimony may be served by regular mail on its attorney; and

            ii.      Agrees that any such notice or subpoena for Wall Street Access' appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest, and for the protection of investors to impose the sanctions agreed to in Wall Street Access' Offer.

Accordingly, pursuant to Section 8A of the Securities Act, Sections 15(b) and 21C of the Exchange Act, and Sections 9(b) and 9(f) of the Investment Company Act, it is hereby ORDERED that:

    A.    Respondent Wall Street Access cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act, Sections 10(b), 15(c) and 17(a) of the Exchange Act and Rules 10b-3, 10b-5 and 17a-4 thereunder, and Rule 22c-1 promulgated under Section 22(c) of the Investment Company Act.

    B.    Respondent Wall Street Access is hereby censured.

    C.    IT IS FURTHERED ORDERED that Respondent shall, within 30 days of the entry of this Order, pay disgorgement of $464,897 and prejudgment interest of $103,187.41 to the Securities and Exchange Commission. Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way,

Alexandria, Stop 0-3, VA 22312; and (D) submitted under cover letter that identifies Wall Street Access as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Helene Glotzer, Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 3 World Financial Center, New York, NY 10281.

      D.      It is further ordered that Respondent shall, within 30 days of the entry of this Order, pay a civil money penalty in the amount of $120,000 to the Securities and Exchange Commission. Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies Wall Street Access as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Helene Glotzer, Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 3 World Financial Center, New York, NY 10281.

      By the Commission.

                                                        Nancy M. Morris
                                                         Secretary