**EXHIBIT C**

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
                                                                    :
                               Plaintiff,                       :
                                                                    :
            - against -                                        :       06 CV 7885
                                                                    :
GENE T. MANCINELLI,                                    :       COMPLAINT
                                                                    :
                               Defendant.                    :
                                                                    :
------------------------------------------------------------x

[Stamp: RECEIVED OCT 0 2 2006 U.S.D.C. S.D.N.Y. CASHIERS]

[Stamp: JUDGE KOELTL]

The plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendant Gene T. Mancinelli ("Mancinelli" or the "Defendant"):

## SUMMARY

1.     The Commission brings this enforcement action against Mancinelli, a registered representative ("RR" or broker) who worked at Wall Street Access. Mancinelli and his customers defrauded mutual funds by engaging in late trading and by deceptively market timing mutual funds.

2.     Specifically, from approximately April 2001 through October 2001, Mancinelli and others acting at his direction accepted and executed more than 2,000 late trades in mutual funds for a hedge fund customer ("Hedge Fund A"). Mancinelli permitted Hedge Fund A

routinely to place orders to purchase or redeem mutual fund shares well after 4:00 p.m. ET, the time as of which funds calculate their net asset value ("NAV"). Mancinelli and Hedge Fund A knew that the late trades would receive that day's NAV as opposed to the next trading day's NAV.

3. Additionally, Mancinelli and his market timing customers utilized deceptive tactics to deceive mutual funds and facilitate these customers' market timing strategies. For example, Mancinelli opened multiple accounts for his market timing customers, and used multiple broker identification numbers ("RR numbers") to conceal his customers' identity from mutual funds that had previously identified these customers as market timers and blocked their trading.

4. Mancinelli and Wall Street Access benefited from the late trading and market timing through, among other things, the fees Mancinelli's customers paid. At the same time, the mutual funds were harmed by the market timing and late trading of Mancinelli and his customers.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5. Mancinelli, directly or indirectly, singly or in concert, has engaged in transactions, acts, practices, or courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Mancinelli has also engaged in acts, practices, or courses of business that have aided and abetted violations of Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c), and Rule 10b-3, 17 C.F.R. § 240.10b-3.

2

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

6. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1). The Commission seeks a permanent injunction to restrain and enjoin Mancinelli from engaging in the transactions, acts, practices, and courses of business alleged herein. The Commission also seeks a judgment ordering Mancinelli to disgorge his ill-gotten gains and to pay prejudgment interest thereon. The Commission also seeks the imposition of civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Finally, the Commission seeks all other just and appropriate relief.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a), and Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa.

8. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York. For instance, Wall Street Access maintained its principal place of business in New York, New York, and Mancinelli engaged in the conduct alleged herein while working at Wall Street Access' office located in New York, New York.

9. Mancinelli, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of

3

business alleged herein.

## DEFENDANT AND RELEVANT ENTITY

10.    **Mancinelli**, age 45, is a resident of Oakdale, New York. Mancinelli was a RR and managing director at Wall Street Access from March 2001 to May 2002.

11.    **Wall Street Access** is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b). Wall Street Access is a New York partnership that was formed in 1981. Wall Street Access is a member of the National Association of Securities Dealers and the New York Stock Exchange.

## FACTS

### Late Trading and Market Timing

12.    "Late trading" refers to the practice of placing orders to buy, redeem, or exchange mutual fund shares after the time as of which mutual funds calculate their NAV, usually as of the close of trading at 4:00 p.m. ET, but receiving the price based on the prior NAV determined as of 4:00 p.m.

13.    Rule 22c-1(a), 17 C.F.R. § 270.22c-1, adopted pursuant to Section 22(c) of the Investment Company Act, 15 U.S.C. § 88a-22(c), requires registered investment companies issuing redeemable securities, principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem. Mutual funds generally determine the daily price of mutual fund shares as of 4:00 p.m. ET. Mutual funds' prospectuses generally state that orders received before 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. that day, and that orders received after 4:00 p.m. are executed at the price determined as of 4:00 p.m. the next trading day.

