**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────

**SECURITIES AND EXCHANGE COMMISSION**

                    **Plaintiff,**             **07 Civ. 6072 (JGK)**

     **- against -**               <u>**OPINION AND ORDER**</u>

**SIMPSON CAPITAL MANAGEMENT, INC.,**
**ROBERT A. SIMPSON AND JOHN C.**
**DOWLING,**

                    **Defendants.**
────────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     This is a motion to dismiss a complaint brought by the Securities and Exchange Commission ("the SEC") alleging that the defendants Simpson Capital Management, Inc. ("Simpson Capital"), Robert A. Simpson and John C. Dowling violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Complaint alleges that the defendants conducted a fraudulent scheme by using five separate broker-dealers to place more than 10,700 late trades in over 375 mutual funds. As defined in the Complaint, late trading is the practice of placing orders to buy, redeem, or exchange mutual fund shares after the 4:00 p.m. Eastern Time ("ET") market close while still receiving the current day's mutual fund price, or net asset value ("NAV"). Late trading allegedly harms shareholders in mutual

funds by diluting the value of their shares.  (Compl. ¶ 20.) The defendants maintain that the Complaint does not allege any actual fraud and oversteps the SEC's legal enforcement authority, and now bring this motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the Complaint are accepted as true.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  Twombly v. Bell Atl. Corp., 127 S. Ct. 1955, 1974 (2007); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).

While the Court should construe the factual allegations
in the light most favorable to the plaintiff, the Court is not
required to accept legal conclusions asserted in the
Complaint.  See Port Dock & Stone Corp. v. Oldcastle
Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007); Smith v.
Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir.
2002).


                              II.

The following facts as alleged in the Complaint are
accepted as true for the purposes of this motion to dismiss.
The defendant Simpson Capital is the investment adviser to a
hedge fund complex consisting of a master fund, Simpson Master
Investments, Ltd., which makes investments on behalf of two
hedge funds, Simpson Partners, L.P. and Simpson Offshore, Ltd.
(Compl. ¶ 2.)  Defendant Simpson is the founder, owner,
president, and Chief Investment Officer of Simpson Capital and
was primarily responsible for all investment decisions at
Simpson Capital.  (Compl. ¶¶ 12, 24.)  Defendant Dowling is
the head trader of Simpson Capital and was responsible for
executing trades for Simpson Capital.  (Compl. ¶¶ 13, 24.)

The Complaint alleges that between May 2000 and September
2003, the defendants Simpson and Dowling, through Simpson
Capital, engaged in a scheme to place thousands of trades

                               3

after 4:00 p.m. ET and improperly receive that day's NAV, either with the intent to deceive the mutual funds and the fund shareholders, or in reckless disregard that mutual fund shareholders were being defrauded. (Compl. ¶¶ 1, 35-36.) The late trader allegedly obtains an advantage, at the expense of other shareholders of the mutual fund, when he learns of market moving information and is able to purchase (or redeem) mutual fund shares at prices set before the market moving information was released. (Compl. ¶ 1.)

The Complaint specifically alleges that Simpson and Dowling knew or were reckless in not knowing that late trading was illegal. Nevertheless, they sought out broker-dealers that would allow them to place trades after 4:00 p.m., and devised a method that would falsely represent to mutual funds that the trades had been received prior to 4:00 p.m. in order to receive that day's NAV. (Compl. ¶ 36.)

Because mutual funds consist of a large basket of underlying equity holdings, their value (or NAV) fluctuates as the value of the underlying shares change. The prices of mutual funds shares are not continually reset over the course of the day, but are typically fixed for an entire day at a single price. Mutual funds, including the funds in which Simpson Capital traded, generally determine the NAV of mutual fund shares at the close of the major United States securities

4

exchanges and markets -- 4:00 p.m. ET.  (Compl. ¶¶ 17, 19.)
Rule 22c-1(a), 17 C.F.R. § 270.22c-1, adopted pursuant to
Section 22(c) of the Investment Company Act of 1940, 15 U.S.C.
§ 88a-22(c), requires any registered investment company
issuing redeemable securities, its principal underwriter, any
dealers in its shares, and any person designated in the fund's
prospectus as authorized to consummate transactions in
securities issued by the fund to sell and redeem fund shares
at a price based on the current NAV next computed after
receipt of an order to buy or redeem.  The mutual funds in
which the Simpson Funds traded were registered investment
companies subject to Rule 22c-1(a).  (Compl. ¶ 22.)