14. "Market timing" includes: (i) frequent buying and selling of shares of the same mutual fund or (ii) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing can harm other mutual fund shareholders because it can dilute the value of their shares. Market timing, while not illegal per se, can also disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur considerable extra costs associated with excessive trading and, as a result, cause damage to other shareholders in the funds. Market timing may be illegal, for example, if deception is used to induce a mutual fund to accept trades that it otherwise would not accept under its own market timing policies.

### Wall Street Access Served as a Dealer for Mutual Funds

15. Wall Street Access entered into agreements with the distributors, or principal underwriters, of approximately eighty-nine mutual fund families. Each of these agreements, referred to as "dealer agreements," authorized Wall Street Access to serve as a dealer for a particular mutual fund family's mutual funds, and thereby sell the family's mutual funds to Wall Street Access' customers.

16. In addition, Wall Street Access served as a correspondent firm of a broker-dealer ("Broker-Dealer A") and entered into a clearing agreement with Broker-Dealer A. Broker-Dealer A had dealer agreements with more than 100 mutual funds families. As a correspondent firm, Wall Street Access had implicit authorization to sell mutual funds pursuant to Broker-Dealer A's dealer agreements with the mutual fund families.

17. The dealer agreements that Wall Street Access and Broker-Dealer A entered into typically required them to sell the fund families' mutual funds in accordance with the federal securities laws and the terms of the mutual funds' prospectuses.

18. Prospectuses for many mutual funds, including funds subject to the dealer agreements Wall Street Access and Broker-Dealer A entered into, prohibited market timing. For example, some prospectuses prohibited frequent trading altogether, while others contained limitations on the number of trades that an investor could make within a specific time period.

19. In addition, many mutual fund prospectuses, including funds subject to the dealer agreements Wall Street Access and Broker-Dealer A entered into, required that Wall Street Access receive orders to purchase, redeem, or exchange shares of a fund no later than 4:00 p.m. ET to be executed at that day's NAV.

### Wall Street Access Hired Mancinelli
### To Develop a Mutual Fund Trading Business

20. In March 2001, Wall Street Access hired Mancinelli to develop both a fixed income municipal bond trading desk and a mutual fund trading business.

21. As of April 2001, Mancinelli had one customer that utilized a mutual fund market timing strategy.

22. Shortly after joining Wall Street Access, Mancinelli's market timing business rapidly expanded.

23. Indeed, by October 2001, Mancinelli had approximately thirteen customers who were market timing mutual funds.

### Mancinelli and a Customer Defrauded
### Mutual Funds by Engaging in Late Trading

24. In April 2001, Hedge Fund A opened accounts at Wall Street Access with Mancinelli.

25. Immediately upon opening accounts at Wall Street Access, Hedge Fund A began to engage in late trading of mutual funds.

6

26. Moreover, Hedge Fund A engaged in late trading on an almost daily basis.

27. Specifically, as Mancinelli knew, some time prior to 4:00 p.m. ET, Hedge Fund A would typically send a facsimile to Wall Street Access listing proposed trades for the day.

28. Hedge Fund A labeled the listing of proposed trades as "tentative trades."

29. Further, Hedge Fund A instructed Wall Street Access to then wait for a call from Hedge Fund A before executing the trades.

30. After 4:00 p.m. ET, Hedge Fund A would then provide the final day's trading instructions to Mancinelli or other Wall Street Access employees (who acted at Mancinelli's direction). After 4:00 p.m. ET, Hedge Fund A would instruct Mancinelli or other employees to execute all or some of the proposed trades. Alternatively, after 4:00 p.m. ET, Hedge Fund A would change or cancel some of the trades, and would direct Mancinelli or other employees to execute the remainder of the trades.

31. On occasion, Mancinelli or another employee acting at Mancinelli's direction, initiated contact with Hedge Fund A after 4:00 p.m. ET to determine if Hedge Fund A had any modifications to that day's trading instructions.

32. For example, at 4:55 p.m. ET on October 2, 2001, Hedge Fund A called one of Mancinelli's assistants, a Wall Street Access employee who was acting at Mancinelli's direction, and asked him to execute 33 trades. Hedge Fund A also asked if Wall Street Access was able to "yank some on a best efforts basis" if Hedge Fund A called again later. Mancinelli's assistant responded that he would stay until 5:10 p.m. ET. Wall Street Access then cancelled certain trades. Account records show that the Hedge Fund A accounts made only 30 trades that day.