     The Complaint alleges that the five brokers described in
the Complaint with whom the defendants dealt entered into
dealer arrangements with distributors or principal
underwriters of various mutual fund families of funds.  These
agreements allowed the brokers to serve as dealers for the
mutual fund families of funds.  The brokers also entered into
clearing agreements with clearing brokers.  The dealer
agreements that the brokers and the clearing brokers entered
into typically required them to sell mutual funds in
accordance with the federal securities laws and the terms of
the mutual funds' prospectuses.  The mutual funds'
prospectuses for the funds that the defendants traded

generally stated that the publicly available price for the shares was calculated as of 4:00 p.m. ET or as of the close of the New York Stock Exchange (which is typically also 4:00 p.m. ET). Thus, the Complaint alleges, the brokers were required to receive orders to purchase, redeem, or exchange shares of a fund no later than 4:00 p.m. ET to be executed at that day's NAV. (Compl. ¶¶ 37-40.)

The Complaint alleges that the scheme involved five brokers who time stamped customer order sheets before 4:00 p.m., but who did not actually execute the trades until Simpson and Dowling or a representative called after 4:00 p.m. to confirm which of the orders to execute. The trades were executed after the brokers received the call. (Compl. ¶¶ 35-74.)

The Complaint alleges that the defendants received approximately $57 million for the Simpson Funds as a result of late trading, representing approximately 70 percent of the Simpson Funds' total gains on investments of $81.5 million over that time period. (Compl. ¶¶ 4, 75.) Additionally, Simpson personally earned at least $19 million in fees and profits, and Dowling earned more than $996,000 in salary and bonuses. (Compl. ¶ 78.)

### III.

The Complaint asserts a single claim of securities fraud, based on a violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. § 78j(b).  Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Although the Complaint merely repeats the language of 10b-5(a), (b), and (c), the SEC urges in its papers that the alleged violation is premised on a course of deceptive conduct undertaken by the defendants, violative of sections (a) and

(c).  To state a claim under sections (a) and (c) of Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of a security, "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." In re Global Crossing, Ltd., Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (citing SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)); see also In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005); cf. In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005) (stating that plaintiff must allege that defendant "(1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.") (emphasis in original).  At the very least, the plaintiff must allege conduct that is "manipulative or deceptive."  In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig., No. 06 Civ. 643, 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 13, 2007).  Unlike private litigants, the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud.  See SEC v. KPMG LLP, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2005) (citing SEC v. North Am.

Research & Dev. Corp., 424 F.2d 63, 84 (2d Cir. 1970) (other citations omitted).

A claim under Section 10(b) sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b), see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

The SEC argues that the defendants "conducted a fraudulent scheme involving unlawful 'late trading' in shares of mutual funds."  (Compl. ¶ 1.)  The SEC contends that the late trading violated Rule 22c-1(a) because the trades were placed after 4:00 p.m. ET, but were recorded and treated as though they were placed before 4:00 p.m. ET.  The SEC therefore alleges that the scheme which was instigated and conducted by the defendants violated Section 10(b) and Rule 10b-5(a) and (c).

The defendants contend initially that the Complaint does not allege a violation of Rule 22c-1(a).  The SEC responds that the defendants are wrong in their interpretation of Rule 22c-1(a), and in any event, the gist of the Complaint is not that the defendants violated Rule 22c-1(a).  Indeed, the SEC

concedes that the defendants are not in the class of persons subject to Rule 22c-1(a).  Rather, Rule 22c-1(a) is the reason that mutual fund transactions made before 4:00 p.m. ET are valued as of that time, and the SEC alleges that the defendants are accused of conducting a deceptive scheme to make the trades appear to have been conducted earlier than 4:00 p.m. when they were in fact transacted at a later time. Second, the defendants contend that the Complaint does not allege that they engaged in any deceptive conduct.  The SEC responds that the Complaint sufficiently alleges that the defendants devised, sought out, and implemented a scheme to defraud mutual funds into believing that the defendants had placed their trades before 4:00 p.m. ET in order to receive the same day's NAV, when in fact they had not, and that this is sufficient to allege a violation of Section 10(b) and Rule 10b-5(a) and (c).