33. As an additional example, on June 15, 2001, Mancinelli received trading instructions for the day from Hedge Fund A well after 4:00 p.m. ET. Mancinelli then directed

7

another Wall Street Access employee to execute the orders at approximately 5:02 p.m. ET. [Additional examples of late trades are provided in Appendix A.]

34. Although Hedge Fund A regularly contacted Wall Street Access after 4:00 p.m. ET with the day's final trading instructions, Hedge Fund A and Mancinelli understood that Wall Street Access would execute the trades at that day's NAV.

### Mancinelli's Late Trading Violated Wall Street Access' Dealer Agreements

35. Many of Hedge Fund A's late trades were orders to purchase, exchange, or redeem mutual funds of fund families with which Wall Street Access had dealer agreements.

36. For example, on October 1, 2001, Hedge Fund A contacted a Wall Street Access employee at 4:55 p.m. ET and directed the employee to execute thirty trades in mutual funds of fund families with whom Wall Street Access had dealer agreements.

### Mancinelli Understood that Late Trading Was Illegal

37. Mancinelli and his customers knew that late trading was illegal.

38. For example, shortly after Mancinelli joined Wall Street Access, he received an email authored by the firm's compliance officer and general counsel that advised him that late trading was illegal.

39. Specifically, on June 11, 2001, Wall Street Access' compliance officer and general counsel authored an email entitled "Purchases & Sales of Mutual Fund Shares," which contained the following:

> A couple of weeks ago we discussed the issue of when orders to buy or sell mutual fund shares are deemed to be received, although prior to transmission via Fund/Serv.
>
> SEC Rule 22c-1, under the Investment Company Act of 1940, controls the issue and requires that purchases, sales, or redemptions of mutual fund shares must be done based on the current net asset value which is next computed after receipt of the order. SEC No-Action Letters and

8

> Interpretive Releases dictate that an order is deemed to be received by the mutual fund at the time of receipt by the retail broker, hence permitting after hours transmittal via Fund/Serv. They also dictate that the underlying policy is to prevent an investor from taking advantage of a swing in the market by purchasing or selling at prior price that does not reflect the resulting swing in the fund's NAV.
>
> Permitting a customer to cancel an accepted order *after* 4:00 would appear to be inconsistent with Rule 22c-1 and may open us up to liability for causing a disadvantage to other shareholders in the mutual fund. Therefore, we should have a hard cut-off time for acceptance and cancellation of mutual fund orders that corresponds to the time that the mutual fund does their NAV calculation. As well, according to some discussion in one No-Action Letter, the same potential liability may exist for mutual fund transactions done on an "as of" basis.
>
> Let me know if you want me to follow up with the operations area on this issue.

40. The same day, one of the recipients of the email forwarded it to Mancinelli, adding the following:

> I asked [the compliance officer and general counsel] to review under what circumstances we could accept trades in mutual funds after 4PM. The attached memorandum explains our policy. Please make sure we advise our clients.
>
> The only trades which should be excepted [sic] after 4PM are corrections.

41. Despite receiving this email, Mancinelli continued to accept and execute late trades from Hedge Fund A.

42. For example, as alleged in paragraph 33, *supra*, on June 15, 2001, Mancinelli accepted an order from Hedge Fund A well after 4:00 p.m. ET and directed another Wall Street Access employee to execute the trade at approximately 5:02 p.m. that day.

**Wall Street Access Finally Halted Late Trading**

43. On October 5, 2001, Wall Street Access's Vice Chairman sent an email to Mancinelli reiterating that all mutual fund trades had to be received from Hedge Fund A by 4:00

9

p.m. ET.

44. On October 8, 2001, a Wall Street Access employee also sent Mancinelli an email indicating that Wall Street Access' clearing firm, Broker-Dealer A, would not accept orders from Wall Street Access after 4:00 p.m. ET.

45. Mancinelli responded by email: "Whatever."

46. The Wall Street Access employee then wrote: "I'm serious Gene. This is our position and you must respect that."

47. Mancinelli again responded by email: "Whatever."

48. Despite those direct instructions, Mancinelli continued to accept and execute late trades from Hedge Fund A until October 18, 2001, when Wall Street Access finally stopped all late trading.