Each of these issues will be considered in turn.


**A.**

Rule 22c-1(a), which governs the price setting process for mutual fund shares, provides:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or

> repurchase any such security except at a price based on
> the current net asset value of such security which is
> next computed after receipt of a tender of such security
> for redemption or of an order to purchase or sell such
> security.

17 C.F.R. § 270.22c-1(a).  The rule is commonly referred to as

the "forward pricing rule" because the price assigned to

mutual fund shares is not assigned until after the time an

order is placed by an investor.  The rule creates a

requirement that the price of mutual fund shares be set at the

NAV "next computed" by the mutual fund company after the

receipt of the order to buy or sell the shares in question.

The defendants argue that the rule leaves the matter of

calculating the time or times at which the NAV calculation is

to be performed to the discretion of individual mutual fund

companies.  The defendants argue that the time for setting the

NAV is not as the SEC argues, the time "as of" which the NAV

is calculated, generally 4:00 p.m. ET, but the actual time

when the calculation is made.  Hence, if a transaction comes

in at 4:30 p.m., and the calculation is only made at 5:30

p.m., the defendants argue that the transaction should be

completed at the price calculated at 5:30 p.m.  (See Def. Mem.

5-6.)

    The interpretation that the defendants urge of Rule 22c-

1(a) is not persuasive.  Rule 22c-1(b)(1) states that the

"current net asset value of any such security shall be

11

computed no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets . . . ."  17 C.F.R. § 270.22c-1(b)(1).  Additionally, Section 22 of the Investment Company Act requires both investment companies, like mutual funds, and dealers to sell mutual fund shares "at a current public offering price described in the prospectus." See 15 U.S.C. § 80a-22(d).  Generally, the time of day that mutual funds disclose in their prospectuses and on which they base their NAVs is the close of the U.S. markets, generally at 4:00 p.m. ET.  (Compl. ¶¶ 19, 40.)

The SEC's Interpretive Release published in December 1968 made clear that for an order to be filled at a price based on the "current net asset value," the dealer must receive the order before the specified "as of" time.  See Staff Interpretative Positions Relating to Rule 22c-1, Investment Company Act Release No. 5569 ("Interpretive Release"), 1968 SEC LEXIS 979 (Dec. 27, 1968) (App. Ex. C.).  The Interpretive Release is entitled to deference by this Court because it is consistent with the Commission's stated purpose in adopting the Rule and with Congress's express intent to protect investors.  See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 560 (1980); see also Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir. 2000) (deferring to the SEC's

interpretation of Rule 10b-10); Levy v. Southbrook Int'l
Invs., Ltd., 263 F.3d 10, 16 (2d Cir. 2001) (deferring to the
SEC's interpretations of Rules 13d-3(a) and 13d-3(d)(1)(i)).

The Interpretive Release provides hypothetical examples
to illustrate the application of Rule 22c-1 and to make it
clear that a customer order should be priced at the next time
used by the mutual fund to compute the NAV.  The Interpretive
Release then explains:  "As used in the Rule, the word
'computed' does require a pricing of each portfolio security
not less frequently than once daily as of the time of the
close of trading on the New York Stock Exchange."
Interpretive Release (emphasis added).

Other courts interpreting Rule 22c-1 have upheld the
interpretation of the Commission and its staff, reading Rule
22c-1 to prohibit mutual fund investors from trading a fund's
shares after the "as of" time while still receiving that day's
price.  See SEC v. JB Oxford Holdings, Inc., No. 04 Civ. 7084
(C.D. Cal. filed Aug. 24, 2005) (deferring to the SEC's
interpretation of Rule 22c-1, setting the relevant "as of"
time as the time that a mutual fund values its holdings for
purposes of pricing mutual fund transactions rather than the
time that a fund actually performs the NAV calculation) (App.
Ex. D); In the Matter of Paul A. Flynn, Initial Decision
Release No. 316, 2006 SEC LEXIS 1766, at *74-75 (Aug. 2, 2006)

(Initial Decision) and Securities Act Rel. No. 8737 (Aug. 31. 2006) (Notice that Initial Decision has become final) (concluding that the "NAV that is next computed" means the time as of which the mutual fund sets for its calculation in order to be consistent with Rule 22c-1's language and purpose and finding that, although Rule 22c-1 does not apply to the hedge funds that traded, the hedge fund's late trading "was a scheme, practice, or course of business intended to defraud mutual funds and their shareholders").