### Mancinelli Engaged in Deceptive Market Timing

49. Mancinelli, and other Wall Street Access employees acting at his direction, also utilized deceptive practices to facilitate their customers' market timing of mutual funds.

50. Mancinelli and the other employees received letters from certain mutual fund families both warning that the funds prohibited market timing and prohibiting Mancinelli's customers from future trading in the funds.

51. For example, prior to June 12, 2001, a mutual fund family ("Mutual Fund Family A") warned Mancinelli that it discouraged market timing.

52. On September 10, 2001, Mutual Fund Family A sent three letters to Mancinelli listing his customers' accounts that had "excessive exchange activity." The letters further indicated that Mutual Fund Family A would "not tolerate abusive exchange activity due to the burden it places on other fund shareholders." Further, Mutual Fund Family A informed

Mancinelli that it would reject all orders for the listed accounts, effective immediately, and that it would not accept any future investments from these Mancinelli customers "or any other clients in which exchange activity is anticipated and is part of the client's objective."

53. Because certain mutual funds prohibited market timing, Mancinelli and his market timing customers opened multiple accounts so that when mutual funds blocked certain accounts, the customers could continue trading in new accounts that the mutual funds had not yet identified as market timers.

54. For example, Hedge Fund A had at least ten accounts at Wall Street Access.

55. In addition to blocking market timers based on the account numbers, mutual funds would also sometimes identify market timers by the RR number on the account. To avoid having customers' market timing trades blocked, Mancinelli would sometimes use other employees' RR numbers to process trades.

56. For example, Mancinelli and other employees acting at his direction entered Hedge Fund A's trades using at least four different RR numbers.

57. Mancinelli and his market timing customers understood that using multiple accounts and multiple RR numbers would help conceal the customers' identities from mutual fund families, and enable the customers to market time mutual funds of fund families that had previously identified the customers as market timers.

58. For instance, on June 27, 2001, a representative from a mutual fund family ("Mutual Fund Family B") informed Mancinelli that Mutual Fund Family B had restricted him and Wall Street Access from trading in Mutual Fund Family B's mutual funds due to Mancinelli's customers' market timing activity.

59. On July 3, 2001, Mutual Fund Family B sent a letter to Mancinelli that indicated

11

that excessive exchange activity had a detrimental effect on fund performance, and again notified Mancinelli that Mutual Fund Family B would not allow his customers' to make any future exchanges.

60.     Mancinelli ignored these instructions from Mutual Fund Family B, and he continued to execute his customers' trades in Mutual Fund Family B's mutual funds through means intended to evade detection by Mutual Fund Family B.

61.     For example, on October 1, 2001, Mancinelli executed market timing trades for one of his customers in funds in Mutual Fund Family B using another Wall Street Access employee's RR number.

### Mancinelli Profited from His Customers' Late Trading and Market Timing While Mutual Funds Suffered Harm

62.     During the period from April 2001 through October 2001, Mancinelli earned ill-gotten gains through the fraudulent late trading and market timing.

63.     In particular, Wall Street Access entered into agreements with its mutual fund customers through which the customers paid Wall Street Access an administrative fee for services, such as executing market timing trades.

64.     From April 2001 through October 2001, customers engaged in market timing and late trading paid Wall Street Access approximately $250,000 in fees.

65.     In addition, Wall Street Access received compensation from mutual fund families, in the form of 12b-1 fees, for selling the mutual funds.

66.     Wall Street Access received approximately $215,000 from mutual funds during the period from April 2001 through October 2001.

67.     Wall Street Access paid Mancinelli a salary plus a percentage of the revenues that the mutual fund operations generated.

68. During 2001, Wall Street Access paid Mancinelli approximately $630,000.

69. At the same time, Mancinelli's customers profited from late trading and market timing of mutual funds.

70. For instance, Hedge Fund A earned profits of approximately $3.8 million through its late trading of mutual funds.

71. Further, Mancinelli's customers' trading diluted the value of mutual funds they traded and increased transaction costs associated with the management of the funds.