The defendants' interpretation of Rule 22c-1 would allow dealers to provide their customers with the same day's NAV on mutual fund trades submitted until the actual point of NAV calculation, and would allow an end run around Congress's and the Commission's intent to prevent dilution of share value, speculative trading, and unfair treatment of investors. Although the Rule does not apply to the defendants directly, the existence of the Rule, together with the allegations in the Complaint that mutual funds generally price their shares as of 4:00 p.m. ET, provides the background for why the defendants allegedly engaged in a scheme where they could obtain the prices that were set as of 4:00 p.m. ET, even though their transactions actually occurred at a later time.

**B.**

The defendants argue that the Complaint does not properly allege securities fraud.  At a hearing on the motion to dismiss, the parties agreed that the central issue before the Court is whether the conduct as alleged in the Complaint constitutes deceptive conduct under 10b-5(a) or (c) that is actionable under a primary liability theory.  (See Hr'g Tr. 2, 15, July 8, 2008.)

While the SEC asserts that the Complaint plainly alleges that the mutual funds were deceived by the defendants, the defendants charge that at most the Complaint alleges that the mutual funds only had a belief about what the brokers who placed the trades were doing, particularly whether the brokers were abiding by Rule 22c-1.

This case touches upon two developing areas of law in this Circuit in the securities fraud context:  what constitutes "deceptive conduct" under Rule 10b-5(a) and (c), and what qualifies as a primary liability violation under Section 10(b) and Rule 10b-5(a) and (c).  The Court will address each of the issues in turn.

**1.**

The Court of Appeals for the Second Circuit has recently had occasion to address the scope of liability for "deceptive

conduct" within the meaning of Rule 10b-5(a) and (c).  In the
so-called "specialist" cases, the Court of Appeals was
presented with the question of whether "interpositioning," the
practice of a specialist declining to match public buy and
sell orders and interposing itself between the matching orders
in order to generate profits for the principal account
constitutes "deceptive conduct."  See United States v.
Finnerty, 533 F.3d 143, 145 (2d Cir. 2008).  In Finnerty, the
Court of Appeals held that interpositioning did not amount to
"deceptive conduct" within the meaning of securities fraud
liability.  Id. at 148-49.  The Court of Appeals found:
"'Conduct itself can be deceptive,' and so liability under §
10(b) or Rule 10b-5 does not require 'a specific oral or
written statement.'  Stoneridge Inv. Partners, LLC v.
Scientific-Atlanta, 128 S. Ct. 761, 769 (2008).  Broad as the
concept of 'deception' may be, it irreducibly entails some act
that gives the victim a false impression."  Id. at 148.  The
Court noted, however, that it "need not decide whether some
form of communication by the defendant is always required to
prove deception (although that is the template of virtually
every case)[,]" because rather than demonstrating that
Finnerty had communicated anything false to his customers, the
government "undertook to prove no more than garden variety
conversion."  Id. at 148-49.

Put another way, all that Finnerty did was to execute trades at disclosed terms.  While he could have matched buy and sell orders, he interpositioned himself and bought and sold for the specialist account but did not deceive either the buyer or the seller with respect to the terms of their trades. Each side of the trade knew what it got -- the shares purchased or sold and at what price.  They did not know that the specialist usually made a small profit by interpositioning the specialist as the middle person in each of the trades. The Government attempted to assert that customers had an "expectation" that Finnerty would follow the rules of the New York Stock Exchange and match orders to buy and sell and thereby provide the best terms to those customers.  However, the Court of Appeals rejected that theory because unless the customers' understanding "was based on a statement or conduct by Finnerty, he did not commit a primary violation of § 10(b)- the only offense with which he was charged." Id. at 150.