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act, and Rule 10b-5**

72. The Commission repeats and realleges paragraphs 1 through 71 above.

73. Mancinelli directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

74. As part of and in furtherance of a fraudulent scheme, Mancinelli accepted and executed late trades in mutual funds. For instance, Mancinelli allowed Hedge Fund A to place trades in mutual funds after the 4:00 p.m. ET market close, and he executed those trades as if he had received them before 4:00 p.m. As Mancinelli and Hedge Fund A knew, Hedge Fund A

received that day's NAV on late trades instead of the following day's NAV. Further, Mancinelli employed deceptive practices to conceal his market timing customers' identities from mutual funds, and to enable them to market time mutual funds of fund families that had previously identified these customers as market timers, and prohibited further trading. For example, Mancinelli opened multiple accounts for his customers and entered their trades using multiple RR numbers.

75. Mancinelli misrepresented, and failed to disclose, material information to mutual funds to induce them to accept Mancinelli's customers' trades in the funds.

76. Mancinelli knowingly or recklessly engaged in the fraudulent conduct alleged above. Mancinelli also knowingly or recklessly made material misrepresentations and omissions to mutual funds.

77. By reason of the foregoing, Mancinelli, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### In the Alternative, Mancinelli Aided and Abetted His Customers' Violations of Sections 10(b) Exchange Act and Rule 10b-5

78. The Commission repeats and realleges paragraphs 1 through 77 above.

79. Mancinelli's customers, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances

under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

80. As part of and in furtherance of the violative conduct, Mancinelli's customer Hedge Fund A regularly placed trades in mutual funds after the 4:00 p.m. ET market close, and understood that those trades would receive that day's NAV instead of the following day's NAV. Additionally, Mancinelli's market timing customers utilized deceptive practices to conceal their identities from mutual funds to enable them to market time mutual funds that had previously identified these customers as market timers and prohibited them from further trading.

81. Mancinelli knew that Hedge Fund A was regularly placing trades after 4:00 pm ET market close and receiving that day's NAV. Mancinelli also knew that his market timing customers were concealing their identities from mutual funds.

82. Mancinelli substantially assisted the fraudulent conduct described above. For example, Mancinelli or others acting at his direction accepted and executed Hedge Fund A's late trades. Mancinelli and others acting at his direction also opened multiple accounts for customers, including accounts with alternate RR numbers, to help these customers conceal their identities from mutual funds.

83. Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, Mancinelli, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 15(c) of the Exchange Act and Rule 10b-3**

84. The Commission repeats and realleges paragraphs 1 through 83 above.

85. Wall Street Access, directly or indirectly, singly or in concert, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, by means of a manipulative, deceptive, or other fraudulent device or contrivance as prohibited by Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

86. Wall Street Access used or employed acts, practices, or courses of business that were a manipulative, deceptive, or other fraudulent device or contrivance in connection with the purchase or sale of any security otherwise than on a national securities exchange as prohibited by Rule 10b-3.

87. Mancinelli engaged in a fraudulent scheme with Wall Street Access to help Hedge Fund A place trades in mutual funds after the 4:00 p.m. ET market close, but nonetheless receive same-day NAV pricing. Mancinelli and Wall Street Access also helped customers engage in deceptive market timing.

88. Mancinelli knowingly provided substantial assistance to Wall Street Access. For instance, Mancinelli and others acting at his direction accepted and executed Hedge Fund A's late trades. Mancinelli also utilized deceptive practices to deceive mutual funds about his customers' trading. Mancinelli opened multiple accounts, often with alternate RR numbers, for his market timing customers.

89. Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, Mancinelli, directly or indirectly, aided and abetted and unless enjoined will

again violate Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(a) and Rule 10b-3, 17 C.F.R. § 240.10b-3.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Mancinelli, his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### II.

Permanently enjoining Mancinelli, his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, or as an aider or abettor, Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c), and Rule 10b-3, 17 C.F.R. § 240.10b-3.

### III.

Ordering Mancinelli to disgorge the ill-gotten gains he received as a result of his violations of the federal securities laws and to pay prejudgment interest thereon.

### IV.

Ordering Mancinelli to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, NY
       October 2, 2006

                                        /s/ Mark K. Schonfeld
                                        _____
                                        Mark K. Schonfeld (MS-2798)

                                        Attorney for the Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Northeast Regional Office
                                        3 World Financial Center
                                        New York, New York 10279
                                        (212) 336-0077 (Gizzi)

Of Counsel:

Helene Glotzer
Kay L. Lackey
Paul G. Gizzi
Shannon A. Keyes