In contrast to Finnerty, here the acts that gave a false impression are plain.  The Complaint alleges that the defendants deceived the mutual funds into providing an improper price for each of the 10,700 trades they effected after 4:00 p.m. ET.  According to the Complaint, Simpson and Dowling monitored the futures markets and used news and other information disseminated after the market close to make their

trading decisions.  (See Compl. ¶¶ 3, 28, 71.)  The defendants
allegedly submitted proposed trades on "scenario sheets"
before 4:00 p.m., so that they could be time-stamped when
received before 4:00 p.m., but they only authorized the
brokers to submit the trades after the brokers received a
subsequent call after 4:00 p.m.  (Compl. ¶¶ 41-74.)  The
scenario sheets enabled Simpson and Dowling to call and
authorize trades as late in the day as possible and provided
the defendants with evidence that the trades were placed
before 4:00 p.m.  (Compl. ¶¶ 32, 52, 66, 72.)  As a result of
the ability to conduct late trades, the defendants allegedly
realized approximately $57 million from the mutual funds and
their shareholders.  (Compl. ¶¶ 4, 75.)

     Thus, the "false impression" communicated by the
defendants' acts was that the trades were submitted before 4
p.m., when they actually were submitted with the benefit of
market moving information after 4 p.m.  The mutual funds were
misled into thinking that the trades were made before 4 p.m.

     Other courts have found a claim for securities fraud on
the same or similar alleged facts.  See In re Mutual Funds
Inv. Litig., 384 F. Supp. 2d 845, 856-58 (D. Md. 2005)
(denying a motion a dismiss Section 10(b) claims against hedge
funds for late trading in mutual fund shareholder class action
finding that defendants were the "architects" of the late

trading scheme, and commenting that "[l]ate trading is itself illegal, and therefore, as alleged by plaintiffs, a scheme, practice, or course of business effectuating late trading is inherently fraudulent") (footnotes omitted); SEC v. JB Oxford Holdings, Inc., 2004 U.S. Dist. LEXIS 29494, at *15, 16 (C.D. Cal. Nov. 9, 2004) (App. Ex. E).

## 2.

The defendants argue that any liability should be solely that of the brokers who allegedly violated Rule 22c-1 and deceived the mutual funds.  The defendants argue that they are not "primary violators" of Section 10(b) and Rule 10b-5(a) and (c), and that the SEC has not accused them of aiding and abetting liability.  The SEC argues that the defendants should be held liable as primary violators of Section 10(b) and Rule 10b-5 because they were "architects" or "conductors" of a fraudulent scheme.  The SEC alleges that the defendants devised, sought out, and implemented the scheme to deceive and that this is sufficient for primary liability for the defendants.  The defendants argue that, at best, the allegations in the Complaint support an inference that the defendants had knowledge of the regulatory violations of others, obtained an economic advantage from those violations, and did nothing to reveal or prevent those violations.

In <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), the Supreme Court held that Section 10(b) did not provide a private cause of action for aiding and abetting a primary violation of that section. The Court stated:

> Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

<u>Id.</u> at 191.

Congress responded to <u>Central Bank of Denver</u> in the Private Securities Litigation Reform Act of 1995 ("PSLRA") by providing that the SEC could bring aiding and abetting claims. <u>See</u> 15 U.S.C. 78t(e).  That section provides that in a suit brought by the SEC under the Exchange Act, as amended, "any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  <u>See</u> <u>U.S. Envtl., Inc.</u>, 155 F.3d at 113 (discussing the SEC's authority

to bring aiding and abetting claims).  In this case, however, the SEC has not asserted an aiding and abetting claim against the defendants but contends that they are primary violators of Section 10(b) and Rule 10b-5.[1]

The Court of Appeals has not definitively described the bounds of primary liability, as opposed to aiding and abetting liability, particularly in an action brought by the SEC, and particularly when the action involves a claimed violation of Rule 10b-5(a) or (c), rather than Rule 10b-5(b).[2]  In SEC v. First Jersey Securities, Inc., the Court of Appeals stated that "[p]rimary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" 101 F.3d 1450, 1471 (2d Cir. 1996) (quoting Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994)).

The case on which the Court of Appeals relied for that proposition, Azrielli, was decided about two weeks before the decision in Central Bank of Denver was issued, and it is difficult to see how the standard of "knowledge and assistance" differs from "aiding and abetting liability."  See

---

[1] It is unclear why the SEC did not allege, at least in the alternative, that the defendants provided substantial assistance to the brokers who allegedly engaged in the late trading.

[2] Cases that have attempted to define the proper limits of primary liability in light of the decisions of the Court of Appeals include KPMG, 412 F. Supp. 2d at 371-75; In re Parmalat Sec. Litig., 376 F. Supp. 2d at 499-503; and Mishkin v. Ageloff, No. 97 Civ. 2690, 1998 WL 651065 (S.D.N.Y. Sept. 23, 1998).

In re Parmalat Sec. Litig., 376 F. Supp. 2d at 500; Mishkin, 1998 WL 651065, at *13-15.  The Court of Appeals nevertheless used this standard to affirm the primary liability of Robert Brennan, the president, chief executive, and sole owner of First Jersey Securities.[3]  The Court of Appeals found that Brennan was also liable on an independent basis as a "control person" under 15 U.S.C. § 78t.  See First Jersey Sec., 101 F.3d at 1472.

The authority of First Jersey Securities was somewhat undercut by the Court of Appeals' subsequent decision in Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998).  In that case, an investor brought a private action against an accounting firm for allegedly making false representations in violation of Section 10(b) and Rule 10b-5.  The Court of Appeals found that the complaint was correctly dismissed because the accounting firm neither directly nor indirectly

---

[3] While First Jersey Securities has been read as a case involving Rule 10b-5(b), the case could also reasonably be read as involving both sections (a) and (b).  In noting that the facts of First Jersey Securities might be better understood as an example of a violation of sections (a) and (c), Judge Kaplan observed that "those subsections were not as salient [in 1996] as they are now, and nowhere in the decision did the Second Circuit specify which subsections were at issue."  In re Parmalat Sec. Litig., 376 F. Supp. 2d at 500.  Although First Jersey Securities discusses the defendant's violations as failures to disclose material facts, which fall under section (b), it also recognizes that the district court found his conduct to violate Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), a parallel provision to Rule 10b-5(a) which also uses the language "to employ any device, scheme, or artifice to defraud . . . ." 101 F.3d at 1467; see also SEC v. First Jersey Sec., Inc., 890 F. Supp. 1185, 1209 (S.D.N.Y. 1995) (finding that the SEC had proved that the defendants violated Section 17(a) with scienter, where the scienter requirement applies only to Section 17(a)(1) and not to Section 17(a)(2) and (3)).

communicated misrepresentations to investors.  Id. at 175.

Without acknowledging that First Jersey Securities affirmed

the liability of Brennan under both a theory of primary

liability as well as a theory of control person liability, the

Court of Appeals appeared to limit that case to a situation

involving control person liability:

> In First Jersey, we affirmed the imposition of primary
> liability under § 10(b) on Robert Brennan, the president,
> chief executive and sole owner of First Jersey
> Securities, Inc.  Brennan had directed his employees to
> make false and misleading statements to customers.  We
> held Brennan liable for securities fraud in his capacity
> as a "controlling person," that is, for fraud planned and
> directed by upper level management . . . .  Here, we
> confront alleged fraud by accountants – secondary actors
> who may no longer be held primarily liable under § 10(b)
> for mere knowledge and assistance in the fraud.

Id. at 176.

More recently, in U.S. Environmental, 155 F.3d 107, the

Court of Appeals returned to First Jersey Securities and gave

it a more sympathetic and expansive reading.  In U.S.

Environmental, the defendant was accused by the SEC of

following a stock promoter's direction to execute stock trades

that he knew, or was reckless in not knowing, were

manipulative, and thus in violation of Section 10(b) and Rule

10b-5(a) and (c).  The Court found:

> It is plain to us that the complaint alleged [the
> defendant] to be a primary violator.  [The defendant]
> 'participated in the fraudulent scheme,' First Jersey
> Sec., 101 F.3d at 1471, i.e., the manipulation of USE's
> stock, by effecting the very buy and sell orders that

> artificially manipulated USE's stock price upward.
> Indeed, if the trader who executes manipulative buy and
> sell orders is not a primary violator, it is difficult to
> imagine who would remain liable after Central Bank.

Id. at 112.

U.S. Environmental is especially relevant because it was

a case in which the SEC was the plaintiff and which concerned

an alleged violation of Rule 10b-5(a) and (c), although the

conduct in that case was stock manipulation rather than the

deceptive conduct alleged here.  It is also significant that

the Court of Appeals endorsed a "participation" standard from

First Jersey Securities, although it did not provide any

bounds to that test because the defendant actually executed

the trades that were alleged to be manipulative.  Put another

way, U.S. Environmental leaves unclear what level of

"participation" is sufficient to establish primary liability.

See In re Parmalat Sec. Litig., 376 F. Supp. 2d at 501 ("Nor

is it clear what would make someone a 'participant' in a Rule

10b-5(a) or (c) scheme."); see also SEC v. Enterprises

Solutions, Inc., 142 F. Supp. 2d 561, 575 (S.D.N.Y. 2001)

(finding a defendant liable for having "participated in the

fraudulent scheme" even though the defendant did not

personally make the misleading statements).

The language of Rule 10b-5(a) and (c) is broader than

that of Rule 10b-5(b) and supports a participation standard,

at least in actions brought by the SEC.[4]  The dictionary defines "employ" as "to make use of," Webster's Third New International Dictionary 743 (1961), and "engage" as "to employ or involve oneself . . . to take part," and it lists "participate" as a synonymous cross-reference for "engage," id. at 751.  These definitions encompass participation, whereas the requirement under Rule 10b-5(b) of making an untrue statement or an omission does not.

Rule 10b-5(a) and (c) require that the SEC prove that the defendant "directly or indirectly" (a) "employ[ed] any device, scheme, or artifice to defraud," or (c) "engage[ed] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."  Hence, the text of the rule requires the SEC to allege and ultimately prove that the defendant at issue directly or indirectly used or employed a deceptive device or engaged in an act or practice that operated or would act as a fraud.  See also In re Parmalat Sec. Litig., 376 F. Supp. 2d at 502-03; Mishkin, 1998 WL 651065 at *17.  Neither Rule 10b-5(a) or (c) requires

---

[4] In a private civil action, the Supreme Court recently held that the defendants could not be held liable under Section 10(b) and Rule 10b-5 for deceptive statements or acts where the investor plaintiffs had not relied on the acts or statements of the defendants.  See Stoneridge Investment Partners, LLC, 128 S. Ct. at 770.  However, the SEC is not required to prove reliance as an element of its claim against the defendants for a violation of § 10(b) and Rule 10b-5.

that the defendant personally make a material

misrepresentation or omission.

The issue then becomes whether the SEC has sufficiently

alleged that the defendants employed a deceptive device or

engaged in a fraudulent practice.  The Complaint alleges that

the defendants Simpson and Dowling, much like Brennan in First

Jersey Securities, orchestrated the fraudulent scheme.

According to the Complaint, Simpson was responsible for all

investment decisions, and Dowling was responsible for

executing all trades.  The Complaint alleges that Simpson and

Dowling carefully identified individuals at five broker-

dealers who agreed to participate in the late trading scheme.

The Complaint also alleges that Simpson and Dowling submitted

proposed trades to the broker-dealers on "scenario sheets"

before 4:00 p.m. that allowed the defendants the opportunity

to authorize those trades late in the day and incorporate

after-market information into their decisions.

The SEC is correct that the Complaint alleges that the

defendants devised the scheme to defraud and that they

proceeded to deal only with brokers who agreed to continue to

join with them in the scheme to defraud the mutual funds.  The

defendants dealt only with brokers who agreed to place the

late trades as though they had been placed before 4:00 p.m.,

and ceased to do business with brokers when the brokers would

not continue to treat such trades in a deceptive way.    (Compl.

¶¶ 55-58, 74.)    The Complaint provides further details of how

the defendants orchestrated late trading schemes with each of

the five brokers.

These allegations are sufficient to allege with

particularity the primary liability of the defendants.    The

SEC has specifically alleged how the defendants employed a

deceptive device and engaged in a deceptive course of conduct

to defraud the mutual funds.    The Court concludes that the SEC

has made sufficient allegations of the defendants' personal

involvement to satisfy Rule 9(b) and to survive the motion to

dismiss.


CONCLUSION

For the reasons explained above, the defendants' motion

to dismiss the complaint (Docket No. 11) is **denied**.


SO ORDERED.

Dated:    New York, New York
          September 3, 2008

                                    _____
                                          John G. Koeltl
                                    United States District Judge


27